**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| *Plaintiff*, | ) **)** Civil Action No. 1:26-cv-01658-RJL |
| | ) |
| v. | ) |
| | **)** |
| | ) |
| **HAMILTON P. FOX III, *et al.*,** | **)** |
| *Defendants*. | ) |
| | ) |

**BRIEF FOR *AMICI CURIAE***

**FORMER PRESIDENTS OF THE DISTRICT OF COLUMBIA BAR.**
**OTHER BAR LEADERS, BAR ORGANIZATIONS IN THE DISTRICT OF COLUMBIA,**
**AND FORMER OFFICIALS OF THE DISTRICT OF COLUMBIA ATTORNEY DISCIPLINARY SYSTEM**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Andrea Ferster
Law Offices of Andrea C. Ferster
(DC Bar #384648)
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: Andreaferster@gmail.com

Philip Allen Lacovara
(DC Bar #194472)
9101 Southmont Cove
Fort Myers, FL 33908
Phone: 917-412-9766
Email: placovara@gmail.com

Jonathan J. Rusch
(DC Bar #350603)
4600 Connecticut Avenue, N.W.
Washington, DC 20008
Phone: 202-494-8684
Email: jrusch@american.edu

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

All of the following organizations that are signatories to this *amicus* brief are non-stock, nonprofit corporations with no parent company.  No person or entity owns them or any part of them:

Bar Association of the District of Columbia
Hispanic Bar Association of the District of Columbia
Metropolitan Washington Employment Lawyers Association
National Bar Association
Trial Lawyers Association of Metropolitan Washington, D.C.
Washington Council of Lawyers
Women's Bar Association of the District of Columbia

## TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**……………………………….…… ……...-i-

**TABLE OF CONTENTS** …………………………………………………… …….-ii-

**TABLE OF AUTHORITIES**…………………………………………… ……….-v-

**STATEMENT OF IDENTITY, INDEPENDENCE, AND AUTHORIZATION** ……………………………………………………………1

**INTRODUCTION**………………………………………………………………....2

**ARGUMENT** ……………………………………………………………….3

A. **Enforcement of Professional Ethics Is Profoundly Important**…………………..…..3

B. **The DOJ's Legal Theories Are Unsound and Disruptive to the System of Professional Discipline.** ………………………………………………………………...…6

C.

    1. *Separation of Powers*: **Regulation of Lawyer Conduct Is a Judicial Function**……7

    2. *Supremacy Clause*: **State and District of Columbia Judicial Systems Are Authorized to Monitor Professional Conduct of Federal Lawyers** …………………10

        a. *Federal Supremacy Does Not Displace State Regulation of Lawyer Conduct*…………………………………………………………………10

        b. *Congress Expressly Confirmed That DOJ Lawyers Are Subject to State Disciplinary Regulation.* …………………………………………...………………12

    3. *Derivative Immunity*: **Unique Presidential Immunity Does Not Excuse Unethical Conduct By DOJ Lawyers**……………………………………………………15

    4. *Disparate Treatment*: **Courts May Be Trusted to Enforce Professional Standards Fairly**……………………………………….……………………………… …...16

…

        a. *The Courts Can Assure Fair and Consistent Application of Professional Standards*…………………………………………………………… ….…17

**CONCLUSION**……………………………………………………………..…....21

..

**CERTIFICATE OF COMPLIANCE** …………………………………………………22

**APPENDIX – LIST OF AMICI**……………………………………….-…………..A-1

T<small>ABLE OF</small> A<small>UTHORITIES</small>

**U.S. Constitution**

Article I…………………………………………………………………….3,11, 12, 13
Article II………………………………………………………………………...10
Amendment 1…………………………………………………………………..11

**Statutes**

D.C. Code § 11-102 ..................................................................................................... 3
First Judiciary Act of 1789
McDade-Murtha Amendment
  28 U.S.C. § 530B ............................................................................................... 12, 13
Administrative Procedures Act,
  5 U.S.C. § 706 ....................................................................................................... 1
28 U.S.C. § 1257(b). ................................................................................................. 13
28 U.S.C. § 516........................................................................................................ 17
28 U.S.C. §§ 501 *et seq.* 2........................................................................................ 12

**Rules and Regulations**

28 C.F.R. Part 77…………………………………………………………………...13
DC Bar Rules of Professional Conduct ……………………………………..……3,4
    Rules 8.4……………………………………………………………………….2
    Rule 6.1…………………………………………………………………...2, 4
Rules Governing the District of Columbia Bar …………………………………..4, 5
ABA Model Rules of Professional Responsibility …………………………………..3
Federal Register/Vol. 91, No. 43, AT 10780 (March 5, 2026) …………………...…..15

**Legislative Materials**

Majority Staff Report, U.S. S<small>ENATE</small> C<small>OMMITTEE ON THE</small> J<small>UDICIARY</small>, S<small>UBVERTING</small> J<small>USTICE</small>
    (October 7, 2021) ……………………………………………………..…5
The Federalist Papers
    Federalist 33 ……………………………………………………………………10
Congressional Research Service, "McDade-Murtha Amendment: Legislation in the 107th
Congress Concerning Ethical Standards for Justice Department Litigators,"
    December 18, 2001……………………………………………….…14

**Government websites:**

https://www.justice.gov/jmd/ls/establishment-department-justice-pl-41-97…………...................12

https://www.justice.gov/doj/organization-mission-and-functions-manual …………...................17

https://www.justice.gov/history/doj-seal-history-and-motto?shem=rimspwouoe ………………18

https://www.presidency.ucsb.edu/documents/executive-order-6692-establishing-more-appropriate-seal-for-the-department-justice ...................................................................................19

https://oig.justice.gov/tmpc/challenge-3  ...............................................................................20

**Other Websites**

*Report and Recommendation of the Board on Professional Responsibility*, *In the Matter of Jeffrey B. Clark* (Disciplinary Docket No. 2021-D193) chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.dcbar.org/ServeFile/GetDisciplinary ActionFile?fileName=JeffreyBClark22BD039.pdf ……………………………………………3

https://www.scotusblog.com/2019/08/response-of-michael-dreeben-to-tributes-upon-his-leaving-the-office-of-the-solicitor-general/#more-288545 …………………………………………19

chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://harvardlawreview.org/wp-content/uploads/2026/03/139-Harv.-L.-Rev.-F.-173.pdf …………………………..…………19

https://www.roberthjackson.org/speech-and-writing/the-federal-prosecutor/ …………..…………19

**Miscellaneous**

Mark Lipnickey, "The English Roots of American Legal Regulation: An Examination of Early Legal Regulation in Virginia, Massachusetts, and New York,"
        *Georgetown Journal of Legal Ethics Vol*. 34:1131  (Fall 2021)…………………………7

Christer Berg, Yasmi Abusaif, and Joe Gaeta, "Justice Department Attempts to Shield Its Lawyers from Accountability for Misconduc**t,"** https://www.brennancenter.org/our-work/research-reports/justice-department-attempts-shield-its-lawyers-accountability-misconduct?shem=rimspwouoe
        Brennan Center Expert Brief, April 6 2026……………………..………………………..15

Charles Wolfram, "Toward a History of the Legalization of American Legal Ethics—I. Origins," University of Chicago Law School Roundtable, Volume 8, Issue 2 (2001) …………………….7
Laurel A. Rigertas, "Post-Watergate: The Legal Profession And Respect For The Interests Of Third Parties," Chapman Law Review, Spring 2012 ……………………………………………9

**STATEMENT OF IDENTITY, INDEPENDENCE, AND AUTHORIZATION**

*Identity*. The *Amici Curiae* ("*amici*") are (i) leaders of the legal profession in the Nation's Capital who have served as presidents,  officers or governors of The District of Columbia Bar or of various voluntary bar associations, (ii) various local bar associations in their institutional capacities, and (iii) former officials of the District of Columbia attorney disciplinary system.  Many of the *amici* have served as lawyers in the federal government, particularly in the Department of Justice. A list of *amici* is attached hereto.

We tender this brief in support of Defendants' Motion to Dismiss.

The Plaintiff challenges the authority of the disciplinary authorities in the District of Columbia (and elsewhere) to apply to lawyers in the Department of Justice ("DOJ") the standards of professional conduct that generally apply to all other lawyers licensed to practice law in their respective licensing jurisdictions.  *Amici* take no position on the details of any particular disciplinary case involving actual or proposed professional discipline, including the specific case that is the focus of the DOJ Complaint.

But *amici* share a profound concern that the DOJ's frontal attack on the application of professional standards by licensing authorities under judicial supervision threatens to erode the integrity of the courts and the legal profession in the District of Columbia and elsewhere.  The DOJ's theories are constitutionally unsound, conflict with an explicit federal statute, and would effectively sanction and, indeed, encourage unethical conduct by insulating it from  review.

*Independence*.  No counsel for a party has drafted this brief in whole or in part.  No party or other entity has made any financial contribution toward the preparation and submission of this brief.

*Authorization*.  Counsel for all parties consented to the filing of this brief.

All *amici* have authorized participation.

## INTRODUCTION

This case poses nothing less than a direct challenge to the rule of law as it applies to government lawyers. Although the Complaint focuses on a single pending disciplinary proceeding against a single former official of the DOJ, Jeffrey Clark, the arguments made in seeking to enjoin that ongoing proceeding pose an unmistakable threat to the ability of State and District of Columbia judicial systems to hold DOJ lawyers to the same standards that apply to all other lawyers licensed by those systems.

Because the DOJ Complaint misleadingly asserts that the defendants "are prosecuting and punishing Mr. Clark for a pre-decisional and deliberative internal draft letter that was never issued" (Complaint at 23, ¶130), it is important at the outset to summarize Mr. Clark's charged conduct accurately. The Complaint itself (¶69) links to the actual text of the disciplinary charges, which the Court may compare with the DOJ's purported characterization of the predicate for the proposed sanction.

The matter now pending before the District of Columbia Court of Appeals involves, in pertinent part, a conclusion by the Board on Professional Responsibility ("BPR") that Mr. Clark violated Rule 8.4(a) of the *District of Columbia Rules of Professional Conduct* [1] and attempted to violate Rule 8.4(c) by attempting, over a one-week period, "to use his position to promote his concerns about the integrity of the 2020 election by misrepresenting what Justice Department investigations had established, without a basis in fact for doing so," proposing "to have the DOJ lie" about that issue, and urging that he be appointed as Acting Attorney General in place of the

---

[1] For the convenience of the Court, this brief provides hyperlinks to the websites and news articles cited herein. Full citations are provided in the table of authorities.

incumbent.  *Report and Recommendation of the Board on Professional Responsibility*, *In the Matter of Jeffrey B. Clark* (Disciplinary Docket No. 2021-D193 at 3, 96, 100).  Thus, as alleged by the District of Columbia disciplinary authorities, the circumstances underpinning the proposed professional sanction appear fundamentally different from the DOJ's characterization of supposedly benign conduct.

## ARGUMENT

### A.    Enforcement of Professional Ethics Is Profoundly Important.

The system of justice in our country depends on the proper functioning of two institutions: the courts and the legal profession.

Various mechanisms exist to facilitate the sound functioning of the courts. These mechanisms include careful processes for selecting judges by appointment or election, regularized procedures for administering and deciding cases, and opportunities for appellate review.

Similarly, the legal profession – which is regulated by the courts – rests on processes for assuring that only persons with demonstrated competence and good character will be licensed to serve as lawyers, whether in private practice *or in public service*.  Once licensed to practice this profession, lawyers are required not only to maintain competence but also to abide by standards of ethical conduct that have been developed and refined over generations.  *See, e.g.*, *District of Columbia Rules of Professional Conduct*;  American Bar Association, *Model Rules of Professional Conduct*.

Congress created the District of Columbia Court of Appeals in 1970 as the highest court in the District.  *See* D.C Code §11-102.  In creating the Court, Congress was asserting its authority under Article I, Section 8, cl. 17 of the Constitution to "exercise exclusive Legislation in all Cases whatsoever" over the District.

3

The Court of Appeals in turn, "in the exercise of its inherent powers over members of the legal profession," created The District of Columbia Bar ("the DC Bar") as the entity that includes all lawyers who are licensed to practice law in the District of Columbia. *See* Rules Governing the District of Columbia Bar (as most recently amended). As part of the Rules, the Court declared: "*All* persons admitted to practice law in the District of Columbia" are "subject to the provisions of the Rules." (Emphasis added).

The Rules contain no exception for lawyers who are employed by any particular employer, including the federal government. The Court adopted and, from time to time, has amended *District of Columbia Rules of Professional Conduct* binding on all of the lawyers who are members of the DC Bar.

One of the most important articulations of the distinction between permissible and impermissible professional conduct is Rule 8.4 ("Misconduct"), which declares in unambiguous and almost self-evident terms:

> "It is professional misconduct for a lawyer to:
> (a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
> (b) Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
> "(c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;
> "(d) Engage in conduct that seriously interferes with the administration of justice * * *."

To be meaningful, these ethics standards must be enforced when there is reason to believe that unprofessional conduct has occurred and when an inquiry, after notice and an opportunity to be heard, leads to a finding that the lawyer has abused the trust conveyed by the lawyer's license to practice law.

Under the Rules promulgated and supervised by the Court, the District of Columbia has a fair and extensive process for investigating and adjudicating instances of suspected misconduct.

See Rule XI of the Rules Governing The District of Columbia Bar.    Section 8 of the Rule XI provides that "investigations" may commence "upon complaint or otherwise."  Under Section 9(h), any lawyer who objects to findings or recommendations made after a hearing is entitled to review by the Court of Appeals.

The defendants embody the three components of this disciplinary system – the Office of Disciplinary Counsel, which investigates potential misconduct; the Board on Professional Responsibility, which hears and makes recommendations on any charges flowing from any investigation; and the Court of Appeals, which reviews contested findings of misconduct and determines professional sanctions.

The supplemental brief filed by defendant Office of Disciplinary Counsel (ECF Document 24) makes clear the basis on which the attorney disciplinary process has been instituted with respect to Mr. Clark.  As they explain, the DOJ makes a misleading assertion  that the  defendants "are prosecuting and punishing Mr. Clark for a pre-decisional and deliberative internal draft letter that was never issued."  (Complaint at 23 ¶130).  Rather, the disciplinary process to date has focused on a series of alleged actions by Mr. Clark to raise false challenges to the legitimacy of the 2020 Presidential election results, his attempt to use the DOJ to advance that false narrative, and his effort to seek his own career advancement to the highest office in the DOJ by advancing that scheme. ECF Document 24, at 4, 9; *see, also*, MAJORITY STAFF REPORT, U.S. SENATE COMMITTEE ON THE JUDICIARY, SUBVERTING JUSTICE *passim* (October 7, 2021).

The District of Columbia Court of Appeals has the ultimate responsibility for evaluating Mr. Clark's conduct, and the Court is still considering issues of both culpability and sanction (if any).  Nevertheless, it is fair to say that such dishonest and fraudulent conduct, if proved, would

constitute the kinds of violations of Rule 8.4(b)-(d) for which any other member of the DC Bar would be subject to professional sanction.

The DOJ seeks to exempt one of its former employees from enforcement of these standards, and by implication to remove all DOJ lawyers from this oversight. This unprecedented initiative must fail.

### B. The DOJ's Legal Theories Are Unsound and Disruptive to the System of Professional Discipline.

As alleged in the Complaint, the DOJ, suing in the name of the United States, invokes four theories for displacing the ordinary disciplinary authorities:

- the Separation of Powers purportedly prevents lawyer-discipline systems from doing anything that might "depriv[e] the Attorney General of control over Department of Justice attorneys;"

- the Supremacy Clause allegedly prohibits authorities in the States and the District of Columbia from "interfering" with federal functions;

- the President's constitutional immunity from criminal liability under *Trump* v. *United States*, 603 U.S. 593, 609 (2024), somehow insulates lawyers in the DOJ from being held accountable for their unethical conduct; and

- lawyers from the DOJ in the current Administration (and other lawyers who have assisted Mr. Trump in various capacities) have been "targeted" for ethics complaints and treated more harshly than other lawyers.

Each of these theories collapses under analysis.

Invoking the first two theories, the DOJ argues that the Separation of Powers and the Supremacy Clause prohibit authorities in the States and the District of Columbia from "interfering" with federal functions. Both theories reflect a fundamental ignorance of the history of professional

6

regulation under the Constitution.  Instead, the preeminent role of the *judiciary* in regulating the conduct of lawyers – an allocation that Congress explicitly confirmed applies to lawyers employed by the federal government – disposes of both the Separation of Powers and Supremacy Clause theories.

    **1.  *Separation of Powers***: **Regulation of Lawyer Conduct Is a Judicial Function.**  The development of the Anglo-American legal system has rested on the premise that ethical conduct by lawyers is fundamental to the administration of justice.  That system, including enforcement of ethical standards, is administered by the *courts*.

As a comprehensive 2021 study published in the *Georgetown Journal of Legal Ethics* reported, the approach to "the legal profession in pre-revolutionary England influenced the development and regulation of the legal profession" in the American colonies:

> "Perhaps the most sweeping and notable piece of legislation addressing the regulation of attorneys was the Attorneys and Solicitors Act of 1729 * * *.  This act formalized the courts' power to regulate attorneys * * *.
> ***
> "In addition to regulating the education and admittance of new attorneys, the 1729 act reauthorized ***courts to exercise control over attorney conduct and administer discipline***." (Footnotes omitted) (emphasis added).

Before the Declaration of Independence, the American colonies had varying approaches to licensing lawyers, but they shared the British understanding that supervision of ethical practice of lawyers, once licensed, was the prerogative and responsibility of the *judiciary*.

The same point was made by a leading scholar on professional ethics, Professor Charles Wolfram, who observed:

> "Not surprisingly, ***the method of dealing with miscreant lawyers in the colonies was borrowed by colonial courts directly from England where it was already centuries old***.  English common law courts had regularly used the concept of disbarment and imposed the sanction. The colonial disbarment procedure was to continue through the 1960s with hardly any significant alteration other than the introduction of bar associations as the

complainant in the late nineteenth century and greater attention to the requirements of due process." (Emphasis added).

As such historical surveys demonstrate, the practice of regulating the ethical behavior of lawyers under the United States Constitution reflects the centuries-old tradition that, in terms of the allocation of governmental powers, it is the courts and their institutions – *not* executive branch officials – that determine whether a lawyer has transgressed professional standards.

Indeed, Section 35 of the First Judiciary Act of 1789 (1 Stat. 92) explicitly declared that it was up to the newly established federal courts to determine who would be permitted to practice before them. The Act provided that parties could appear in the federal courts with "assistance of such counsel or attorneys at law ***as by the rules of the said courts*** respectively shall be ***permitted*** to manage and conduct causes therein." (Emphasis added).

As the Supreme Court recognized unanimously 170 years ago:

> "it has been well settled by the rules and practice of common law courts that it ***rests exclusively with the court to determine*** who is qualified to become one of its officers as an attorney and counselor and ***for what cause he ought to be removed***." *Ex Parte Secombe*, 60 U.S. 9, 13 (1856) (emphasis added).

Relying on this history, the Court in 1868 declared that even Congress could not prescribe requirements or prohibitions that would be binding on courts regarding the qualification of lawyers to practice law:

> "***Attorneys and counselors*** are not officers of the United States; * * *. They ***are officers of the court***, admitted as such by its order upon evidence of their possessing sufficient legal learning and fair private character. * * * The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counselors, and are entitled to appear as such and conduct causes therein." *Ex Parte Garland*, 71 U.S. 333, 378-379 (1866) (citations omitted) (emphasis added).

The Court continued:

> "From its entry, the parties ***become officers of the court, and are responsible to it for professional misconduct***. They hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the court after

8

opportunity to be heard has been afforded. Their admission or ***their exclusion * * * is the exercise of judicial power***, and has been so held in numerous cases." *Id*.

Thus, it has been settled for centuries that, in terms of "separation of powers," the supervision of the conduct of lawyers is "the exercise of judicial power."

Eventually, the responsibility for licensing and disciplining lawyers was transferred from individual courts to court *systems*, typically under the supervision of the highest court of the State (and, as prescribed by Congress in 1970, the District of Columbia Court of Appeals). But the principle has remained the same. Supervision of the ethical conduct of lawyers *as lawyers* remains with the judicial systems of the States or the District of Columbia where the lawyers are admitted to the bar. Thus, in 1979 the Supreme Court unambiguously reaffirmed:

> "Since the founding of the Republic, the ***licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia*** within their respective jurisdictions. The States prescribe the qualifications for admission to practice and the standards of professional conduct. ***They also are responsible for the discipline of lawyers***." *Leis* v. *Flynt*, 439 U.S. 438, 442 (1979) (per curiam) (emphasis added).

In addition to broad disciplinary power invested in the court system in which a lawyer is licensed to practice law, individual courts, including federal courts, have the authority to discipline lawyers allowed to practice before them:

> "Courts have long recognized an inherent authority to suspend or disbar lawyers. * * * This inherent power derives from the lawyer's role as an officer of the court which granted admission.
> ***
> "The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of Justice." *In re Snyder*, 472 U.S. 634, 643-644 (1985).

An employer – whether a law firm, or a corporation, or a State, local, or federal government agency such as the DOJ – may decide whether or not to discipline a misbehaving lawyer as *an employee*. But the authority to make that *employment* choice does not preempt the authority of State or District of Columbia disciplinary authorities to impose *professional* discipline on such a

9

person as *a lawyer*. That judicial authority and responsibility for professional discipline applies, regardless of the identity of the lawyer's employer, including lawyers working for the DOJ.

For example, in the wake of the Watergate scandal, State and DC attorney disciplinary authorities initiated disciplinary proceedings against twenty-nine lawyers, including lawyers employed by the government; the DOJ lawyers who were sanctioned included the Attorney General, the Deputy Attorney General, and an Assistant Attorney General. None of them had the temerity to claim that their federal employment created some kind of constitutional immunity from professional accountability for their misconduct, even when it involved acting on direct orders from the President or assisting him in exercising government power.

2.    ***Supremacy Clause***: **State and District of Columbia Judicial Systems Are Authorized to Monitor Professional Conduct of Federal Lawyers.** Much of the preceding analysis dispels the DOJ's injudicious contention that, under the "Supremacy Clause," any of the District of Columbia disciplinary actions in this case "are invalid under Article II of the U.S. Constitution." That contention rests on no precedent of the Supreme Court or other federal court. It manifests solely the *ipse dixit* that Article II vests the President with sweeping authority over Executive Branch employees unconstrained by any other provision of the Constitution.

a.    *Federal Supremacy Does Not Displace State Regulation of Lawyer Conduct*. As Hamilton noted in explaining the scope of the Supremacy Clause in FEDERALIST No. 33, "acts of the larger society [the national government] which are *not pursuant* to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies [states]" do not become the supreme law of the land. Indeed, he characterized such acts as "merely acts of usurpation, and will deserve to be treated as such." For that reason, the Supremacy Clause needs to be recognized not only as a source of authority for federal government action, but as a constraint on assertions of

10

federal power.  *See* Bradford R. Clark, *The Supremacy Clause as a Constraint on Federal Power*, 71 GEO. WASH. L. REV. 91 (2003).

Hamilton's view of the limited scope of the Supremacy Clause was promptly confirmed by the adoption of the Tenth Amendment, which declares that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. X.

The Tenth Amendment thus carves out a broad range of governmental actions by States and local governments that are not subordinated to federal supremacy.  Regulation of the practice of law is one of those functions.

As discussed in the preceding section regarding "separation of powers," both history and Supreme Court precedent demonstrate that regulation of the eligibility of persons to practice law is a function reserved to the States, particularly the courts in the several States.

The Supreme Court on occasion has provided guidance when federal courts have found it necessary to address professional misconduct in *federal* practice but has refrained from such supervision when State courts are addressing misconduct by lawyers within their judicial systems. *See*, *e.g.*, *Snyder*, 472 U.S. at 643-644,  and *Ex Parte Wall*, 107 U.S. 265, 290 (1883).  A corollary of that function of the State courts (and now District of Columbia courts) is the authority to determine whether a licensed lawyer has departed from governing professional norms.

Thus, the Tenth Amendment's express reservation of power to the States precludes the DOJ from inviting this Court to commandeer the District of Columbia's attorney disciplinary process. *See, e.g., Printz v. United States, 521 U. S. 898* (1997).  Although Articles I and II of the Constitution vest extensive powers in Congress and the President, "conspicuously absent" from the list of such powers "is the power to issue direct orders to the governments of the States,"

11

whether those orders are issued by the President, by Congress, or by the federal judiciary. *Murphy v. NCAA*, 584 U.S. 1, 15 (2018).

   b. *Congress Expressly Confirmed That DOJ Lawyers Are Subject to State Disciplinary Regulation*. Furthermore, it is well settled that Congress has power to authorize State or local regulation, even if it were otherwise preempted by federal "supremacy" interests. *See*, *e.g.*, *Northeast Bancorp, Inc.* v. *Board of Governors, Federal Reserve System*, 472 U.S. 159 (1985). Here Congress has affirmatively exercised its power under Article I of the Constitution to confirm the authority of State and District of Columbia judicial systems to apply their professional standards to federal lawyers, including DOJ lawyers, who hold professional law licenses from those jurisdictions.

   Congress created the Department of Justice in 1870. Congress has defined its authority and responsibilities in chapter 31 of the Judicial Code, 28 U.S.C. §§ 501 *et seq*. Since at least 1938, Congress has prohibited the DOJ from hiring any attorney "unless such person be duly licensed and authorized to practice as an attorney under the laws of a State, territory, or the District of Columbia." Congress further prescribed the source of the standards of professional conduct that lawyers in the DOJ must observe and approved the authority of judicial systems such as those in the District of Columbia to enforce those standards.

   The so-called McDade-Murtha Amendment, 28 U.S.C. §530B, provides:

"§530B. **Ethical standards for attorneys for the Government**

"(a) An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, ***to the same extent and in the same manner as other attorneys in that State***.

"(b) The ***Attorney General shall*** make and amend rules of the Department of Justice to ***assure compliance with this section***." (Emphasis added).

12

In unambiguous terms, therefore, Congress has insisted in the McDade Amendment that DOJ lawyers must be subject to ethical standards "*to the same extent and in the same manner as other attorneys in that State.*" *Id.* Under its "exclusive" Article I, Section 8 authority to enact legislation for the District of Columbia, Congress has declared that the District of Columbia Court of Appeals is to be treated in the same way as "the highest court of a State." 28 U.S.C. § 1257(b). As a consequence, the standards promulgated by the District of Columbia Court of Appeals to govern the conduct of members of the DC Bar have the same effect as those adopted by the courts systems in the fifty States to bind the conduct of members of their respective bars.

Not surprisingly, the DOJ complied with the statutory requirement that the Attorney General issue regulation to assure compliance with this national policy. Thus, Part 77 of the DOJ regulations, 28 C.F.R. declares:

"**§ 77.1 Purpose and authority**.

"(a) The ***Department of Justice is committed*** to ensuring that its attorneys perform their duties in accordance with the highest ethical standards. The purpose of this part is ***to implement 28 U.S.C. 530B*** and to provide guidance to attorneys concerning the requirements imposed on Department attorneys by 28 U.S.C. 530B.

\*\*\*

**§ 77.2 Definitions**.

\*\*\*

(h) The ***phrase state laws and rules*** and local federal court rules governing attorneys means rules enacted or adopted by any State or Territory of the United States or ***the District of Columbia*** or by any federal court, ***that prescribe ethical conduct for attorneys*** and that would subject an attorney, ***whether or not a Department attorney***, to professional discipline, such as a code of professional responsibility.

\*\*\*

"**§ 77.3 Application of 28 U.S.C. 530B**.

"In all criminal investigations and prosecutions, in all civil investigations and litigation (affirmative and defensive), and in all civil law enforcement investigations and proceedings, ***attorneys for the government shall conform their conduct and activities to the state rules and laws***, and federal local court rules, ***governing attorneys*** in each State where such attorney engages in that attorney's duties, ***to the same extent and in the same manner as other attorneys in that State*** \* \* \* ."

13

(All emphases added).

On its face, the McDade Amendment, as implemented by DOJ's own regulations, leaves the DOJ with no room – at least, no legitimate room – to deny that lawyers who are employed by the DOJ and are members of the DC Bar are subject to the same professional standards to the "same extent" and enforced in the "same manner" as every other member of the DC Bar.

Before this Court, the DOJ nevertheless argues that allowing outside disciplinary authorities to sanction unethical conduct by DOJ lawyers could interfere with important federal functions. But in enacting the McDade Amendment (and consistently defeating proposals to weaken it), Congress deliberately rejected precisely these assertions, which the DOJ had advanced from 1980 and afterwards – that "nothing" in "state or local standards should be construed as an impediment to federal law enforcement efforts." To the contrary, Congress decided in Section 530B that, in pursuing *legitimate* federal goals, federal lawyers must abide by the same professional standards that lawyers in private practice must observe in pursuing their clients' legitimate objectives.

The DOJ's complaint in this case thus flouts the statutory command – as confirmed by the DOJ's own regulations – that the Attorney General is obliged to see to it that DOJ lawyers (and other federal lawyers) are to be held to ethical standards "to the same extent ***and in the same manner*** as other attorneys in that State" in which the lawyer is licensed. 28 U.S.C. §530B(a).

The DOJ is demanding that this Court (and, implicitly, every other court) ignore the clear commands of the McDade Amendment and, in the case of the states, the Tenth Amendment, and insert itself into State or District of Columbia bar and judicial processes. The objective is to ensure that a former senior Justice Department official can avoid accountability for actions that, if proved,

14

may warrant professional discipline. This distortion of logic and precedent does no credit to lawyers who claim to speak for the people of the United States of America.

Indeed, in addition to the Acting Attorney General's filing of this meritless complaint in violation of an explicit federal statute imposing precisely the opposite duty upon the Attorney General, the prior Attorney General, Pam Bondi, actually proposed a rule directly contrary to the statutory requirement. Her proposal would purport to make the disciplinary responsibilities of State and District of Columbia authorities subordinate to the decisions of the Attorney General. The proposed rule was widely criticized, and has not been adopted.

If DOJ ultimately adopts this proposed rule, State and District of Columbia bar and disciplinary system authorities will have standing to challenge the rule under multiple provisions of Section 706(2) of the Administrative Procedure Act (*e.g.*, "agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

**3.** ***Derivative Immunity***: **Unique Presidential Immunity Does Not Excuse Unethical Conduct By DOJ Lawyers** Particularly indefensible is the DOJ's attempt to extend the controversial decision in Trump v. United States, 603 U.S. 593 (2024), which created for the President an extraordinary immunity from criminal liability for his official acts, beyond its defined limits. The DOJ argues:

> "The President's constitutionally required immunity would provide little protection if Executive Branch attorneys could be targeted for internal Executive Branch deliberations." (Complaint ¶3).

The stated rationale for the decision in *Trump*, however, is that the President is "unique" in the constitutional system. It is astonishing that the DOJ appears to be arguing that, for the President

to be able to plan a criminal conspiracy, such as a bribery scheme or some fraud, for which he may not be prosecuted, his co-conspirators in the planning must also escape accountability. Even the members of the majority in *Trump* did not suggest that his immunity from criminal liability would exempt his subordinates from culpability, if they committed crimes at his behest.

Indeed, the prosecution of President Nixon's White House and DOJ co-conspirators was never questioned, either at the time or in *Trump*. In short, a government lawyer has no special privilege to counsel a president to commit a crime (as convictions of White House counsel John Ehrlichman and John Dean and Attorney General John Mitchell graphically illustrate).

Moreover, this case does not involve exposure to *criminal* liability, which was at issue in *Trump*. What is at stake are potential civil and administrative consequences. In *Trump*, the Court analogized to the President's unique absolute immunity from certain civil claims under *Nixon* v. *Fitzgerald*, 457 U.S. 731 (1982). But the Court simultaneously confirmed the well-established rule that the aides with whom the president consulted on those same matters do not enjoy comparable immunity. *See Harlow* v. *Fitzgerald*, , 457 U.S. 800 (1982).

A government lawyer is not excused from the ordinary ethical constraints that prohibit every lawyer from assisting a client in planning a fraud. Certainly, nothing in the *Trump* decision purported to create such a disgraceful notion.

**4. *Disparate Treatment*: Courts May Be Trusted to Enforce Professional Standards Fairly**. Finally, the DOJ complains about the unusual number of ethics complaints filed against lawyers affiliated with President Trump, including lawyers in the DOJ. Of course, even if accurate, this assertion does not justify the inference that the DOJ wants the Court to draw. It is like complaining that the medical profession had to go into high gear to deal with an unusually extensive pattern of illnesses during the COVID pandemic.

16

a. *The Courts Can Assure Fair and Consistent Application of Professional Standards*. The DOJ also alleges that some of these government lawyers are being treated more severely than some other lawyers who engaged in conduct of comparable or greater impropriety (at least as the DOJ would see it). *Amici* do not comment on the merits of any specific cases, including the pending Clark matter, in which the Court of Appeals ultimately will decide whether misconduct has been proved and, if so, what disciplinary consequences should follow.

One might suggest that lawyers in *public* service, exercising the remarkable power and privilege to appear in the name of the "the United States of America" (*see* 28 U.S.C. §516), might be expected to adhere to even higher standards than lawyers representing purely private interests. But lawyers for the government surely are not entitled to observe *lower* standards or to engage in conduct forbidden to any other lawyers licensed to practice law, which would be the effect of the broad immunity claimed by the DOJ.

Moreover, there is no apparent reason why the courts in the District of Columbia or in the States that ultimately rule on the propriety of professional discipline are incapable of fairly evaluating the seriousness of any alleged misconduct and tailoring the degree of discipline (if any) to the facts of the particular case. For this Court to intervene while the District of Columbia Court of Appeals still has the Clark matter pending before it would abrogate core principles of comity and ripeness, which – at a minimum – strongly counsel abstention .

b. *DOJ Tradition Recognizes That Federal Lawyers Must Adhere to At Least the High Standards Applicable to All Other Lawyers*. Perhaps the most troubling part of the DOJ's pursuit of this case is that it reverses the long-standing tradition of the Department to emphasize the highest professional standards.

The DOJ itself proudly proclaims:

17

"**Honesty and Integrity**.  The Justice Department's employees adhere to the highest standards of ethical behavior, mindful that, as public servants, we must work to earn the trust of, and inspire confidence in, the public we serve."

Despite occasional lapses by individual members of the DOJ, including some high-ranking officials, this understanding has been the hallmark of the DOJ tradition for generations.

For example, nearly ninety years ago, the Supreme Court summarized the special ethical obligations of lawyers in the DOJ in a case that, while involving a criminal prosecution, expressed the principle that traditionally guided DOJ lawyers in all functions about their distinct obligations. A DOJ lawyer –

"is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  * * *  But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger* v. *United States*, 295 U.S. 78, 88 (1935).

Indeed, this vital principle is reflected on the face of the seal of the Department of Justice itself.



At common law in England, before American independence, it was customary for criminal charges to be introduced with a "Law Latin" phrase that, translated, declared: "Now comes [name],

18

Attorney-General, who prosecutes on behalf of *our Lord, the King*." (Emphasis added). But according to the DOJ itself, as most recently refined by presidential order in 1934, the seal of the DOJ proclaims: "*Qui Pro Domina Justitia Sequitur*" – "Who comes to plead on behalf of our lord, ***Justice***." (Emphasis added).

In this country, lawyers in public service, including especially the DOJ, are ethically bound to serve justice – not a "king," whatever title he holds.

Against this backdrop, eighty-five years ago, highly respected Attorney General Robert H. Jackson delivered an iconic address in which he reminded lawyers of the DOJ of their high ethical duty to avoid any temptation to "participate in the operation of the machinery of practical politics":

> "If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should, rather than pick cases that need to be prosecuted."

One high ranking veteran of the DOJ (until 2019), former Deputy Solicitor General Michael R. Dreeben, who appeared before the Supreme Court on behalf of the United States in more than 100 cases, recently confirmed that DOJ had "traditionally inculcated Jackson's values through institutional structures and role models." But he warned about the consequences of accepting the notion that the DOJ may be just another instrument of presidential score-settling:

> "Jackson's aspiration that prosecutorial decisions should be impartial would be hard to maintain in a Justice Department that defines as its prime mission carrying out the President's will."

It also is a matter of public record that the current Administration has deliberately "gutted" the staff members and organizations within the DOJ that traditionally have been responsible for overseeing the ethical performance of DOJ lawyers and other federal officials. It has fired, transferred, or diminished the role of lawyers in the Office of Professional Responsibility and the Office of the Inspector General as well as the Criminal Division's Public Integrity Section.

19

Particularly egregious is the neutering of DOJ's Office of Professional Responsibility, which admits that it was –

> "established in 1975 in response to professional misconduct associated with the Watergate scandal. OPR's primary mission is to ensure that Department attorneys perform their duties in accordance with the high professional standards expected of the nation's principal law enforcement agency."

> Former Deputy Solicitor General Dreeben suggested one remaining external "constraint"

on potential misconduct by DOJ lawyers:

> "Prosecutors, of course, are members of the bar, and thus are susceptible to the enforcement of professional-responsibility principles that require the impartial use of prosecutorial power. This is a real constraint."

But this "constraint" is precisely what DOJ is asking this Court to undermine.

> Rigorous investigation of possible misconduct by DOJ lawyers is a vital matter of public

interest. As the DOJ Office of the Inspector General acknowledges:

> "Criminal wrongdoing and administrative misconduct by Department employees undermine the public's trust in the Department. The Department can gain the public's confidence **by supporting investigation of its personnel who engage in wrongdoing**." (Emphasis added).

Yet, in this case, the DOJ is seeking to close off precisely the kind of investigation that centuries of history and law have authorized.

> Every attorney in the DOJ, from the Attorney General on down, "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all . . . ." *Berger v. United States*, 295 U.S. at 88. In this case, the DOJ has chosen to abandon that standard in favor of an assault on the longstanding authority of State and District of Columbia courts to discipline members of their bars. The DOJ has neither constitutional nor statutory authority to evade this well-established system. Rather,

there is every reason, as a matter of law, for the Court to reject the DOJ's preemptive demand in this case.

If ever there were a time to rely solely on the *internal* DOJ supervision of the professional ethics of federal government lawyers, this would hardly be the time to do so.

Rather, there is every reason, as a matter of law, for the Court to reject the DOJ's preemptive demand in this case.

## CONCLUSION

The Motion to Dismiss should be granted.

Respectfully submitted.

Andrea Ferster
Law Offices of Andrea C. Ferster
(DC Bar #384648)
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: Andreaferster@gmail.com

Philip Allen Lacovara
(DC Bar #194472)
9101 Southmont Cove
Fort Myers, FL 33908
Phone: 917-412-9766
Email: placovara@gmail.com

Jonathan J. Rusch
(DC Bar # 350603)
4600 Connecticut Avenue, N.W.
Washington, DC 20008
Phone:  202-494-8684
Email: jrusch@american.edu

Counsel for *Amici Curiae*

July 17, 2026

21

CERTIFICATE OF COMPLIANCE

1.  This document complies with the page limit of LCvR 7(o)(4) [no more than 25 pages]:

    **X**    this document contains 21 pages

2.  This document complies with the typeface requirements of LCvR 5.1(d): because:

    **X**    This document has been prepared in a proportionally spaced typeface using Microsoft Word in using Time New Roman, 14 opt.

3.  This document has been submitted in compliance with the court's ECF requirements.


                              /s/ Andrea Ferster_____

22

LIST OF AMICI CURIAE
(Each signatory to this *amicus* brief is identified by their specific category of bar service, their periods of service, plus other relevant experience, including prior service as officers of the Department of Justice)

### *Past Presidents of The District of Columbia Bar*
(appearing in their individual capacities)

Charles R. Work (1976-1977)
(U.S. Department of Justice:  Assistant U.S. Attorney, District of Columbia 1966-1973; Deputy Administrator, Law Enforcement Assistance Administration, 1973-1975)

Marna Tucker (1984-1985)
Member, Board on Professional Responsibility, 1977-1983

Philip Allen Lacovara (1988-1989)
(U.S. Department of Justice:  Deputy Solicitor General, 1972-1973, Counsel to Watergate Special Prosecutor, 1973-1974)

Robert N. Weiner (1995-1996)
Co-Chair, District of Columbia Bar Disciplinary System Review Committee 1991-1993, and Member, Disciplinary System Study Committee 2003-2006
(U.S. Department of Justice: Associate Deputy Attorney General, 2010-2012, Senior Counsel, Civil Rights Division, 2022-2025)

Myles V. Lynk (1996-1997)
Senior Assistant Disciplinary Counsel, Office of Disciplinary Counsel, 2019-2022

Andrew H. Marks (1998-1999)

Joan H. Strand (1999-2000)

John W. Nields, Jr. (2000-2001)

John C. Keeney Jr. (2004-2005)

John C. Cruden (2005-2006)
(U.S. Department of Justice: Senate Confirmed Assistant Attorney General for the Environment and Natural Resources Division (ENRD) 2015 - 2017; ENRD Deputy Assistant Attorney General, 1995 - 2011; ENRD Environmental Enforcement Section Chief, 1991-1995)

James J. Sandman (2006-2007)

Melvin White (2007-2008)

Kim M. Keenan (2009-2010)

Andrea C. Ferster (2013-2014)

Annamaria Steward (2016-2017)

Patrick McGlone (2017-2018)

Susan M. Hoffman (2019-2020)

Charles R. Lowery, Jr. (2023-2024)


***Former Officers and Governors of The District of Columbia Bar***
(appearing in their individual capacities and listed alphabetically)

Brooksley Born, Secretary, 1975-1976, Board of Governors, 1976-1979

Carol Elder Bruce, Board of Governors, 1994-1997 and 1997-2000

William F. Causey, Board of Governors,1996-1999
(U.S. Department of Justice: Assistant Counsel, Office of Professional Responsibility, 2008-2011)

Daryl A. Chamblee, Secretary, 1985-1986, Board of Governors, 1986-1989

H. Guy Collier, Board of Governors, 2010-2013
(U.S. Department of Justice: Special Trial Attorney, Civil Division, Torts Branch, 1980-1981, detailed from U.S. Department of Health and Human Services, Office of General Counsel)

James E. Coleman, Jr., Treasurer, 1983-1984, Board of Governors, 1984-1990
Frederick D. Cooke, Jr., Board of Governors, 1994-1997

Devarieste Curry, Board of Governors, 1995-2001; Member, Disciplinary System Study Committee, 2003-2006

Gilberto de Jesus, Treasurer, 1994-1005, Board of Governors, 1995-1998

David Epstein, Secretary, 1977-1978, District of Columbia Bar Disciplinary Board, 1972-1976; Adjunct Professor on Professional Responsibility, Georgetown University Law Center

A-2

Ann K. Ford, Board of Governors, 2015-2018

Elizabeth Sarah Gere, Board of Governors, 2018-2024, Board on Professional
Responsibility Hearing Committee, 1994-2000
(U.S. Department of Justice, Trial Attorney, Criminal Division, 1975-1976; Trial Attorney,
Assistant Branch Director, Senior Trial Counsel, Civil Division 1976-1980, 1986-1987;
Assistant U.S. Attorney, Chief, Civil Division, Southern District, Ohio, 1980-1985;
Assistant Director, Attorney General's Advocacy Institute, 1985-1986)

Nathalie F.P. Gilfoyle, Board of Governors, 2004-2007

Jeffrey S. Gutman, Treasurer, 2011-2012, Board of Governors, 2012-2015
(U.S. Department of Justice: Trial Attorney, Federal Programs Branch, Civil Division, 1987-
1994)

Janine D. Harris, Board of Governors, 1985-1988

Micheal M. Hicks, Board of Governors, 1996-1997

Su Sie Ju, Board of Governors, 2019-2022

Sara Kropf, Secretary, 2013-2014
Annette K. Kwok, Board of Governors, 2016-2019

Mira Nan Marshall, Secretary, 2003-2004

Alan B. Morrison, Board of Governors, 1975-1978 and 1980-1986
(U.S. Department of Justice: Assistant U.S. Attorney, Southern District of New York, 1968-
1972)

Amy E. Nelson, Treasurer, 2018-2019, Board of Governors, 2019-2022

Linda E. Perle, Board of Governors, 1993-1996

Don Resnikoff, Treasurer, 2007-2008

Florence Wagman Roisman, Board of Governors, 1972-1979
(U.S. Department of Justice: Attorney, Appellate Section, Civil Division, 1964-1967)

Lois Schiffer, Board of Governors,1979-1982, and 1983-1989
(U.S. Department of Justice: Assistant Attorney General, Environment and Natural
Resources Division, 1993-2001)

Gigi B. Sohn, Board of Governors, 1997-2000

Leslie T. Thornton, Board of Governors, 2018-2021

Benjamin F. Wilson, Board of Governors, 2008-2011 and 2014-2018

Peter H. Wolf, Secretary, 1971-1973, Board of Governors, 1974-1977
Retired Associate Judge, Superior Court of the District of Columbia, 1979-1994, Senior Judge,1994-2018
(U.S. Department of Justice: President's Commission on Crime in the District of Columbia,1965-1966)


### *Former Senior Executive Staff of The District of Columbia Bar*

Katherine A. Mazzaferri, Executive Director, 1982-2010, Chief Executive Officer, 2010-2017
Cynthia D. Hill, Assistant Executive Director for Programs, 1990-2010, Chief Programs Officer, 2010- 2017

Maureen Thornton Syracuse, D.C. Bar Pro Bono Center, Director/Executive Director, 1992-2011


### *Former District of Columbia Disciplinary and Ethics Officials*

Martin Baach, District of Columbia Board on Professional Responsibility, 2001-2007, Chair: 2004-2007

Patricia A. Brannan, District of Columbia Board on Professional Responsibility, 1994-2001; Vice Chair, 1996-1998; Chair, 1998-2001

John M. Ferren, District of Columbia Bar Disciplinary Board, 1972-1976, Retired Associate Judge, District of Columbia Court of Appeals, 1977-1997; Senior Judge, 1999-2023, Corporation Counsel for the District of Columbia, 1997-1999

Joanne Doddy Fort, District of Columbia Board on Professional Responsibility, 1997-2003; Vice Chair, 1998-2001; Chair 2001-2003

Joan Goldfrank, Executive Attorney, District of Columbia Board on Professional Responsibility, 1985-1994
Retired Magistrate Judge, Superior Court of District of Columbia, 2002-2012
(U.S. Department of Justice: Staff Attorney, Office of Professional Responsibility, 1994-1996; Senior Attorney, Environment and Natural Resources Division, 1996-1997; Deputy, Professional Responsibility Advisory Office, 1997-2002)

A-4

Elizabeth Herman, Senior Bar Counsel and Assistant Bar Counsel, D.C. Office of Disciplinary Counsel, 1984-2018; Deputy Disciplinary Counsel, 2006-2018

Dwight D. Murray, Member, Legal Ethics Committee, and Chair, Grievance Committee, U.S. District Court for the District of Columbia

Wallace E. Shipp, Jr., Assistant Bar Counsel, 1980-1983; Deputy Bar Counsel 1983-2005, Bar Counsel/Disciplinary Counsel, 2005-2017
Allen Snyder, Chair, District of Columbia Board on Professional Responsibility, 1982-1984; Treasurer, District of Columbia Bar, 1977-1978

### *Past Presidents of Voluntary Bars*
(appearing in their individual capacities and listed alphabetically)

Jessica E. Adler, President, Women's Bar Association of the District of Columbia (2013-2014)

Mark W. Atwood, President, DC Chapter, InterAmerican Bar Association (2025-2026)

Alfred F. Belcuore, National President, Federal Bar Association (1991-1992); DC Chapter President, American Board of Trial Advocates (2018-2024); President, The Counsellors, District of Columbia (2024-2025)

Joel P. Bennett, President, Bar Association of the District of Columbia (1992-1993)

Mary L. Blatch, President, Women's Bar Association of the District of Columbia (2024-2025)

Paulette E. Chapman, President, Women's Bar Association of the District of Columbia (2003-2004); President, Bar Association of the District of Columbia (2007-2008)

Daniel Trujillo Esmeral, President, Hispanic Bar Association of the District of Columbia (2025-2026)

Karen E. Evans, President, Washington Bar Association (2014-2016); President, Trial Lawyers Association of Metropolitan Washington, DC (2012)

L. Palmer Foret, President, Trial Lawyers Association of Metropolitan Washington, DC (2003-2004); D.C. Chapter President, American Board of Trial Advocates (2011-2013)

Kathleen Gunning, President, Women's Bar Association of the District of Columbia (1991-1992)

Christopher G. Hoge, President, Bar Association of the District of Columbia (1998-1999)

Gerald I. Holtz, President, Trial Lawyers Association of Metropolitan Washington, DC (1986-1987)

Ronald C. Jessamy, Sr., President, Washington Bar Association (2008-2010)

Mary Ellen Fleck Kleiman, President, Women's Bar Association of the District of Columbia Foundation (2024-2026)

William E. Lawler, III, President, Bar Association of the District of Columbia (2003-2004)

A-5

(U.S. Department of Justice: Assistant United States Attorney for the District of Columbia, 1989-1996)

Avi Kumin, President, Metropolitan Washington Employment Lawyers Association (2025-2027)

Nancy Aliquo Long, President, Women's Bar Association of the District of Columbia (1996-1997); Women's Bar Association Foundation (2014-2016)

Victor E. Long, President, Trial Lawyers Association of Metropolitan Washington, DC (2013-2014); (U.S. Department of Justice: Trial Attorney, Civil Rights Division, Voting Section, 1985-1988)

Patrick Malone, President, Trial Lawyers Association of Metropolitan Washington, DC (2004-2005)

Lorelie S. Masters, President, Women's Bar Association of the District of Columbia (2007-2008)

M. Elizabeth Medaglia, President, Women's Bar Association of the District of Columbia (1982-1983): President, Assistant United States Attorneys Association for the District of Columbia, (1982-1984)
(U.S. Department of Justice: Assistant United States Attorney, District of Columbia, 1974-1979)

Patrick M. Regan, President, Trial Lawyers Association of Metropolitan Washington, DC (1991-1992)

Melissa Rhea, President, Trial Lawyers Association of Metropolitan Washington, DC (2006-2007)

Diana Savit, President, Women's Bar Association of the District of Columbia (1993-1994)

Gregory S. Smith, President, Bar Association of the District of Columbia (2011-2012); President, Atlanta Bar Association (1998-1999)

Keith W. Watters, President, Bar Association of the District of Columbia (2006-2007); Washington Bar Association (1988-1990), National Bar Association (1995-1996)


### *District of Columbia Voluntary Bar Associations*

### Bar Association of the District of Columbia (BADC)

BADC is a non-profit voluntary bar association that seeks to promote civility, justice, and collegiality among members of the legal profession as well as access to legal services for all residents of the nation's capital. The BADC is the first bar association founded in the District of Columbia in 1871, the same year that the U.S. Department of Justice was established. It is a zealous proponent of the Rule of Law, and the independence of the judiciary, law firms and lawyers.

### Hispanic Bar Association of the District of Columbia (HBA-DC)

HBA-DC is a non-profit established in 1977 serving lawyers and law students in the D.C. region. Committed to fostering professional growth, the HBA-DC runs multifaceted initiatives through scholarships, advocacy, pro bono activities, and community outreach. The HBA-DC's interest in this litigation stems from its dedication to the principles of promoting equal justice and opportunity;

educating the community about relevant legal issues; and promoting the professional development of lawyers and law students, including those of Hispanic heritage.

**Metropolitan Washington Employment Lawyers Association (MWELA)**

MWELA is a non-profit organization comprised of over 350 lawyers who regularly advise and represent employees in employment and civil rights disputes. MWELA is the local chapter of the National Employment Lawyers Association, a national organization of more than 3,000 lawyers dedicated to the advancement of employee rights. MWELA shares the amicus brief's concerns about the targeting of law firms for their client representations and their implementation of employee DEI programs, and the chilling effect on the legal profession were the Executive Orders allowed to stand.

**National Bar Association (NBA)**

The National Bar Association (NBA), founded in 1925, is a non-profit voluntary bar association representing the interests of more than 65,000 African American lawyers, judges, law professors, and law students worldwide. The NBA is dedicated to advancing the administration of justice, protecting civil and political rights, and ensuring equal justice under law. The NBA's interest in this brief reflects its long-standing commitment to defending access to justice, safeguarding the independence of the legal profession, and protecting marginalized communities from discrimination.

**Trial Lawyers Association of Metropolitan Washington, D.C. (TLA-DC)**

The Trial Lawyers Association of Metropolitan Washington, D.C. (TLA-DC) is a nonprofit voluntary bar association dedicated to preserving the civil justice system and promoting the rule of law. TLA-DC champions the constitutional right to trial by jury, supports access to justice for all, and works to protect public safety through legal accountability. The organization is a strong advocate for ethical advocacy, the independence of the legal profession, and the integrity of the courts.

**Washington Council of Lawyers (WCL)**

Washington Council of Lawyers (WCL) is a voluntary bar association committed to ensuring that our legal system treats everyone fairly, regardless of money, position, or power. Our members represent the legal community's diversity: They come from law firms, law schools, private and nonprofit organizations, and the government.

WCL promotes pro bono and public-interest law by building partnerships between the public, private, and nonprofit sectors; volunteering to provide legal services to those who need them; training and mentoring the next generation of public-interest advocates; and supporting policies that expand access to justice.

**Women's Bar Association of the District of Columbia (WBADC)**

The mission of the Women's Bar Association of the District of Columbia (WBADC) is to maintain the honor and integrity of the profession, promote the administration of justice, and advance and

A-7

A-8

protect the interest of women lawyers. The WBADC envisions a world in which all women lawyers are empowered to achieve personal and professional success and satisfaction, where all members are meaningfully connected, engaged, and mentored, and where diversity, equity, and inclusion are hallmarks of our programming and leadership. WBADC works through its advocacy voice and community service to improve the legal profession and society as a whole and promote the rule of law.