## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

     *Plaintiff,*

v.

HAMILTON P. FOX III, *et al.,*

     *Defendants.*

Case No. 1:26-cv-1658-RJL

---

## BRIEF OF MORE THAN 500 FORMER
## U.S. DEPARTMENT OF JUSTICE ATTORNEYS
## AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

---

Rupa Bhattacharyya
Mary B. McCord
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY AND PROTECTION
GEORGETOWN LAW
600 New Jersey Ave. NW
Washington, DC 20001
(202) 662-4036
rb1796@georgetown.edu
mbm7@georgetown.edu

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................iii

STATEMENT OF INTEREST ........................................................................................ 1

ARGUMENT ................................................................................................................... 2

CONCLUSION................................................................................................................ 13

## TABLE OF AUTHORITIES

### Cases & Case Materials

*Berger v. United States*, 295 U.S. 78 (1935)........................................................................ 3

*In re Dobbie*, 305 A.3d 780 (D.C. 2023) ........................................................................ 10

*Olmstead v. United States*, 277 U.S. 438  (1928)............................................................ 12

*Trump v. Internal Rev. Serv.*, --- F. Supp. 3d ---, No. 26-20609-CV-William,
    2026 WL 2015525 (S. D. Fla., July 13, 2026) ................................................................ 9

*United States v. Abrego Garcia*, --- F. Supp. 3d ----, No. 3:25-CR-00115,
    2026 WL 1454303 (M.D. Tenn., May 22, 2026)............................................................ 9

*United States v. Agurs*, 427 U.S. 97 (1976) ...................................................................... 3

*United States v. Chem. Found., Inc.*, 272 U.S. 1 (1926)................................................... 7

*United States v. Salinas*, 693 F.2d 348 (5th Cir. 1982)................................................... 7

*United States v. Supreme Court of New Mexico*, 839 F.3d 888 (10th Cir. 2016) .......... 8

### Statutes

28 U.S.C. § 530B(a) .............................................................................................................. 4

Omnibus Consolidated and Emergency Supplemental Appropriations Act for Fiscal
    Year 1999, Pub. L. No. 105-277, div. A, tit. VIII, § 801, 112 Stat. 2681, 2681–118
    (1998) ............................................................................................................................ 4

### Other Authorities

Disqualification of Prosecutor Because of Former Representation, 9 Op. O.L.C. 1
    (1985)............................................................................................................................ 4

Review of State Bar Complaints and Allegations Against Department of Justice
    Attorneys, 91 Fed. Reg. 10780 (Mar. 5, 2026)......................................................... 2, 5

Robert H. Jackson, Att'y Gen., U.S. Dep't of Just., Address at the Second Annual Conference of United States Attorneys: "The Federal Prosecutor" (Apr. 1, 1940) ............................................................................................ 2, 12

State Bar Disciplinary Rules as Applied to Federal Government Attorneys, 9 Op. O.L.C. 71 (1985) ...................................................................................... 8

## Rules

D.C. Rule of Professional Conduct 8.4(c) ................................................................ 10

Michigan Court Rules ............................................................................................... 11

Rules Governing the District of Columbia Bar, Ch. XI ....................................... 10, 11

Rules of Procedure of the State Bar of California ................................................... 11

Rules of the Virginia Supreme Court, Part VI, § IV ................................................ 11

Texas Rules of Disciplinary Procedure .................................................................... 11

Wyoming Rules of Disciplinary Procedure ............................................................... 11

## Reports

Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2015 ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2016 ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2017 ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2018 ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2019 ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2020 ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2021 ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2022 ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., 2023 Annual Report ..................................... 5

Off. of Pro. Resp., U.S. Dep't of Just., FY2024 Annual Report ........................................ 5

Off. of Pro. Resp., U.S. Dep't of Just, 2025 Annual Report ..................................... 5, 6

## STATEMENT OF INTEREST

*Amici curiae* are more than 500 former U.S. Department of Justice attorneys, including an Acting Attorney General, several United States Attorneys, and numerous Deputy Assistant Attorney Generals, Branch Chiefs, and Section Heads. We worked in both political and career positions and some of us served in the Department for decades. We served in a wide range of Department components. And we served Administrations of both parties.

*Amici* seek leave to file this brief to refute two of the central premises of Plaintiff the United States of America's case: that the possibility that Executive Branch attorneys may be disciplined by state bar authorities unduly "chills" those attorneys in their work, *see* Compl. (ECF No. 1) ¶ 1; and that this is exacerbated by partisan "calls for the weaponization of state bar disciplinary processes," *see* Compl. ¶ 24. All of us obeyed the rules of professional ethics to which the United States now objects. At no point did the possibility of investigation for violating those rules inhibit our ability to represent or advise the United States or its officials. On the contrary, that possibility enhanced our credibility, because the principals we advised, and the judges and juries before whom we appeared, knew that we adhered to the same ethical standards that apply to all attorneys. Although it is of course possible that state bar disciplinary processes could be used for improper purposes, we do not see evidence of the kind of widespread weaponization that the United States advances, and in our experience the significant substantive and procedural protections adopted by state bars and state courts ensure that any discipline of federal attorneys arises

from the application of well-established ethical standards and adherence to due process requirements.  The full list of *amici* is attached as an Appendix to this brief.[1]

## ARGUMENT

As the current Administration recently acknowledged, the U.S. Department of Justice "has long been committed to upholding the highest standards of ethics among its attorneys."  Review of State Bar Complaints and Allegations Against Department of Justice Attorneys, 91 Fed. Reg. 10780, 10781 (proposed Mar. 5, 2026).  The undersigned *amici* were part of that tradition.  And we took our ethical obligations especially seriously because we represented the United States of America.  In his famous address to the Second Annual Conference of United States Attorneys, then-Attorney General Robert H. Jackson spoke of the awesome power vested in federal prosecutors, and their concomitant duty to carry out their mission in the "spirit of fair play and decency."  Robert H. Jackson, Att'y Gen., U.S. Dep't of Just., Address at the Second Annual Conference of United States Attorneys: "The Federal Prosecutor" 3 (Apr. 1, 1940) ("The Federal Prosecutor"), https://perma.cc/9EKD-4WNM.  Although the Attorney General's remarks were specifically about prosecutors, his words capture the gravity of every Department attorney's responsibilities as a representative of a sovereign.  Many of us had "more control over life, liberty, and reputation than any other person in America."  *Id.* at 1.  We could "order arrests, present cases to the grand jury in secret session," cause persons "to be indicted and

---

[1] Undersigned counsel for *amici curiae* are the sole authors of this brief.  No party, and no other person, contributed money that was intended to fund the preparation or submission of this brief.

2

held for trial," and make recommendations regarding sentencing and parole. *Id.* We could seek multi-billion-dollar penalties for violating U.S. laws, or injunctions against individuals, corporations, and even other sovereigns, including States. And we were responsible for helping to formulate and defend federal programs and policies that could have significant impacts on the lives and wellbeing of U.S. residents. With that power came an equally grave responsibility: to "temper[]" our "zeal with human kindness"; to "seek[] truth and not victims"; to "serve[] the law and not factional purposes"; and to "approach[]" our "task with humility." *Id.* at 7. The public placed great trust in us. We carried out our daily tasks with an understanding that we had to continue to earn that trust.

Being bound by enforceable ethical standards was critical to that effort. If attorneys cannot be disciplined by state bar authorities for failing to comply with their professional obligations, there is little external check on their actions. That would naturally erode the trust that the public has in the Department's attorneys and could create the impression that they are pursuing partisan or personal goals rather than the impartial administration of justice. *See United States v. Agurs*, 427 U.S. 97, 110-11 (1976) (Department attorneys "must always be faithful to … [the] overriding interest that 'justice shall be done.'"); *Berger v. United States*, 295 U.S. 78, 88 (1935) (A Department attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, … is not that it shall win a case, but that justice shall be done.").

3

Consistent with this understanding, Department attorneys have been subject to discipline by both federal and state authorities for decades. At the federal level, amici were subject to oversight by the Department's Office of Professional Responsibility (OPR), the Office of the Deputy Attorney General, the Professional Misconduct Review Unit (PMRU), and the Office of the Inspector General. We were also bound by state ethical standards. Since at least the late 1970s, Congress has required Department attorneys to be licensed and authorized to practice as attorneys under the laws of a state, territory, or the District of Columbia. *See* Disqualification of Prosecutor Because of Former Representation, 9 Op. O.L.C. 1, 16 n.12 (1985); *cf.* Mem. of P.&A. in Supp. of Defs.' Consolidated Mot. to Dismiss Pl.'s Compl. at 5, ECF No. 23-1 (dating this requirement to 1938). And in 1998, Congress adopted the McDade Amendment. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act for Fiscal Year 1999, Pub. L. No. 105-277, div. A, tit. VIII, § 801, 112 Stat. 2681, 2681–118 (1998). In relevant part, that law requires that any "attorney for the Government shall be subject to state laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a).

These requirements were respected and reinforced by the Department of Justice throughout our tenures. In particular, OPR is charged with investigating allegations of misconduct made against Department attorneys, including allegations that Department attorneys violated constitutional or statutory obligations; Department policies, rules, or regulations; or, as relevant here, state rules of attorney

professional conduct.[2]  OPR investigations include providing an opportunity for the subject attorney to respond to preliminary findings; and where OPR finds intentional or reckless misconduct, the PMRU reviews those findings and determines the appropriate discipline, including whether or not to authorize OPR to refer the matter to the relevant state bar authorities.[3]  Between Fiscal Years 2015 and 2024, PMRU authorized OPR to refer at least 45 findings of professional misconduct to state bar authorities for further review and action.[4]

In this system of dual regulation, the Department and state bar authorities historically have worked together well.  OPR typically acts as a liaison with state disciplinary authorities (and with those of the territories and the District of Columbia).  91 Fed. Reg. at 10782.  It "advises the relevant State bars of attorney

---

[2] Off. of Pro. Resp., U.S. Dep't of Just., 2025 Annual Report, at 2, https://perma.cc/2M4V-QVYZ.

[3] *Id.* at 5. Where OPR finds that the facts do not support a misconduct finding but demonstrate that a Department attorney exercised poor judgment, OPR refers the matter to the employing component for appropriate disciplinary action or other remedial measures. *Id.* at 5 n.1.

[4] *See* Off. of Pro. Resp., U.S. Dep't of Just., FY2024 Annual Report, at 16, 19, https://perma.cc/6FES-UUT8 (reporting one authorized referral); Off. of Pro. Resp., U.S. Dep't of Just., 2023 Annual Report, at 16–22, 25, https://perma.cc/335N-CRKT (eight authorized referrals); Off. Pro. Resp., U.S. of Dep't Just., Annual Report 2022, at 15, 17–19, https://perma.cc/E3U5-C4AN (three authorized referrals); Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2021, at 11–13, 19–20, https://perma.cc/E68Z-K5J8 (three authorized referrals); Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2020, at 12–14, https://perma.cc/SK3T-8PUA (two authorized referrals); Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2019, at 14, 16–17, https://perma.cc/VBB7-4HU4 (two authorized referrals); Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2018, at 14, https://perma.cc/8ZRV-6E8Z (five authorized referrals); Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2017, at 10, https://perma.cc/D8EX-JXT8 (eleven authorized referrals); Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2016, at 10, 29–34, 38–39, 43, https://perma.cc/TF3Z-H9ZA (six authorized referrals); Off. of Pro. Resp., U.S. Dep't of Just., Annual Report 2015, at 21–24, 27, 29–30, https://perma.cc/ZN4W-Z4SQ (five authorized referrals).  PMRU did not authorize OPR to make any state bar referrals in Fiscal Year 2025. *See generally* 2025 Annual Report, *supra* note 2.

misconduct after authorization from the PMRU; assists the State bars in obtaining evidence in the control of the Department … ; and coordinates with the State bars on matters of mutual interest to improve attorney ethical standards and conduct." *Id.* Indeed, "[w]hen OPR refers a matter to a State bar, it is often the first information the State bar has received about the allegations." *Id.* And even when "a State bar has received a complaint about a Department attorney's conduct before or during OPR's investigation, most State bars refrain from taking further action until OPR is able to complete the investigation so that the bar has a full account, through OPR's report of investigation, of the evidence and OPR's analysis, as well as the PMRU's conclusions, when determining whether to open their own investigation." *Id.* Moreover, "most State bars do not take additional action after referrals are made concerning current or former Department attorneys." *Id.*

In this case, the United States argues that, by subjecting Department attorneys to state bar disciplinary processes, the McDade Amendment impermissibly interferes with the proper functioning of the Executive Branch because it "chills [Executive Branch attorneys] from giving candid legal advice to others in the Executive Branch." Compl. ¶ 1; *see also id.* ¶¶ 24, 28, 114 (similar). That assertion does not withstand scrutiny and our experience demonstrates otherwise. Each of us has advised or represented the United States and agencies or officials thereof; some of us advised the President directly. We were often asked to, and did, provide advice on unclear areas of law; give opinions on controversial topics; explore novel legal theories; or advance aggressive legal arguments in court. Yet neither the possibility of sanction by state bar authorities nor of referral by OPR to state bar authorities

deterred us from offering candid advice, or from zealously advocating on behalf of the United States and its officials.

To the contrary, the understanding that we were subject to discipline for violating ethical rules enhanced our credibility. Because of that possibility, the principals we advised could trust that we based our advice on an honest assessment of the relevant facts and the best view of the applicable law. Similarly, because we could be sanctioned by state bar authorities, judges and juries could trust that we honestly represented the facts and the law. That in turn increased our chances of winning a case or securing a favorable verdict. Indeed, government attorneys have long benefitted from the presumption of regularity—the presumption that they "properly discharged their official duties" "in the absence of clear evidence to the contrary." *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926). And they also benefitted from the presumption of good faith—the presumption that they acted with proper intentions. *see United States v. Salinas*, 693 F.2d 348, 352 (5th Cir. 1982). Those presumptions are rooted, at least in part, in the knowledge that government attorneys are subject to discipline by state bar authorities.

In addition, as Department attorneys, complying with our ethical obligations was critical to maintaining our professional licenses, which was a condition of our continued Department employment. If the Department routinely were to argue that state ethical rules do not apply to Department attorneys or that state bar authorities cannot discipline Department attorneys for violating those rules, the state bars' continued issuance or renewal of professional licenses for attorneys throughout the

7

Department could be put at risk, severely jeopardizing the continued execution of the Department's mission.

We recognize that the Department has historically taken the position that state ethics rules may have to yield to the Constitution's Supremacy Clause where "a state bar standard impedes the authorized functions of the Attorney General and the Department of Justice, so that the Department cannot adequately carry out its functions if it adheres to the state standard." State Bar Disciplinary Rules as Applied to Federal Government Attorneys, 9 Op. O.L.C. 71, 73 (1985). But this is a high bar, implicated only in cases where a Department attorney cannot act in a manner necessary to meet the lawful needs of the United States without violating the state bar rule. *See United States v. Supreme Court of New Mexico*, 839 F.3d 888, 923 (10th Cir. 2016) (holding state ethics rule restricting issuance of grand jury subpoenas to attorneys was conflict-preempted as applied to federal prosecutors because its requirements "pose 'an obstacle to the accomplishment and execution of the full purposes and objectives' of the federal legal regime governing grand-jury practice" (citation omitted)), *cert. denied*, 583 U.S. 905 (2017). That is not the case here.

Of course, frivolous bar complaints are sometimes filed against Department attorneys. Some of us were the subject of such complaints. But nothing in our experience supports that state authorities are "weaponiz[ing]" state bar disciplinary processes as the United States suggests. *See* Compl. ¶ 24. And this is so notwithstanding an extraordinary increase in federal judges making findings or

8

commenting on professional misconduct by Department attorneys,[5] while, at the same time, the Department has systemically dismantled the internal checks it had created over the previous 50 years to prevent such misconduct.[6]

---

[5] *See Trump v. Internal Rev. Serv.*, --- F. Supp. 3d ---, No. 26-20609-CV-William, 2026 WL 2015525, at *38, 51 (S. D. Fla., July 13, 2026) (finding that "[i]n abdicating its responsibility to zealously defend the interests of the United States, the Government entered into a 'settlement' that deviated from its litigation posture in similar actions, disregarded DOJ policies, and accomplished objectives beyond those authorized, as well as those specifically prohibited, by law."); Jon Seidel, *'Broadview Six' Charges Dropped as Chicago's Top Federal Prosecutor Admits Case Was Tainted by Misconduct*, Chicago Sun-Times (May 21, 2026), https://chicago.suntimes.com/immigration/2026/05/21/broadview-ice-protest-grand-jury-transcript-kat-abughazaleh-trump (describing how the Department was forced to dismiss criminal charges); Transcript of Proceedings at 22, *United States v. Rabbitt*, Case No. 25-cr-693 (N. D. Ill. May 21, 2026) (judge describing herself as "incredibly shocked" by the government's conduct: "I have never seen the types of prosecutorial behavior  before a grand jury    that    I    saw    in    those    transcripts."),    *available    at* https://blockclubchicago.org/2026/05/22/full-transcript-judge-discusses-prosecutors-errors-in-broadview-protester-case (last visited July 10, 2026); *id.* at 25 (judge noting the "potential" for "sanctions for prosecutorial misconduct and for potential ethical violations, including lack of candor to the Court."); *United States v. Abrego Garcia*, --- F. Supp. 3d ----, No. 3:25-CR-00115, 2026 WL 1454303, at *12 (M.D. Tenn., May 22, 2026) (dismissing indictment for vindictive and selective prosecution, finding that "the evidence before the Court sadly reflects an abuse of prosecuting power"); *see also, e.g.,* Siven Watt, *Immigration Habeas Tracker: Government Obstruction, Judicial Trust and Accountability*, Just Security (June 22, 2026), https://www.justsecurity.org/133928/immigration-habeas-tracker  (documenting at least 740 immigration cases where either the court found or the government admitted non-compliance with court orders);  Ryan Goodman, et al., *The Presumption of Regularity in Trump Administration Litigation (4th Edition)*, Just Security (Sept. 15, 2025, last updated Mar. 19, 2026),   https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation  (documenting 34 cases not involving immigrant habeas petitions where courts have expressed concern over government compliance with court orders).

[6] In March 2025, Department leadership fired the head of OPR.  Perry Stein et al., *Several Top Career Officials Ousted at Justice Department*, Wash. Post (Mar. 7, 2025), https://www.washingtonpost.com/national-security/2025/03/07/justice-department-trump-firings.  As of this writing, it has not named a replacement.  In July 2025, Department leadership also fired the Director of the Department's Ethics Office, which is responsible for administering Department-wide ethics programs and policies.  Scott MacFarlane & Melissa Quinn, *Bondi Ousts Top Ethics Official at the Justice Department*, CBS News (July 15, 2025), https://perma.cc/3G23-467B.  And it forced out the Department's "highest-ranking career official, whom administrations of both political parties had relied on to make ethics determinations and review disciplinary recommendations for attorney misconduct." Christine Berger & Joe Gaeta, *The Department of Justice's Broken Accountability System*, Brennan Ctr. for Just. (Oct. 20, 2025), https://perma.cc/P5HH-UC6S.

State disciplinary processes have checks in place to guard against their use for improper purposes. Here, for example, one of the charges arose under D.C. Rule of Professional Conduct 8.4(c), which prohibits "[e]ngag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation." To establish that an attorney violated this Rule, disciplinary authorities must prove that the attorney made false statements while "'consciously disregard[ing] the risk' that [the attorney's] conduct was untruthful or that it would lead to a misapprehension of the truth." *In re Dobbie*, 305 A.3d 780, 805 (D.C. 2023) (citation omitted). And disciplinary authorities must establish this by "clear and convincing evidence." *Id.* at 792 (citation omitted). As these standards make clear, the D.C. Court of Appeals can impose discipline only if the process it has created results in specific findings that are supported by a significant quantum of evidence.

State laws governing attorney misconduct and discipline also provide ample procedural protections. As an example, before an attorney may be subject to discipline for misconduct, the D.C. Office of Disciplinary Counsel must notify the attorney of the charges in a manner that is "sufficiently clear and specific to inform the attorney of the alleged misconduct." Rules Governing the District of Columbia Bar (eff. Mar. 4, 2024), Ch. XI, § 8(c). The attorney has a right to be heard, to be represented by counsel, to cross-examine witnesses, to present evidence in defense or mitigation of the charges, and to "reasonable discovery." *Id.* § 8(d), (g). The matter is then submitted to a Hearing Committee, which then issues a report. *Id.* § 8(i), § 9(a). The attorney may file "exceptions" to the report with the Board on Professional Responsibility; if he does so, the Board then orders the matter to be briefed and

10

argued. *Id.* § 9(b).  Once the Board issues its report, the attorney may file exceptions with the D.C. Court of Appeals. *Id.* § 9(e), (f).  If exceptions are filed, the Court must consider the case "in accordance with applicable court procedures." *Id.* § 9(h)(1).[7]

The process is not unusual.  State disciplinary authorities across the country have adopted similar procedures to ensure that attorneys are not disciplined without adequate protections. *See, e.g.,* Rules of the Virginia Supreme Court, Part VI, § IV, ¶¶ 13-16(A), 13-16(B), 13-16(E), 13-16(M), 13-11; Texas Rules of Disciplinary Procedure 2.17(A), 2.17(B), 2.17(E), 2.17(J), 2.17(L), 2.23; Michigan Court Rules 9.115(B), 9.115(E), 9.115(J)(1), 9.118(A)(1), 9.126, 9.233; Rules of Procedure of the State Bar of California 5.41, 5.43, 5.62, 5.65, 5.104(B), 5.151; Wyoming Rules of Disciplinary Procedure 10(c), 10(f), 13, 15, 16(c).

*    *    *

In sum, our experience refutes the United States's assertion that the possibility that federal attorneys may be disciplined by state bar authorities chills their advice or advocacy.  And the significant substantive and procedural safeguards that state bar authorities have in place have worked as an important guard against abuse of the disciplinary process.  For decades, in our role as Department attorneys, we faced the possibility of discipline by the state bars that granted our licenses to practice law. That possibility did not impede our ability to provide the best advice or advocacy. Instead, it enhanced our credibility and backstopped our ability to do our work

---

[7] In certain circumstances, an attorney may be suspended pending final action by the Court. *See id.* § 9(g).

11

professionally and ethically, all of which inured to the benefit of the Department and to the benefit of the American people whom we served.

In closing, we note that the United States's position here is inimical to the broader project of instilling faith in government institutions, a project to which we dedicated ourselves in our time as Department lawyers. As Justice Brandeis wrote nearly 100 years ago:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. … If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting). A rule exempting government attorneys—who, as Attorney General Jackson remarked, have "more control over life, liberty, and reputation than any other person in America," The Federal Prosecutor at 1— from the same standards of professional ethics that govern all other attorneys would generate the sort of distrust about which Justice Brandeis warned. This Court should reject it.

**CONCLUSION**

The Defendants' motion to dismiss should be granted.

July 17, 2026                                    Respectfully submitted,

                                                 */s/ Rupa Bhattacharyya*

                                                 Rupa Bhattacharyya (D.C. Bar No. 1631262)
                                                 Mary B. McCord (D.C. Bar No. 427563)
                                                 INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                                     AND PROTECTION
                                                 GEORGETOWN LAW
                                                 600 New Jersey Ave. NW
                                                 Washington, DC 20001
                                                 (202) 662-4036
                                                 rb1796@georgetown.edu
                                                 mbm7@georgetown.edu

                                                 *Counsel for Amici Curiae*