**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br>HAMILTON P. FOX III, *et al.*,<br>*Defendants*. | Civil Action No. 1:26cv1658-RJL |

**UNITED STATES' OPPOSITION TO DEFENDANTS'**
**CONSOLIDATED MOTION TO DISMISS**

## TABLE OF CONTENTS


I. Introduction ........ 1

II. Background ........ 2

A. The Disciplinary Process ........ 2

B. Factual Background ........ 3

III. Legal Standard ........ 7

IV. Argument ........ 7

A. The United States Has Brought a Live Case or Controversy. ........ 7

1. The United States Satisfies Standing. ........ 8

a) The United States Has Alleged an Injury in Fact. ........ 8

b) The United States Has Standing Against Each Defendant. ........ 12

2. The United States' Claims are Ripe. ........ 20

3. Defendants' *Sui Juris*, Official Capacity, and Immunity Arguments Fail. ........ 22

a) The DCCA is *Sui Juris*. ........ 23

b) The Official Capacity Defendants Are Not Redundant. ........ 24

c) Chief Judge Blackburne-Rigsby and Chair Walker Do Not Have Judicial Immunity Against Injunctive Relief. ........ 25

B. *Younger* Abstention Does Not Apply. ........ 27

1. *Younger* Abstention Does Not Apply When the Federal Government Is the Plaintiff. ........ 28

2. *Younger* Abstention Does Not Apply to The Bad-Faith and Harassing Proceedings Here. ........ 34

C. All Three Counts State Plausible Claims ........ 36

1. Count 1 – Unlawful Regulation ........ 38

a) Defendants are Directly Regulating the Federal Government. ........ 38

b) The McDade Amendment Does Not Apply Here. ........ 40

2. Count 2 – Unlawful Discrimination ........ 45

3. Count 3 – Interference with Executive Authority ........ 46

V. Conclusion ........ 48

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,* 387 U.S. 136 (1967) ....................20

*Abuzeid v. Mayorkas*, 62 F.4th 578 (D.C. Cir. 2023) ....................7

*Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137 (D.C. Cir. 2011) ....................13

*Anatol Zukerman & Charles Krause Reporting*, 64 F.4th 1354 (D.C. Cir. 2023) ....................14

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) ....................19

*Ardestani v. INS,* 502 U.S. 129 (1991) ....................41, 44

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) ....................26

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ....................7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................7

*AT&T Corp. v. FCC*, 349 F.3d 692 (D.C. Cir. 2003) .................... 20-21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................7

*Bennett v. Spear,* 520 U.S. 154 (1997) ....................13, 15

*Blackmar v. Guerre*, 342 U.S. 512 (1952) ....................23, 25

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) ....................42

*California v. ARC Am. Corp.,* 490 U.S. 93 (1989) ....................43

*Cheney v. U.S. Dist. Ct.*, 542 U.S. 367 (2004) ....................37

*Chisholm v. Superior Court of D.C.*, No. CIV.A.06-2174(RBW),
2007 WL 1601718 (D.D.C. June 4, 2007) ....................19, 23

*Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795 (1999) ....................46

*Cohens v. Virginia,* 19 (6 Wheat.) 264 (1821) ....................27

*Conroy v. Aniskoff*, 507 U.S. 511 (1993) ....................42

*Cullen v. Fliegner*, 18 F.3d 96 (2d Cir. 1994) .................... 35-36

*District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) ............................ 22-23

*Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011) ..............................................................14

*Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025) ...................................... 8, 15-16

*District of Columbia v. Trump*, No. 25-5418,
2025 WL 3673674 (D.C. Cir. Dec. 17, 2025) ..............................................................24

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ..............................................................32

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
485 U.S. 568 (1988) ..............................................................................................44

*EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280 (11th Cir. 2004) ..........................................33

*Ex parte Young*, 209 U.S. 123 (1908) ..............................................................................24

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ......................................................15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167 (2000) ..............................8

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*,
146 S. Ct. 1546 (2026) ..........................................................................................42

*Galloway v. District of Columbia Courts*, No. CIV. A. 91-0644(JHG),
1991 WL 229949 (D.D.C. Oct. 21, 1991) ......................................................................23

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) ........................................... 40-41, 44

*Hancock v. Train*, 426 U.S. 167 (1976) ...................................................................39, 44

*Hill v. Traxler*, No. 13cv1037, 2013 WL 4580456 (D.D.C. July 9, 2013),
*aff'd,* 550 F. App'x 1 (D.C. Cir. 2013) ......................................................................26

*Hoai v. Superior Court of District of Columbia*, 539 F. Supp. 2d 432, 435 (D.D.C. 2008),
*aff'd,* 344 F. App'x 620 (D.C. Cir. 2009) ....................................................................23

*Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) ........................................................34, 36

*In re Carter*, 333 A.3d 558 (D.C. 2025) ...........................................................................15

*In re Clark*, DCCA No. 25-BG-0731 (D.C.) ..............................................................6, 12, 15

*In re Dobbie*, 305 A.3d 780 (D.C. 2023) ....................16, 21

*In re Justs. of Supreme Ct. of Puerto Rico*, 695 F.2d 17 (1st Cir. 1982) ....................18

*In re Neagle*, 135 U.S. 1 (1890) ....................37

*JMM Corp. v. District of Columbia*, 378 F.3d 1117 (D.C. Cir. 2004) ....................34, 36

**Johnson v. Maryland*, 254 U.S. 51 (1920) .................... 38-39

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,

909 F.3d 446 (D.C. Cir. 2018) ....................40

*Keifer & Keifer v. Reconstruction Finance Corporation*, 306 U.S. 381 (1939) ....................23

*Kentucky v. Graham*, 473 U.S. 159 (1985) ....................24

*Klayman v. Blackburne-Rigsby*, No. CV 21-0409 (ABJ), 2021 WL 2652335

(D.D.C. June 28, 2021), *aff'd*, No. 21-7069, 2022 WL 298933 (D.C. Cir. Jan. 20, 2022) .......26

*Klayman v. Fox*, No. CV 18-1579 (RDM), 2019 WL 2396538 (D.D.C. June 5, 2019),

*aff'd sub nom. Klayman v. Lim*, 830 F. App'x 660 (D.C. Cir. 2020) .................... 27, 34-35

*Klayman v. Porter*, 104 F.4th 298 (D.C. Cir. 2024) ....................27

*Kundrat v. District of Columbia*, 106 F. Supp. 2d 1 (D.D.C. 2000) ....................20, 23

**Leiter Mins., Inc. v. United States*, 352 U.S. 220 (1957) ....................29

*Leslie Miller, Inc. v. State of Ark.*, 352 U.S. 187 (1956) ....................39

*Lewellen v. Raff,* 843 F.2d 1103 (8th Cir. 1988) ....................35

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................42

**Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................8, 11, 14, 16

*Martin v. Hunter's Lessee,* 14 U.S. 304 (1816) ....................37

*Massachusetts Delivery Ass'n v. Coakley*, 671 F.3d 33 (1st Cir. 2012) ....................32

*Mayo v. United States*, 319 U.S. 441 (1943) .................... 38-39

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ....................36

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ....................20, 24

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) ........................28

*Mitchum v. Foster*, 407 U.S. 225 (1972) ..........................................................................18

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ..................................24

*Murthy v. Missouri*, 603 U.S. 43 (2024) .................................................................. 12-13

*Myers v. United States*, 272 U.S. 52 (1926) ..........................................................................37

*N.B. v. District of Columbia*, 244 F. Supp. 3d 176 (D.D.C. 2017) ..............................................25

*Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996) ...........................20

*NLRB v. SW Gen., Inc.*, 580 U.S. 288 (2017) ..........................................................................42

*North Dakota v. United States*, 495 U.S. 423 (1990) ..........................................................36, 39

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,* 477 U.S. 619 (1986) .........................34

*Phelps v. Hamilton*, 59 F.3d 1058 (10th Cir. 1995) ..................................................................35

*POET Biorefining, LLC v. EPA*, 970 F.3d 392 (D.C. Cir. 2020) .................................................20

**Pulliam v. Allen*, 466 U.S. 522 (1984) ........................................................................ 17-18, 25

*Rhodes v. Superior Ct. of D.C.*, 2019 WL 6894045 (D.D.C. Dec. 18, 2019) .............................19

*Roth v. King*, 449 F.3d 1272 (D.C. Cir. 2006) ..........................................................................26

*Ruffin v. District of Columbia*, 662 F. Supp. 3d 1 (D.D.C. 2023) ...............................................24

*Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388 (D.C. Cir. 2022) ..........................7

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) .....................................................................37

*Sibley v. U.S. Supreme Ct.*, 786 F. Supp. 2d 338 (D.D.C. 2011) .................................................19

*Sidak v. United States Int'l Trade Comm'n*, 174 F.4th 151 (D.C. Cir. 2026) ...............................21

*Simons v. Bellinger*, 643 F.2d 774 (D.C. Cir. 1980) ...........................................................17, 26

*Spargo v. New York State Comm'n on Jud. Conduct*, 351 F.3d 65 (2d Cir. 2003) .......................33

*Sperry v. Florida,* 373 U.S. 379 (1963) ....................................................................................42

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) ...............................................................27

*Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72 (D.C. Cir. 1997) .......................22

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ........................................................19

*Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4 (1st Cir. 2000) ..................................... 42-44

*Supreme Ct. of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719 (1980) ........................18

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...........................................................20

*Trump v. Barbara*, 146 S. Ct. 2438 (2026) ..................................................................4, 35

**Trump v. Vance*, 941 F.3d 631 (2d Cir. 2019), *aff'd and remanded,* 591 U.S. 786 (2020) ....28, 31

*United States v. Anderson Cnty., Tenn.*, 705 F.2d 184 (6th Cir. 1983) .........................................31

*United States v. Commonwealth of Pa.*, 923 F.2d 1071 (3d Cir. 1991) .......................................30

**United States v. Composite State Bd. of Med. Examiners, State of Ga.*,
656 F.2d 131 (5th Cir. 1981) .............................................................................. 28-32

*United States v. Dicter*, 198 F.3d 1284 (11th Cir. 1999) ............................................................30

*United States v. E. Baton Rouge Par. Sch. Bd.*, 594 F.2d 56 (5th Cir. 1979) ...............................33

*United States v. Lowery*, 166 F.3d 1119 (11th Cir. 1999) ..........................................................43

*United States v. Morros*, 268 F.3d 695 (9th Cir. 2001) .........................................................28, 30

*United States v. Nixon*, 418 U.S. 683 (1974) ..................................................................37

*United States v. Ohio*, 614 F.2d 101 (6th Cir. 1979) .....................................................................31

**United States v. Supreme Ct. of New Mexico*, 839 F.3d 888 (10th Cir. 2016) ......................10, 43

*United States v. Texas*, 143 U.S. 621 (1892) ..............................................................18, 24

*United States v. Washington*, 596 U.S. 832 (2022) ........................................... 36, 41, 44-45

*Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383 (1988)...............................................10

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) ....................................................... 17-18

*Wyandotte Transp. Co. v. United States*, 389 U.S. 191 (1967) ....................................................26

*Youkelsone v. FDIC*, 910 F. Supp. 2d 213 (D.D.C. 2012),
*aff'd*, 560 F. App'x 4 (D.C. Cir. 2014) ........................................................................40

*Younger v. Harris*, 401 U.S. 37 (1971) .........................................................27-28, 35-26

**Constitution**

U.S. Const. art. II ....................................................................................................36-37, 40-41

U.S. Const. art. VI.................................................................................................................. 36

**Statutes**

5 U.S.C. § 704........................................................................................................................21

28 U.S.C. § 506......................................................................................................................37

28 U.S.C. § 511 ......................................................................................................................37

28 U.S.C. § 530B ............................................................................................................. 40-43

28 U.S.C. § 1257....................................................................................................................22

42 U.S.C. § 1983....................................................................................................................26

D.C. Code § 11-2501 ...............................................................................................................2

**Regulations**

28 C.F.R. § 77.1 .....................................................................................................................41

**Other Authorities**

Fed. R. Civ. P. 8......................................................................................................................46

Fed. R. Civ. P. 12......................................................................................................................7

D.C. R. Pro. Conduct 8.4 .........................................................................................................2

D.C. Bar R. XI ................................................................................................... 3, 15-17, 21

Black's Law Dictionary (12th ed. 2024).................................................................................14

# I. INTRODUCTION

The United States cannot stand by while Defendants attempt to regulate and weaponize their attorney disciplinary process against federal government attorneys. One basis of Defendants' disciplinary proceedings at issue here is a privileged "Proof of Concept" letter that was written for internal purposes. Yet Defendants are claiming the authority to dictate the *content* of these internal government deliberations. Defendants have no business—no authority whatsoever—in policing internal deliberative discussions and documents exchanged within the executive branch, no matter how much they disagree with the views of those discussions. Thus, as the Complaint's three Counts assert, Defendants' actions are unconstitutional several times over. They violate the Supremacy Clause twice over by both unlawfully regulating and discriminating against the Federal Government. And they even more directly violate Article II by interfering with the President's core executive power.

Not wanting to answer for their unconstitutional actions, Defendants spend the vast majority of their briefs trying to manufacture procedural technicalities in the hope this case never reaches the merits. But the procedural walls they try build crumble on the facts and the case law.

At bottom, weaponizing and politicizing state bar discipline proceedings against officials in the executive branch undermines core constitutional principles. Defendants try to chill federal officials from zealously advocating for the executive branch. And that is the point of their actions. Defendants' unprecedented attack against federal government attorneys is plainly animated by irrational animus against the current President. *See, e.g.*, Comp. ¶¶ 94-105 (recounting Defendant Assistant Disciplinary Counsel Theodore Metzler's attacks on purported "Trump judges"). This Court should not allow such lawfare to continue.

Defendants' Motion to Dismiss the Complaint should be denied. This Court needs to halt Defendants' flagrantly unconstitutional overreach into the President's executive power.

## II. BACKGROUND

### A. The Disciplinary Process

Federal statute empowers the D.C. Court of Appeals ("DCCA") to "make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion." D.C. Code § 11-2501(a). The DCCA has accordingly made its own rules of professional misconduct. Those rules declare that it is "professional misconduct" for attorneys to "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation" or "attempt to violate the Rules of Professional Conduct." D.C. R. Pro. Conduct 8.4(c), (a). They also prohibit attorneys from "[e]ngag[ing] in conduct that seriously interferes with the administration of justice." *Id.* § 8.4(d).

To enforce its professional misconduct rules, the DCCA made rules setting out the disciplinary process. D.C. Bar Rule XI. The DCCA has a Board on Professional Responsibility ("Board") that has the power to "consider and investigate any alleged ground for discipline or alleged incapacity of any attorney . . . and to take such action with respect thereto as shall be appropriate." *Id.* § 4(e)(1).

The Board has an Office of Disciplinary Counsel ("ODC") that investigates and prosecutes the attorney in all stages. *Id.* §§ 6(a)(2), 6(a)(4), 8(b)–(c). The ODC starts attorney formal discipline proceedings by filing a petition and specification of charges with the Board to initiate a disciplinary action. *Id.* § 8(c). That petition goes to a Hearing Committee, composed of two members of the Bar and one non-attorney member of the public. *Id.* §§ 5(a), 8(c). The Hearing Committee conducts a hearing and submits its findings and recommendations on the charges of misconduct to the Board." *Id.* § 5(c)(1), (2).

The Board itself then reviews the Hearing Committee's findings and recommendations and then forwards its own findings, recommendations, and a record of the Hearing Committee

proceedings to the DCCA for final disposition. *Id.* § 4(e)(7). If the Board has recommended disbarment, the DCCA orders the attorney to show cause why the court should issue an interim suspension pending its final decision. D.C. Bar R. XI § 9(g). In making its final determination, the DCCA must "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record," and it will adopt the Board's recommended disposition unless doing so would lead to inconsistent outcomes for similar conduct or would "otherwise be unwarranted." *Id.* § 9(h)(1). The DCCA must order all sanctions of suspension or disbarment against an attorney. *Id.* § 9(g)(1).

### B. Factual Background

Shortly after the presidential election on November 3, 2020, Jeffrey Clark, in his capacity as Acting Assistant Attorney General for the Department of Justice's Civil Division, prepared the internal and privileged "Georgia Proof of Concept" letter on which the Office of Disciplinary Counsel's proceedings were premised. Compl. ¶ 59. The draft letter was marked "Pre-Decisional & Deliberative/Attorney-Client or Legal Work Product," had placeholders for a letterhead and publication date, and was watermarked "FOR INTERNAL SJC USE ONLY DO NOT DISTRIBUTE." *Id.* ¶¶ 60-61.

The draft letter was never sent to its potential ultimate recipients, the Governor of Georgia, Speaker of the Georgia House of Representatives, and President Pro Tempore of the Georgia Senate. *Id.* ¶ 62. The unsent draft letter would have conveyed that the Department of Justice was investigating irregularities in the 2020 presidential election and that these investigations "identified significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia." *Id.* ¶ 63.

At the Department of Justice, as in all other legal offices, attorneys customarily write draft documents intended for potential future dissemination to describe anticipated actions which

have not yet happened and may never happen. *Id.* ¶ 64. These draft documents often include statements that are subject to revision upon review, including review by the signer or any cosigners of the documents. *Id.* ¶ 65. To that end, Clark shared his opinion in favor of issuing the letter with the two then-highest-ranking members of the Department. *Id.* ¶ 66. Those superiors disagreed with Clark, so they did not issue the letter. *Id.* ¶ 67

Years later, on June 29, 2022, Defendants Fox and the ODC filed a specification of charges instituting disciplinary proceedings against Clark based on the "Georgia Proof of Concept" letter and Clark's internal executive branch deliberations. *Id.* ¶ 69.[1] Fox and the ODC alleged that Clark violated D.C. Rules of Professional Conduct Rules 8.4(a), (c), and (d). *Id.* ¶ 70.

Defendant Assistant Disciplinary Counsel Theodore "Jack" Metzler was involved in the ODC prosecution of Clark. *Id.* ¶ 93. At the same time, Metzler was sharing polemical partisan messages on social-media websites, including insults directed at Justices of the Supreme Court and other "Trump judges." *Id.* ¶ 94-105. Metzler also posted that it is "unethical to engage with … people who claim there is a debate about birthright citizenship"—a position taken by the current Administration and resolved by the Supreme Court in a divided opinion. *Id.* at 102; *Trump v. Barbara*, 146 S. Ct. 2438 (2026).

The ODC prosecuted Clark in front of the Board Hearing Committee, which recommended that Clark get a two-year suspension. *Id.* ¶ 72. The Board itself rejected that and recommended disbarment. *Id.* ¶ 73. The Board concluded that Clark violated D.C. Rules of

[1] Anonymous then-former federal officials disclosed the privileged internal letter and deliberations to the New York Times. *See* Majority Staff Rep. of S. Comm. on the Judiciary, 117th Cong., Subverting Justice: How the Former President and His Allies Pressured DOJ To Overturn the 2020 Election at 1 n.1 (2021), https://perma.cc/F2DQ-KAJG.

Professional Conduct 8.4(a) and (c) but not Rule 8.4(d). *Id.* ¶ 74. The Board based its decision on the apparent disagreement between Clark and others at the Department of Justice, stating that the key question was "*not* whether [Clark] believed there were problems with the election" but rather "whether the *Justice Department*" agreed with his view. *Id.* ¶ 75. In doing so, the Board evaluated one Assistant Attorney General's pre-decisional and deliberative views against the views of the "Justice Department"—and is attempting to discipline him because those inchoate views differed from the agency's final views. *Id.* ¶ 76. In other words, Defendants are prosecuting and attempting to punish Clark merely because others at the Department of Justice disagreed with his draft proposal. *Id.* ¶ 77.

Notably, two Board members, including Defendant Robert L. Walker (who is now the Chair of the Board), observed in Clark's case: "We have not identified any case in which the Court disbarred a respondent over a single dishonest statement supported by a false citation." The draft letter for which Defendants prosecuted does not even fit that characterization. *Id.* ¶ 27.

Defendants Fox, ODC, and the Board have treated another attorney differently. They treated former FBI agent Kevin Clinesmith far more leniently than Clark—even though Clinesmith pled guilty to a felony for materially altering a document that he knew would be presented to obtain a surveillance warrant against Trump campaign advisor Carter Page as part of the thoroughly discredited Crossfire Hurricane investigation. *Id.* ¶ 85.

Specifically, after the Michigan Bar automatically suspended Clinesmith's bar license based on his guilty plea, the Office of Disciplinary Counsel delayed the automatic suspension of his license by five months. The Board then retroactively suspended Clinesmith's license for just one year and restored his license even before he completed his term of probation. *Id.* ¶ 86. By contrast, the Board and ODC seek to *disbar*—not merely suspend—Clark despite the absence of

any criminal conviction or false statement made to any court. They do so because Clark allegedly "attempt[ed] to make a false statement" in a pre-decisional and deliberative draft agency document that was never sent and never resulted in any actual harm. *Id.* ¶ 87.

Beyond Clark, Defendants Fox and the ODC are presently prosecuting the former interim U.S. Attorney for the District of Columbia, Ed Martin, for his official acts. *Id.* ¶ 78. They initiated the prosecution after Martin sent inquiries to them about their history of weaponizing the disciplinary process. *Id.* at 79. They based their prosecution in part on Martin's official letter to Georgetown University Law Center inquiring about its teaching and promotion of discriminatory DEI ideology in the light of recent law relating to race-based discrimination at institutions of higher learning. *Id.* ¶ 80. On March 6, 2026, they charged that "Martin knew or should have known, that as a government official, his conduct violated the First and Fifth Amendments to the Constitution of the United States." *Id.* ¶ 82. They accordingly are prosecuting him in part based on *their own interpretation* of the U.S. Constitution. *Id.* ¶ 81.

Presently Clark's disciplinary proceeding is in front of the DCCA. Because of the recommended disbarment, the DCCA issued a show cause order why Clark should not be suspended from practice pending the final disposition. Order, *In re Clark*, DCCA No. 25-BG-0731 (D.C. Aug.7, 2025).[2] The DCCA has yet to rule on that interim suspension, and has stayed its proceedings while this federal case proceeds. *See* Order, *In re Clark*, DCCA No. 25-BG-0731 (June 26, 2026).[3] Defendants have *never* punished a non-federal government attorney for a deliberative and pre-decisional draft document like the "Georgia Proof of Concept" letter, or any similar document or conduct. Compl. ¶ 90.

[2] Attached as Ex. G to Defs. Consold Mot., ECF No. 23-8.

[3] Attached as Ex. K to Defs. Consold Mot., ECF No. 23-12.

## III. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must establish subject-matter jurisdiction. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). A court should "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine jurisdictional questions." *Abuzeid v. Mayorkas*, 62 F.4th 578, 583 (D.C. Cir. 2023) (citations and quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible when the complaint contains 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). The court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. But "[i]n assessing the sufficiency of the pleadings, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Sanchez*, 45 F.4th at 395 (citation omitted).

## IV. ARGUMENT

### A. THE UNITED STATES HAS BROUGHT A LIVE CASE OR CONTROVERSY.

Defendants challenge the United States' standing, the ripeness of its claims, and urge dismissal for multiple Defendants based on capacity and immunity defenses. This Court should find that: (1) the United States satisfies standing, both generally and against each Defendant;

(2) its claims are constitutionally and prudentially ripe; and (3) Defendants' *sui juris*, official capacity, and immunity arguments fail.

### *1. The United States Satisfies Standing.*

To demonstrate standing, the United States must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *accord Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 111-12 (2025). As explained below: (a) the United States has alleged a plausible concrete injury in fact, namely that Defendants' actions chill the internal deliberative process and candid legal advice of current government attorneys; (b) this injury is traceable to each Defendant and redressable by court-ordered relief against them.

#### *a) The United States Has Alleged an Injury in Fact.*

Defendants (at 12)[4] first challenge the United States' injury in fact. The United States' injury is that the proceedings against Clark and Defendants' actions are currently chilling the internal deliberative process and candid legal advice of current government attorneys.

The Complaint's very first paragraph leads with the chilling injury, alleging that Defendants are punishing Clark for "for preparing a deliberative and pre-decisional draft letter that was never issued" and that "[w]eaponizing state bar discipline against Executive Branch

[4] All mid-sentence citations are to the internal pages of Defendants' Consolidated Memorandum of Points and Authorities, ECF No. 23-1.

attorneys in this way chills them from giving candid legal advice to others in the Executive Branch, including the President and Attorney General." Compl. ¶ 1. The Complaint further alleges that "Defendants' conduct harms the United States by violating the doctrine of separation of powers, depriving the Attorney General of control over Department of Justice attorneys, and chilling the candid legal advice of Government attorneys who might provide an opinion with which the D.C. Board on Professional Responsibility happens to disagree." Compl. ¶ 28. And [t]hese harms are compounded given the fact that typically the Department of Justice (and the Executive Branch) do not know when the Office of Disciplinary Counsel is investigating a Federal Government attorney unless and until that attorney notifies the Department of Justice." Compl. ¶ 29.

Moreover, the Complaint relies on more than the Clark disciplinary proceedings. The Complaint alleges the Clark proceedings are part of Defendants' current pattern of "actual weaponization of the process," Compl. ¶ 25, and that Defendants are also presently "prosecuting" another current Department of Justice attorney, "Edward R. Martin, Jr., for his official acts on the theory that he violated his oath to support the U.S. Constitution by sending a letter" and that Defendants have "no authority to decide whether a Federal Government attorney—no less the [then] interim U.S. Attorney for the District of Columbia—is upholding his Oath of Office or whether his official acts comport with the Constitution." Compl. ¶ 25.

This "actual weaponization of the process," Compl. ¶ 25, "chill[s] the zealous advocacy and candor of Federal officials, interfering with the President's and Attorney General's prerogatives under Article II of the U.S. Constitution, including the President's duty to take care that our Nation's laws be faithfully executed." Compl. ¶ 24. The Complaint further alleges the federal government "is harmed by any ongoing investigations, proceedings, and threats of

discipline against Mr. Clark and other current and former Federal Government attorneys based on their official acts." Compl. ¶ 112. And more particularly by "Defendants' bare efforts to probe the Executive Branch's internal deliberations and prosecute Federal Government officials based on them." Compl. ¶ 113. And as to Clark, "the enforcement actions occurred irrespective of [his] intent in providing pre-decisional and deliberative work. This has the effect of chilling the advice Federal Government attorneys give on controversial matters out of fear of disciplinary complaints." Compl. ¶ 114.

Defendants' chilling of current government attorneys' internal deliberations and candid legal advice is a concrete, particularized injury in fact. *See United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 900 (10th Cir. 2016) (finding "prosecutors' efforts to avoid [ethics] sanctions, and the resulting reduction in available evidence in grand-jury and other criminal proceedings, demonstrate[d] sufficient injuries to establish federal-court jurisdiction."); *cf. Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 393 (1988) (finding self-censorship in response to a "well-founded fear that the law will be enforced against them" is an injury in fact "that can be realized even without an actual prosecution"). Indeed, one of the purposes of a disciplinary sanction is to "deter" "other attorneys from engaging in similar misconduct." *In re Cater*, 887 A.2d 1, 17 (D.C. 2005).

Defendants submit (at 13-14) the Complaint does not "demonstrate a 'substantial risk' of future disciplinary actions against *current* federal attorneys" and thus the harm is not "certainly impending." But this misses that the chilling harm is already happening; the proceedings against

Clark and Defendants actions are currently chilling the internal deliberative process and candid legal advice of current government attorneys.[5]

Defendants take issue (at 14-15) with the grammatical tense of the allegations. They argue that the Complaint needs to allege Defendants' proceeding against Clark "has actually *had* a chilling effect." (emphasis added). This Court should dismiss this hyper-technical grammar argument. "[C]hills," "chill," and "chilling" should all fairly be read as covering the past and present. Especially because this Court should "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (explaining general factual allegations are sufficient at motion to dismiss phase). Moreover, if the United States had used the "had" tense, Defendants undoubtedly would be arguing that "had" tense means there is no present injury.

Defendants also imply (at 15) that the Complaint should have identified particular chilled attorneys by name. Producing that level of detail and evidence may be required at summary judgment, but not at the motion to dismiss phase "where general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss" this Court should presume that "general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation omitted).

This Court should accordingly find the Complaint plausibly alleges a concrete, particularized, on-going injury in fact.

---

[5] Plus the ODC currently has other active open inquiries into current Department of Justice attorneys, and has interviewed Department attorneys and pressed for disclosure of attorney-client and deliberative process privileged materials as part of these inquiries into Department attorneys.

***b) The United States Has Standing Against Each Defendant.***

Beyond the injury itself, Defendants also challenge that the injury is traceable to each Defendant and redressable by court ordered relief against them. These arguments fail.

**i. The ODC**

Defendants claim (at 21) that Court ordered relief against the ODC Defendants would not redress any injury because the "ODC Defendants have already completed their investigation" and the "matter now rests entirely with the D.C. Court of Appeals." This ignores that the ODC still has a prominent active role in the process and is still pressing the DCCA to sanction Clark. The ODC's "[p]owers and duties" include "prosecut[ing] all disciplinary proceedings before Hearing Committees, the Board, *and the Court*. When appearing before the Court, Disciplinary Counsel may, after notice to the Board, argue for a disposition other than that contained in the report and recommendation of the Board." D.C. Bar Rule XI § 6(a)(4) (emphasis added); *accord id.* § 9(i) ("Proceedings before the Board and the Court shall be conducted by Disciplinary Counsel. If Disciplinary Counsel disagrees with the findings or recommendation of the Board, the position of the Board may be presented before the Court, upon request of the Board, by the Executive Attorney or other counsel. The Court in its discretion may appoint an attorney to present the views of a minority of the Board."). In the Clark disciplinary process, the ODC has, among other things, advocated for Clark's interim suspension and opposed bifurcation. *See* ODC Position, *In re Clark*, 25-BG-0731 (D.C. Nov. 19. 2025) (regarding suspension), ECF No. 57; ODC Opp'n, *In re Clark*, 25-BG-0731 (D.C. Oct. 3, 2025) (regarding bifurcation), ECF No. 43.

The ODC is thus actively advocating against Clark and pressing its views on the DCCA. That makes Defendants' attempted reliance (at 21-22) on *Murthy v. Missouri*, 603 U.S. 43 (2024)

and actions by independent parties misplaced. In *Murthy*, plaintiff states and social-media users sued various federal government federal agencies and officials for pressuring social-media platforms to censor content. The Court found that the defendant federal government's pressure on third-party social media platforms to censor had essentially ceased. 603 U.S. at 72-73. The third-party platforms, rather than the federal defendants, were causing any present censorship injury to the plaintiff. The Court reasoned, however, that "evidence of continued pressure from the defendants" would solve the redressability problem. *Id.* at 73-74. The ODC here is still actively pressing its views on the DCCA.

More fundamentally, the *Murthy* decision also rested on the principle that a "federal court cannot redress injury that results from the independent action of some third party not before the court." 603 U.S. at 57 (citation and marks omitted). Here the DCCA is not some outside independent third party, but rather a party to this case and the ODC is even a subsidiary of the DCCA. That makes the injury here even more redressable than in *Bennett v. Spear,* 520 U.S. 154 (1997). The *Bennett* Court found standing and redressability to challenge the action of one agency (Fish and Wildlife Service) despite that redress ultimately depended upon action by another agency (Bureau of Reclamation) not before the Court. The Fish and Wildlife Service pointed to the Bureau of Reclamation as the yet to be ultimate enforcer, but the Court found that "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Id.* at 168-69.

Moreover, Defendants ignore (at 21-22) that the ODC's past investigation and other disciplinary actions against Clark are themselves presently causing injury. Those past actions are presently chilling government attorneys, who understandably fear similar illegal investigations, and will continue to do so until this Court grants relief. Defendants mistakenly urge (at 21-23),

that injunctions and declaratory judgments for past wrongs would be "meaningless." The United States has standing to seek injunctive and declaratory relief for the ODC's past illegal conduct that has "continuing, present adverse effects." *Lujan*, 504 U.S. at 564 (citation omitted); *accord Anatol Zukerman & Charles Krause Reporting*, 64 F.4th 1354, 1362–63 (D.C. Cir. 2023); *Dearth v. Holder*, 641 F.3d 499, 503 (D.C. Cir. 2011) (holding that plaintiff seeking declaratory and injunctive relief "suffer[ed] continuing, adverse effects sufficient to support standing because the Government denied and continues to deny him the ability to purchase a firearm").

The requested relief will remedy those continuing, present adverse effects. The Complaint prays for relief that includes declaring the "investigations, proceedings, adjudications, and findings" are "void," and enjoining Defendants from "commencing maintaining any investigations, proceedings, or disciplinary actions against Mr. Clark." Compl. ¶ 137. Declaring the investigation and findings "void" means they have no legal validity or effect. *See* VOID, Black's Law Dictionary (12th ed. 2024) (defining void as "[t]o render of no validity or effect; to annul; nullify"). And enjoining the "commencing or maintaining" of the investigation and findings prevents the ODC from restarting the same or similar investigation, thereby remedying the present chill on government attorneys.

Defendants urge (at 21-22) that an injunction or declaratory finding that the ODC "erred in pursuing disciplinary charges would not prevent the D.C. Court of Appeals from imposing a disciplinary sanction on Clark." Even if true,[6] the relief against the ODC would *likely* cause the DCCA to not sanction Clark and that's sufficient for redressability. The underlying actions would be void. The DCCA thus would be deciding the issue completely on its own without any underlying record or basis, and without ODC advocating for a disciplinary sanction or finding.

---

[6] The ODC petition starting the process would be void. *Cf.* Defs.' Consold. Br. at 21 n.4.

And the DCCA gives the ODC's actions great weight because of its purported "expertise in disciplinary matters." *In re Carter*, 333 A.3d 558, 568 (D.C. 2025) (admitting that "in at least most of the cases in which we have departed upwards from the Board's sanction, Disciplinary Counsel urged such a result . . . and its decision not to file an exception . . . given its expertise in disciplinary matters, weighs against a departure from the Board's recommendation" (citations omitted)).

Without the underlying actions and bases, the DCCA likely would not sanction Clark---especially since this Court would have declared those underlying actions and bases against Clark illegal and void—and "likely" satisfies redressability. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 121 (2025) ([T]o show redressability, the plaintiff must simply 'show a predictable chain of events' that would likely result from judicial relief and redress the plaintiff's injury." (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024))).

This Court accordingly should find standing against the ODC Defendants.

**ii. The Board**

For essentially the same reasons as the ODC, this Court should find standing against the Board. The Board is also a material "step in the chain of causation" for the United States' injury. *Bennett,* 520 U.S. at 168–69. Defendants' claim (at 22) that the Board defendants "have fully discharged" their responsibilities and can "can take no action in the D.C. Court of Appeals that could impact Clark or the United States." The DCCA proceedings against Clark indicate otherwise. The DCCA sought the Board's and ODC's positions "on what it means for an attorney to 'have the burden of demonstrating a substantial likelihood of success with respect to the exceptions the attorney has taken to the Board's report' for the purpose of preventing an interim suspension under D.C. Bar R. XI, § 9(g)(l).'" Order at 1, *In re Clark*, 25-BG-0731 (D.C.

Oct 30, 2025), ECF No. 55. And the Board submitted that position. Response of the Board on professional responsibility to the court's October 30, 2025, *In re Clark*, (D.C. Nov. 25, 2025), ECF No. 59. And the DCCA still has not decided that preliminary suspension, which could require further advocacy. *See* Order, *In re Clark* (D.C. June 26, 2026), ECF No. 74[7] (ruling "proceeding is held in abeyance").

More importantly, like the ODC, the Board's findings and recommendations to the DCCA are themselves presently causing injury. Those past actions are presently chilling government attorneys, who understandably fear similar illegal findings and recommendations, and will continue to do so until this Court grants relief. The "continuing, present adverse effects" of the Board's findings and recommendations provide the United States's standing. *Lujan*, 504 U.S. at 564 (1992).

And similar to the ODC, the DCCA gives the Board's recommendations great weight. According to the DCCA, the Board's recommended sanction "comes to [the DCCA] with a strong presumption in favor of its imposition." *In re Dobbie*, 305 A.3d 780, 792-93 (D.C. 2023) (citations omitted). The DCCA adopts the Board's "recommended disposition" "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Id.* (quoting D.C. Bar R. XI, § 9(h)(1)). Without the underlying actions and bases, the DCCA likely would not sanction Clark. *See Diamond Alternative Energy, LLC*, 606 U.S. at 121.

This Court accordingly should find standing against the Board Defendants.

---

[7] Attached as Ex. K to Defs. Consold Mot., ECF No. 23-12.

**iii. The DCCA**

Defendants claim (at 23) no controversy against the DCCA exists because the DCCA is purportedly just a "disinterested adjudicator." This ignores that the DCCA issued the substantive professional rules it seeks to enforce against Clark and other government attorneys, issued its own disciplinary process rules, and that it oversees both the ODC and Board. *See, e.g.*, D.C. Bar R. XI, § 4(e)(2) ("Disciplinary Counsel shall serve at the pleasure of the Board, subject to the Court's oversight authority over all disciplinary matters."); Defs.' Consold. Br. at 3-4, ECF No. 23-1. Thus, for disciplinary proceedings, the DCCA proceeds like an administrative agency where it makes the rules, advocates for the enforcement of its rules, and decides whether an attorney has violated its rules.

While determining who can practice before a court may be an inherent judicial function, that does not make that determination function "adjudicatory." Defendants' shortened quote (at 24) of *Simons v. Bellinger*, 643 F.2d 774 (D.C. Cir. 1980), misses that the court (in full) found that "in assessing whether *to initiate a prosecution*, the Committee was performing, by delegation, the inherent judicial function of determining who is authorized to practice law." *Id.* at 780 (emphasis added). That's not just disinterested adjudication.

Defendants attempt (at 23-24) to rely primarily on *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), for the proposition that "'no case or controversy' exists 'between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute.'" *Id.* at 40 (quoting *Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984)). But the United States here is challenging the DCCA's unconstitutional application of *its own rule.* That makes this case much more like the cited *Pulliam,* where the Court found injunctive relief was proper against a state judge's self-made rule of imposing bail on persons arrested for non-jailable offenses and incarcerating those persons if they could not meet the bail. 466 U.S. at 525, 528-43.

Also more on point is *Supreme Ct. of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 734–37 (1980). Similar to the later *Pulliam,* the *Consumers Union* Court allowed suit against the Virginia Supreme Court and its chief justice for that court's unconstitutional application of its professional responsibility rules prohibiting attorney advertising. *Id.* at 734-37. The *Consumers Union* Court reasoned the Virginia court's enforcement of its rules made it amendable to suit. *Id.* at 734-37.

The *Pulliam* and *Consumers Union* cases control and show the United States has standing against a state court enforcing its own rules. Defendants' favored *Whole Woman's Health* even distinguishes *Pulliam* because "the plaintiff sought an injunction only to prevent the judge from enforcing a rule of her own creation." 595 U.S. at 42 (citing *Pulliam*, 466 U.S. at 526); *see also* 595 U.S. at 68 (Sotomayor, J., concurring) (finding "[m]odern cases" "have recognized that suit may be proper even against state-court judges, including to enjoin state-court proceedings." (referencing *Pulliam* and *Mitchum v. Foster*, 407 U.S. 225, 243 (1972)).[8]

*Pulliam* and *Consumers Union* did deal primarily with immunity challenges. *See, e.g.*, *Pulliam*, 466 U.S. at 542-43 ("We conclude that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity.").[9] But the Supreme Court decided the cases on the merits, and thus first needed an Article III controversy and

[8] Defendants favored First Circuit case, *In re Justs. of Supreme Ct. of Puerto Rico*, 695 F.2d 17, (1st Cir. 1982), involving a challenge to a statute, makes a similar distinction regarding judge made rules. *Id.* at 23 (finding in "*Consumers Union,* unlike the case before us, the requirements under attack were promulgated by the judges themselves in the form of court rules; the judges had acted in a legislative capacity, which made their involvement in the litigation more direct and which gave them an institutional stake in the litigation's outcome").

[9] Beyond lack of case or controversy, *Whole Woman's Health* relied on state sovereign immunity. 595 U.S. at 39. State sovereign immunity does not apply to the United States. *United States v. Texas*, 143 U.S. 621, 646 (1892).

standing against those state courts to do so. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998); *id.* at 94 ("[T]he first and fundamental question is that of jurisdiction," and "the court is bound to ask and answer [the jurisdictional question] for itself."); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[C]ourts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

This Court should accordingly find standing against the DCCA.

**iv. The District of Columbia**

If this Court finds the other named entities are *non sui juris* or immune, then the Court should find that the District of Columbia is the responsible party and a necessary Defendant. Courts in this district have found that when a District of Columbia entity is *non sui juris*, the District of Columbia is responsible entity. *See, e.g.*, *Chisholm v. Superior Court of D.C.*, No. CIV.A.06-2174(RBW), 2007 WL 1601718, at *1 n.1 (D.D.C. June 4, 2007) ("[C]onsistent with existing legal authority, the Court concludes that the District of Columbia and not the Superior Court is the proper party for suit in this action and, therefore, should be the named defendant."); *Rhodes v. Superior Court of D.C.*, 2019 WL 6894045, at *1 n.1 (D.D.C. Dec. 18, 2019) ("The Court[] . . . [previously] dismissed all claims against Michael Francis, Daniel Cipullo, and the Superior Court of the District of Columbia and substituted the District of Columbia as the proper defendant. The caption of the case remained unchanged."); *see also Sibley v. U.S. Supreme Ct.*, 786 F. Supp. 2d 338, 344 (D.D.C. 2011) (analyzing the DCCA's *non sui juris* status as a "bod[y] within the District of Columbia government").

Some entity has to be legally responsible for the DCCA's actions. Otherwise, for example, the DCCA could continue to discriminate on the basis or viewpoint, or brazenly

discriminate on the bases of race and sex, without consequence. *See, e,g.*, *Kundrat v. District of Columbia*, 106 F. Supp. 2d 1, 8 (D.D.C. 2000) (allowing substitution of District of Columbia as responsible party for employment discrimination claims against the D.C. Superior Court).

***2. The United States' Claims are Ripe.***

Defendants urge that the United States claims are not ripe for review. The ripeness doctrine seeks to avoid "premature adjudication of abstract disagreements and instead reserves judicial power for resolution of concrete and fully crystalized disputes." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 579 (D.C. Cir. 2025) (citation and quotation marks omitted). Ripeness has a constitutional dimension and a prudential dimension. The United States' claims satisfy both.

Defendants argue (at 16) lack of constitutional ripeness, but that "constitutional dimension of ripeness 'is subsumed into the Article III requirement of standing" because "the constitutional doctrines 'originate from the same Article III limitation.'" *Media Matters for Am. v. Paxton*, 138 F.4th 563, 579 (D.C. Cir. 2025) (quoting *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020), and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014)). As explained above, the United States has alleged a sufficient *current*, particularized injury in fact and has constitutional standing.

Defendants also urge this Court (at 17-20) to exercise its discretion and dismiss the case for prudential ripeness. For the prudential ripeness inquiry, the "court balances 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427-28 (D.C. Cir. 1996) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)); *accord AT&T Corp. v. FCC*, 349 F.3d 692, 699 (D.C. Cir. 2003) (reiterating "framework for assessing [prudential] ripeness" is evaluating two prongs of "fitness" and "hardship").

The fitness prong under the prudential ripeness doctrine looks to whether the court would benefit from postponing review until the dispute in question has sufficiently "crystallized" and whether the dispute raises "purely legal questions." *AT&T Corp.*, 349 F.3d at 699–700 (D.C. Cir. 2003). For fitness, Defendants' point (at 18) to the non-final status of Clark's DCCA proceeding. But the Board has issued its findings and recommendation to the DCCA, which, as explained above, "comes to [the DCCA] with a strong presumption in favor of its imposition." *In re Dobbie*, 305 A.3d 780, 792-93 (D.C. 2023) (citations omitted). The DCCA adopts the Board's "recommended disposition" "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Id.* (quoting D.C. Bar R. XI, § 9(h)(1)). Defendants cite many non-controlling Administrative Procedure Act, 5 U.S.C. § 704, cases on final agency action; but this case is a "constitutional right of action in equity" and "such rights of action have no finality requirement." *Sidak v. United States Int'l Trade Comm'n*, 174 F.4th 151, 158 (D.C. Cir. 2026).

Plus, the overriding legal issue is sufficiently concrete and fit for review. This Court does not need further progress in Clark's DCCA disciplinary proceedings to decide whether the Constitution bars Defendants from regulating the internal, pre-decisional deliberative documents and discussions of Department of Justice attorneys.

The hardship prong of prudential standings looks to the plaintiff's "interest in immediate review." *AT&T Corp.*, 349 F.3d at 700. Here, the United States is presently suffering from government attorneys' lack of zealous advocacy in their internal deliberative discussions and draft documents in performing their Article II duties. That deprives the federal government, including the Department of Justice, from receiving the best legal advice or building the strongest case.

More severely, the United States will suffer severe hardship if this Court dismisses this case to wait for the DCCA's final decision. That would potentially run the United States into the *Rooker-Feldman* doctrine. In *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), the Supreme Court found the "United States District Court is without authority to review final determinations of the District of Columbia Court of Appeals in judicial proceedings. Review of such determinations can be obtained only in [the Supreme] Court." *Id.* at 476 (citing 28 U.S.C. § 1257). And *Feldman* even dealt with the DCCA's order denying a requested waiver from a bar admission rule. *Id.* at 463; *see also Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 75 (D.C. Cir. 1997) (applying *Rooker–Feldman* to bar suspension). If the United States is forced to wait for the DCCA decision it will forever lose its opportunity to assert its superior federal interest offensively as a party in this federal form.[10]

This Court accordingly should find fitness for review and severe hardship and decline to exercise its discretion to dismiss the case for lack of prudential ripeness.

***3. Defendants' Sui Juris, Official Capacity, and Immunity Arguments Fail.***

Beyond challenging standing against each Defendant, Defendants urge dismissal for multiple Defendants based on capacity and immunity defenses. This Court should find that: (a) the DCCA is a *sui juris* entity; (b) the official capacity Defendants are not redundant and should remain Defendants; and (c) Chief Judge Blackburne-Rigsby and Chair Walker do not have judicial immunity against injunctive relief.

---

[10] Defendants refer (e.g., at 29, 33) to the United States' option to participate in an appeal to the Supreme Court, but that would still just be as amicus and the Supreme Court would need to grant a petition for certiorari.

***a) The DCCA is Sui Juris.***

Defendants argue (at 26-27) that this Court and others have found that the DCCA is *non sui juris*, i.e., not an entity subject to suit. *See Hoai v. Superior Court of District of Columbia*, 539 F. Supp. 2d 432, 435 (D.D.C. 2008) (Leon, J.), *aff'd,* 344 F. App'x 620, 620 (D.C. Cir. 2009); *Chisholm v. Superior Court of D.C.*, No. CIV.A.06-2174(RBW), 2007 WL 1601718, at *1 n.1 (D.D.C. June 4, 2007).[11] But these cases are all based on sovereign immunity and inapplicable when the United States is the plaintiff.

Cases finding that District of Columbia subcomponents and the DCCA are *non sui juris* all rely on *Blackmar v. Guerre*, 342 U.S. 512 (1952), where the Court indicated that that an agency established by Congress may not be sued in its own name unless Congress has authorized the entity to be sued by explicit language or by implication. *See id.* at 514-15; *Chisholm*, 2007 WL 1601718, at *1 n.1; *Kundrat v. District of Columbia*, 106 F. Supp. 2d 1, 5-7 (D.D.C. 2000). But the *Blackmar* Court based this need for Congress authorization on the United States' sovereign immunity, relying on *Keifer & Keifer v. Reconstruction Finance Corporation*, 306 U.S. 381, 390 (1939). *Blackmar*, 342 U.S. at 515 (citing *Keifer & Keifer*, 306 U.S. at 390 (concerning whether Congress has endowed a governmental corporation with the federal government's sovereign immunity)).

The cases relying on *Blackmar*[12] and sovereign immunity are inapplicable here because the DCCA (and ODC and Board) and the District of Columbia do not have any sovereign

---

[11] Despite this, the DCCA often remains a named party in many cases—including all the way up to the Supreme Court in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983), of the *Rooker–Feldman* doctrine. *See also Galloway v. District of Columbia Courts*, No. CIV. A. 91-0644(JHG), 1991 WL 229949, at *4 n.1 (D.D.C. Oct. 21, 1991)

[12] As noted in Part IV.A(3)(b) *infra*, *Blackmar* finds that even if Congress has not authorized suit against the entity, the suit can still proceed against the entity's officials. 342 U.S. at 515 ("[A]

immunity against the United States. *See District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *13 (D.C. Cir. Dec. 17, 2025) (finding District does not have a sovereign status separate from the federal government); *United States v. Texas*, 143 U.S. 621, 646 (1892) (finding states have no sovereign immunity against the federal government).

***b) The Official Capacity Defendants Are Not Redundant.***

Defendants urge (at 28-29) that the individual Defendants sued in their official capacities should be dismissed "as 'redundant' and 'unnecessary'" because the Complaint names the entities. But that "redundancy" rationale falls away if this Court dismisses the entity Defendants as well. This Court should exercise its discretion to keep the Defendant officials because Defendants urge the dismissal of all the other entity Defendants.

Defendants' correctly note that it is "the 'overwhelming approach' in this district to summarily dismiss 'government officials sued in their official capacities in conjunction with suits also filed against the *municipality*.'" Defs.' Br. at 28 (quoting *Ruffin v. District of Columbia*, 662 F. Supp. 3d 1, 9 (D.D.C. 2023)) (emphasis added). But Defendants' cases all deal with District of Columbia *municipality* officials (e,g., the mayor), when the District of Columbia is also named as a municipality defendant.[13] And the courts dismiss the municipal official

---

suit involving the action of the Commission generally must be brought against the individual Commissioners as members.").

[13] Defendants also cite but overstate *Kentucky v. Graham*, 473 U.S. 159 (1985), as requiring courts to treat all official capacity suits as a suit against the entity. That overstatement directly conflicts with cases such as *Ex parte Young*, 209 U.S. 123 (1908). See *Media Matters for Am. v. Paxton*, 138 F.4th 563, 574 (D.C. Cir. 2025) (*Ex parte Young* "and its progeny permit actions for declaratory and injunctive relief against state officials in their official capacities, notwithstanding sovereign immunity under the Eleventh Amendment . . . such suits for prospective relief are against the official rather than the state" (citations omitted)). And *Kentucky v. Graham* even notes this. 473 U.S. at 167 n.14 (1985) ("[O]fficial-capacity actions for prospective relief are not treated as actions against the State." (citing *Ex parte Young,* 209 U.S. 123 (1908)); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-

capacity defendants as a matter of convenience and "discretion." *N.B. v. District of Columbia*, 244 F. Supp. 3d 176, 188 (D.D.C. 2017) (Leon, J.) ("[P]laintiffs' official-capacity claims against the Mayor and the Director are redundant and an inefficient use of judicial resources, and I exercise my discretion to dismiss them from this case." (citation and quotation marks omitted)).

Additionally, Defendants ask this Court to dismiss all the entity Defendants. Defendants claim (at 25-26) that Defendant District of Columbia should be dismissed because it purportedly has no responsibility or authority over any of the other Defendants. And in turn, as explained above, they assert (at 26-27) that Defendant DCCA and its subsidiary entities Defendants ODC and the Board are *non sui juris***.** This Court accordingly should exercise its discretion to keep the Defendant officials, and certainly should not dismiss them should it dismiss their entity Defendants. *Cf. Blackmar v. Guerre*, 342 U.S. 512, 515 (1952) ("Since the Civil Service Commission is not a corporate entity which Congress has authorized to be sued, a suit involving the action of the Commission generally must be brought against the individual Commissioners as members of the United States Civil Service Commission.").

***c) Chief Judge Blackburne-Rigsby and Chair Walker Do Not Have Judicial Immunity Against Injunctive Relief.***

Defendants claim (at 29-31) that Chief Judge and Board Chair Walker have common law judicial immunity from suit. As explained above, the Supreme Court in *Pulliam v. Allen*, 466 U.S. 522 (1984), squarely held "that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Id.* at 541. *Pulliam* applies here

---

capacity suits *generally* represent only another way of pleading an action against an entity of which an officer is an agent—*at least where Eleventh Amendment considerations do not control analysis*." (emphasis added)).

because the United States sued both these officials in their official capacity for prospective relief.[14]

Defendants misdirect (at 29-31) to 42 U.S.C. § 1983, noting that Congress "'restore[d] the doctrine of judicial immunity' for suits under 42 U.S.C. § 1983 by statute in 1996, and 'explicitly immunize[d] judicial officers against suits for injunctive relief.'" *Roth v. King*, 449 F.3d 1272, 1286 (D.C. Cir. 2006). But that statutory created immunity applies only to Section 1983 suits by private plaintiffs, and does not disturb the United States' suits, which do not rely on Section 1983. *See, e.g.*, Compl. ¶ 32 (seeking "injunctive relief pursuant to this Court's equitable powers." (citing *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015))); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) (noting "the general rule that the United States may sue to protect its interests"); *see also Klayman v. Blackburne-Rigsby*, No. CV 21-0409 (ABJ), 2021 WL 2652335, at *2-3 (D.D.C. June 28, 2021), (explaining how Section 1983 statutory judicial immunity does not alter *Pulliam* in non-Section 1983 actions) ("Plaintiff ignores the distinction between the statutory judicial immunity that Congress created when it amended section 1983 and the common law judicial immunity at issue in *Pulliam.*"), *aff'd,* No. 21-7069, 2022 WL 298933, at *1 (D.C. Cir. Jan. 20, 2022).

Defendants similarly misdirect to cases about "absolute immunity" from *damages claims*. *See Simons v. Bellinger*, 643 F.2d 774, 776 n.4 (D.C. Cir. 1980) ("Due to the dismissal of plaintiffs' claims for injunctive and declaratory relief, the Court is only presented with the issue

---

[14] Defendants' citation (at 29) to *Hill v. Traxler*, No. 13-cv-1037, 2013 WL 4580456, at *1 (D.D.C. July 9, 2013) for the proposition that judicial immunity applies to "equitable relief" shrouds that *Hill* was making a passing reference to a parenthetical of a Southern District of Mississippi case, and more importantly that the D.C. Circuit did not uphold judicial immunity as the basis for denying injunctive relief. *See* 550 F. App'x 1, 2 (D.C. Cir. 2013) (finding injunctive relief inappropriate because "appellate and post-judgment review of his conviction provided an adequate remedy at law for [the] claims.").

of defendants' immunity from damage claims."); *Klayman v. Porter*, 104 F.4th 298, 311 (D.C. Cir. 2024) ("[A]bsolute immunity shields the ODC Employees from his damages claims."); *Klayman v. Fox*, No. CV 18-1579 (RDM), 2019 WL 2396538, at *12 (D.D.C. June 5, 2019) ("The Court will, accordingly, dismiss Plaintiff's damages claims against the individual defendants as barred by absolute immunity."), *aff'd sub nom. Klayman v. Lim*, 830 F. App'x 660 (D.C. Cir. 2020). As the United States seeks prospective relief, not damages, this Court should find that judicial immunity does not apply here.[15]

### B. *YOUNGER* ABSTENTION DOES NOT APPLY.

Defendants ask this federal Court to shut its doors to the federal government based on a novel extension of the *Younger* abstention doctrine to cases brought by the United States. *Younger* abstention itself is an "exceptional" departure from federal courts' "virtually unflagging" "obligation" to exercise jurisdiction conferred by Congress despite the pendency of related proceedings in state court. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77-78 (2013). Federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Id.* at 77 (quoting *Cohens v. Virginia,* 19 (6 Wheat.) 264, 404 (1821)).

In *Younger v. Harris*, 401 U.S. 37 (1971), the Court found that when a plaintiff asks a federal court to enjoin a pending parallel state criminal proceeding, principles of "comity" and "[f]ederalism" generally call for the federal court to exercise equitable discretion and abstain from intervening. *Id.* at 44-45. The Court explained federalism "does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in

---

[15] Defendants also incorrectly urge (at 30) the United States is seeking an injunction compelling Chair Walker to alter a past decision; the United States asks this Court declare the Board's decision "void" and enjoin the Board and Chair Walker from reissuing it. Compl. ¶ 137.

our National Government and its courts," but rather "sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.* at 44.

The Court has extended *Younger* abstention to certain civil enforcement proceedings, including state-initiated disciplinary proceedings against lawyers for violation of state ethics rules. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 434-35 (1982).

But as a prudential doctrine, *Younger* abstention itself has exceptions and it does not apply in cases involving bad faith, harassment, flagrantly and patently unconstitutional state laws, and other exceptional circumstances. *See Younger*, 401 U.S. at 48-53. The facts alleged here fall within these exceptions. Nor does *Younger* apply when the United States is the plaintiff because the comity and federalism justifications for *Younger* disappear. *See, e.g.*, *United States v. Composite State Bd. of Med. Examiners, State of Ga.*, 656 F.2d 131, 134 (5th Cir. 1981) (finding *Younger* does not apply to the United States).

As explained below, this Court should find that *Younger* does not apply here because: (1) the federal government is the plaintiff; and (2) the disciplinary proceedings are harassing and in bad faith.

***1. Younger Abstention Does Not Apply When the Federal Government Is the Plaintiff.***

The comity and federalism concerns driving *Younger* abstention disappear when the United States brings the case. Accordingly, virtually every Circuit court to have decided the issue has found that *Younger* does not apply when the United States is the Plaintiff. *Trump v. Vance*, 941 F.3d 631, 637-38 & n.9 (2d Cir. 2019) (collecting cases), *aff'd and remanded,* 591 U.S. 786 (2020); *United States v. Morros*, 268 F.3d 695, 707-09 (9th Cir. 2001); *United States v. Composite State Bd. of Med. Exam'rs*, 656 F.2d 131, 135-38 (5th Cir. 1981). While the D.C.

Circuit has not addressed this question, this Court should follow these persuasively reasoned cases that find the comity and federalism principles underpinning *Younger* disappear when the United States brings the case.

The Fifth Circuit found *Younger* inapplicable when the United States is the plaintiff asserting a federal interest against a state interest in *United States v. Composite State Bd. of Med. Examiners, State of Ga.*, 656 F.2d 131, 134 (5th Cir. 1981). The court relied on *Leiter Mins., Inc. v. United States*, 352 U.S. 220 (1957), where the Supreme Court found the Anti-Injunction Act, which prohibits injunctions to stay state court proceedings except as authorized by Congress, does not apply when the United States is plaintiff. *See* 656 F.2d at 134-35 (citing *Leiter*, 352 U.S. at 225-26). The *Leiter* Court reasoned that the Anti-Injunction Act "is designed to prevent conflict between federal and state courts," but that this "policy is much more compelling when it is the litigation of private parties which threatens to draw the two judicial systems into conflict than when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest." *Leiter*, 352 U.S. at 225-26; *see Composite State Bd. of Med. Examiners*, 656 F.2d at 135. Given the "frustration of superior federal interests that would ensue," the *Leiter* Court declined to read the Anti-Injunction Act to apply to the United States. *Leiter*, 352 U.S. at 226 ("[E]xcluding the United States from the coverage of the statute seems to us preferable in the context of healthy federal-state relations.").

In finding *Younger* inapplicable when the United States is the plaintiff, the Fifth Circuit found:

> [T]he policies underlying the abstention doctrine are similar to those underlying the Anti-Injunction Act. Whether it is labeled "comity", "federalism", or some other term, it is the unnecessary conflict between state and federal governments that is sought to be avoided . . . those concepts of comity or federalism that support the Anti-Injunction Act and the abstention doctrine apply to conflicts not only between the judicial systems, but also between the other branches of the respective

> governments . . . the policy of avoiding conflicts between the state and federal courts is more compelling in the case of private litigants [because] absence of intervention by the federal courts, the two governments would not be in direct conflict. . . . [when] the United States seeks relief against a state or its agency, the state and federal governments are in direct conflict before they arrive at the federal courthouse. By the time the United States brings suit . . . any attempt to avoid a federal-state conflict would be futile. Thus, in most cases invocation of either the Anti-Injunction Act or the abstention doctrine, both of which have as their goal the avoidance of federal-state conflicts, would be useless. In other words, by the time federal jurisdiction is invoked the issue has ceased to be one of avoidance of a federal-state conflict; the issue has become one of choosing the proper forum for resolution of the existing conflict. Viewed in this light, we think in this case the answer is clear. "For the Federal Government and its agencies, the federal courts are the forum of choice. For them, . . . access to the federal courts is 'preferable in the context of healthy federal-state relations."

*Composite State Bd.*, 656 F.2d at 135–36 (citations omitted).

The Ninth Circuit followed suit in *United States v. Morros*, 268 F.3d 695 (9th Cir. 2001). The *Morris* court denied *Younger* abstention for the "basic reason" that the United States was the plaintiff. *Id.* at 707. Like the Fifth Circuit, the Ninth Circuit found that "[w]hether it is labeled 'comity,' 'federalism,' or some other term," the policy objective behind *Younger* abstention is to "avoid unnecessary conflict between state and federal governments." *Id.* (citing *Composite State Bd. of Med. Examiners*, 656 F.2d at 136). And that "policy lacks force where the United States is a litigant" because when the United States seeks relief "the state and federal governments are in direct conflict before they arrive at the federal courthouse" and "any attempt to avoid a federal-state conflict would be futile." *Id.* at 707-08 (citing *United States v. Dicter*, 198 F.3d 1284, 1291 (11th Cir. 1999); *United States v. Commonwealth of Pa.*, 923 F.2d 1071, 1078-79 (3d Cir. 1991); *Composite State Bd. of Med. Examiners*, 656 F.2d at 136). The Ninth Circuit found that federal court is the proper forum when the United States is "asserting a superior federal interest against a state." *Id.* at 708.

The Second Circuit similarly found *Younger* inapplicable when the President sought "to vindicate the 'superior federal interests' embodied in Article II and the Supremacy Clause." in

*Trump v. Vance*, 941 F.3d 631, 637 (2d Cir. 2019). The Second Circuit relayed that "nearly every circuit to address the issue has either held or suggested that abstention is unwarranted in such circumstances" and found those "persuasive." *Id.* at 638 & n.9. Like these other courts, the Second Circuit relied on *Leiter*'s "comity" and "frustration of superior federal interests" reasoning for excepting the United States from the Anti-Injunction Act. 941 F.3d 637-38.

This Court should follow these well-reasoned cases here. The United States has filed suit seeking to vindicate its superior federal Article II and Supremacy Clause interests against Defendants, making *Younger* and its federal-state conflict avoidance rationale inapplicable. The United States thus should get to assert its superior federal interest as a party in this Court.

Defendants (at 36) attempt to limit the above Fifth, Ninth, and Second Circuit opinions to their particular facts. But these cases all stand on the "basic" reason that the "'comity" and "federalism" concerns underlying *Younger* are the same that underly the Anti-Injunction Act—which the Supreme Court found inapplicable when the United States is the party bringing the suit to assert its superior federal interests.

Defendants (at 35) rely on the purportedly "leading case" of *United States v. Ohio*, 614 F.2d 101 (6th Cir. 1979), which no other circuit has followed. *See, e.g.*, *Composite State Bd. of Med. Examiners.*, 656 F.2d 135 n.5 ("[W]e we do not find the reasoning of the Sixth Circuit persuasive."). Indeed, the Sixth Circuit does not even appear to follow it. *See United States v. Anderson Cnty., Tenn.*, 705 F.2d 184, 189 (6th Cir. 1983) ("[The United States has challenged the tax assessment as violative of the Supremacy Clause . . . Tennessee's interest in obtaining a state forum is at best concurrent with and at worst totally subservient to the coexisting interest of the United States to obtain a federal adjudication of the propriety and constitutionality of said tax. The principles of comity and federalism which underlie doctrines of abstention in general, and

*Younger* abstention in particular, are absent."). Moreover, the Sixth Circuit's *Ohio* decision does not address the portion of *Leiter* where the Court found the comity and federalism underpinnings for the Anti-Injunction Act do not apply to the United States. This Court should find the Sixth Circuit's opinion in *Ohio* unpersuasive.

Defendants also point (at 34-35) to some courts that have abstained even when the plaintiff is not a party to the state proceeding because the partes are closely related. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 928-29 (1975) (noting "there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them"); *see also id.* (finding insufficient relationship because "while respondents are represented by common counsel, and have similar business activities and problems, they are apparently unrelated in terms of ownership, control, and management"). Defendants flag the United States' amicus brief in Clark's disciplinary proceeding and urge that the United States and Clark have overlapping interests.

Putting aside that the United States is the plaintiff here, this application of *Younger* to supposedly related non-parties is only proper in "exceptional circumstances." *See Massachusetts Delivery Ass'n v. Coakley*, 671 F.3d 33, 45-46 (1st Cir. 2012). And as the Fifth Circuit has explained, it applies "only in the extraordinary situation in which the interests of the state defendant and the federal plaintiff are so 'intertwined' as to be considered identical." *Composite State Bd. of Med. Examiners,* 656 F.2d at 137. Those exceptional circumstances are absent here because the United States and Clark have different interests, and the United States should not need to rely on Clark to assert its superior, broader government interests.

The United States has a direct federal Article II and Supremacy Clause interest in Defendants not illegally regulating the federal government; Clark just urges these as defenses to

maintain his bar license. *See id.* ("[T]he interest of the United States in providing health care to underserved areas in the manner which it deems best is much broader than the interest of Dr. Lewis in maintaining his license."). Clark's interests are thus at best derivative of the United States' broader government interests, not the other way around. *Cf. Spargo v. New York State Comm'n on Jud. Conduct*, 351 F.3d 65, 83-84 (2d Cir. 2003) (finding "this case presents one of the narrow circumstances in which *Younger* may properly extend to bar claims of third-parties" because federal court plaintiffs' First Amendment rights were "entirely derivative" of state defendant's rights).

More generally, courts routinely find a lack of privity between private parties and the federal government because private parties cannot adequately represent the greater interests of the federal government. *See, e.g., EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1291 (11th Cir. 2004) ("Quite simply, it is so unusual to find privity between a governmental agency and private plaintiffs because governmental agencies have statutory duties, responsibilities, and interests that are far broader than the discrete interests of a private party."); *United States v. E. Baton Rouge Par. Sch. Bd.*, 594 F.2d 56, 58 (5th Cir. 1979) (finding res judicata privity generally does not apply to the federal government because of "the recognition that the United States has an interest in enforcing federal law that is independent of any claims of private citizens"). This Court should likewise do so here. While this Court can and should find *Younger* inapplicable simply because the United States is the plaintiff, this Court can also find *Younger* does not apply because the relationship between the United States and Clark is insufficient to meet the "exceptional circumstances" necessary to extend *Younger* to a third party.

This Court should accordingly find *Younger* inapplicable here and deny Defendants' novel request to relegate the United States to the back bench of asserting and protecting its

superior federal interests as an amicus in a local disciplinary proceeding. That amicus role in that local proceeding would not provide the United States a "full and fair opportunity to litigate" its constitutional claims. *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,* 477 U.S. 619, 627 (1986).

***2. Younger Abstention Does Not Apply to The Bad-Faith and Harassing Proceedings Here.***

This Court should also decline to apply *Younger* here because the disciplinary proceedings are "motivated by a desire to harass or [are] conducted in bad faith." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611 (1975); *accord Klayman v. Lim*, 830 F. App'x 660, 662-63 (D.C. Cir. 2020); *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1127 (D.C. Cir. 2004) (noting *Younger* does not apply where "the pending state action was brought in bad faith or for the purpose of harassing the federal plaintiff, or where a state statute is flagrantly and patently unconstitutional" (citation and quotation marks omitted)).

The disciplinary proceedings are harassing and in bad faith because they come from Defendants' animus toward federal attorneys overseen by the current President. The proceedings against Clark are unprecedented. "Defendants have never penalized a state, local, or private attorney for an unsent pre-decisional and deliberative draft document." Compl. ¶¶ 120. Plus they "have never recommended for disbarment a state, local, or private attorney for allegedly 'attempting to lie' once." *Id.* ¶¶ 120-21.

And the proceedings against Clark are part of Defendants' pattern of weaponization of their disciplinary proceedings against federal attorneys overseen by the current President. Defendants are presently prosecuting a current Department of Justice attorney, Edward Martin, for purportedly violating his "Oath of Office" for acts that Defendants deem do not "comport with the Constitution." *Id.* ¶ 25. Moreover, compared to Clark, Defendants gave much more

lenient treatment to FBI agent Clinesmith who "pled guilty to a felony for materially altering a document that he knew would be presented to obtain a surveillance warrant against" a campaign advisor to the President. *Id.* ¶¶ 85; *see also id.* ¶¶ 84-88. And on top of that, Defendant ODC Assistant Counsel Metzler's social media posts show animus towards the current Administration, including his calling the "debate about birthright citizenship" "unethical" (despite a later divided Supreme Court decision on the issue), and his utter contempt for so-called "Trump judges." *Id.* ¶¶ 92-105; *see also Trump v. Barbara*, 146 S. Ct. 2438 (2026). This Court should accordingly find the proceedings here are harassing and in bad faith.

Defendants attempt (at 32) to limit the bad faith and harassment exception, arguing bad faith applies only if Defendants initiated the proceedings with no expectation of sustaining the charges against Clark. *See Lim*, 830 F. App'x at 663 (quoting *Younger*, 401 U.S. at 48). But the bad faith exception also applies when proceedings are "initiated to retaliate for or discourage the exercise of constitutional rights." *Lewellen v. Raff,* 843 F.2d 1103, 1109-10 (8th Cir.1988); *Cullen v. Fliegner*, 18 F.3d 96, 103-04 (2d Cir. 1994) (explaining that *Younger* does not apply when a "proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass"); *Phelps v. Hamilton*, 59 F.3d 1058, 1065 n.12 (10th Cir. 1995) ("[I]f prosecutions are brought for the purpose of chilling or preventing a defendant from exercising his or her constitutional rights, this may constitute a harassing and/or bad faith prosecution, even though the charges are predicated on probable cause." (citations omitted)). Here, Defendants brought disciplinary proceedings against Clark because he was vigorously engaged in internal deliberative communications pursuant to his Article II duty to faithfully execute federal law in

the wake of the 2020 election. Defendants' disciplinary proceedings were "brought to retaliate for or to deter [that] constitutionally protected conduct." *Cullen*, 18 F.3d at 103-04.

Finally, this case also fits in the exception to *Younger* abstention for proceedings predicated upon a law that is "flagrantly and patently" unconstitutional. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 602 (1975) (quoting *Younger*, 401 U.S. at 53); *accord JMM Corp.*, 378 F.3d at 1127. Here, Defendants are applying the professional responsibility rules in flagrant violation of Article II and the intergovernmental immunity doctrine.

This Court should therefore find that *Younger* does not apply because the disciplinary proceedings here are harassing and in bad faith.

### C. All Three Counts State Plausible Claims

The United States' three claims all center on the Supremacy Clause, U.S. Const. art. VI, cl. 2, and Defendants' intrusion and interference with Article II's vesting of the federal "executive Power" in the President and requirement that the President "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3.

In *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), Chief Justice John Marshall explained long ago that "the very essence" of federal supremacy "is to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *Id.* at 427. Thus, the Supremacy Clause gives rise to an "intergovernmental immunity doctrine," which prohibits states "from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022). Intergovernmental immunity prohibits "state laws that *either* 'regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals' (*e.g.*, contractors)." *Id* at 838-39 (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)).

No State may impede, through state law or regulation, the President's duty to take care that federal law is faithfully executed. *See In re Neagle*, 135 U.S. 1, 60-62 (1890) ("The general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers." (quoting *Martin v. Hunter's Lessee,* 14 U.S. 304, 363 (1816))).

In carrying out Article II's charge that he "take Care that the Laws be faithfully executed," the President necessarily depends on "the assistance of subordinates," *Myers v. United States*, 272 U.S. 52, 117 (1926); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020). This includes the officials he appoints at the Department of Justice. *See* 28 U.S.C. § 511 ("The Attorney General shall give his advice and opinion on questions of law when required by the President.); 28 U.S.C. § 506 ("Assistant Attorneys General" "shall assist the Attorney General in the performance of his duties."); U.S. Const. art. II, § 2, cl. 1 (T]he President . . . may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices.").

The Supreme Court has made clear that the President's interest in the confidentiality of his decisionmaking is a central component of the constitutional separation of powers and Article II. In *United States v. Nixon*, 418 U.S. 683 (1974), the Court stressed that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." 418 U.S. 683, 708 (1974); *accord Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 385 (2004) (recognizing "the Executive Branch's interests in maintaining the autonomy of [the Presidency] and safeguarding the confidentiality of its communications").

Pursuant to these bedrock constitutional principles, the United States' Complaint brings an unlawful regulation claim, Count 1, an unlawful discrimination claim, Count 2, and

alternatively an unlawful interference claim, Count 3. As detailed below, all three state plausible clams for relief.

### *1. Count 1 – Unlawful Regulation*

#### *a) Defendants are Directly Regulating the Federal Government.*

Count 1 plausibly alleges Defendants are unconstitutionally regulating the federal government. Compl. ¶¶ 106-16. The Count alleges that Defendants' enforcement of the D.C. professional conduct rules against Clark for his "pre-decisional and deliberative work as Assistant Attorney General constitutes unlawful regulation of the Federal Government.," *id.* ¶ 107, and that "States and the District of Columbia do not have the inherent authority to regulate Federal officials for their official acts, including internal Executive Branch deliberations," *id.* ¶ 108.

This constitutes unconstitutional regulation because it is regulating a federal attorney's performance of his federal function. Direct regulation "lays hold of" federal officers "in their specific attempt to obey orders and requires qualifications in addition to those that the [federal] Government has pronounced sufficient." *Johnson v. Maryland*, 254 U.S. 51, 57 (1920). A state directly regulates when it puts conditions upon "a function of government," and limits "the right to carry on the business" of the federal government. *Mayo v. United States*, 319 U.S. 441, 447-48 (1943). And a law still impermissibly directly regulates federal operations even if it also regulates state operations. *See Johnson*, 254 U.S. at 56-57 ("[E]ven the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." (citation omitted)); *Mayo*, 319 U.S. at 447-48 (finding generally applicable inspection fees were unconstitutionally "laid directly upon the United States")

Defendants attempt (at 38-39) to style their direct regulation of federal attorneys as "merely touch[ing] the Government servants remotely by a general rule of conduct," citing *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920). But this reliance on *Johnson* is puzzling, because it comes from the part of *Johnson* that is directly on point here. Like attorney bar requirements and regulation, *Johnson* found licensing and federal employee job performance conditioned on a "state officer upon examination that they are competent" is impermissible regulation. More fully, *Johnson* held that:

> immunity of the instruments of the United States from state control in the performance of their duties *extends to a requirements that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on. Such a requirement does not merely touch the Government servants remotely by a general rule of conduct*; *it lays hold of them* in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient. It is the duty of the Department to employ persons competent for their work and that duty it must be presumed has been performed

254 U.S. at 57 (emphasis added). Defendants similarly misread *Hancock v. Train*, 426 U.S. 167 (1976), which found that a generally applicable state environmental permit requirement directly regulated federal installations. *Id.* at 178-80; *see also Mayo*, 319 U.S. at 447-48 (finding generally applicable fertilizer inspection fees unconstitutionally "laid directly on the United States" and was "required before executing a function of government"). Indeed, the Supreme Court has found an unconstitutional regulation of the federal government when the state regulation of federal *contractors* requires "qualifications in addition to those that the Government has pronounced sufficient." *Leslie Miller, Inc. v. State of Ark.*, 352 U.S. 187, 190 (1956); *cf. North Dakota v. United States*, 495 U.S. at 437 (plurality opinion) (finding no direct regulation because "the reporting requirement and the labeling regulation operate against suppliers, not the Government").

More fundamentally, Defendants' regulation of federal attorneys here is not indirect regulation, or an "incidental" burden, or akin to a traffic law "regulating the mode of turning at corners of the streets." *See* Defs' Br. at 37-38. Rather Defendants are attempting to directly regulate a federal attorney's internal deliberative communication that the attorney specifically made as part of his core federal duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Defendants are unconstitutionally "claiming the authority to dictate the manner in which th[is] federal function is carried out." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 n.3 (1988).[16]

This Court should accordingly find that Count 1 states a plausible direct regulation claim.

***b) The McDade Amendment Does Not Apply Here.***

Defendants claim (at 39-41) that the McDade Amendment, 28 U.S.C. § 530B, is a federal statute that authorizes their regulation of Clark and other government attorneys. Congress can sometimes authorize "regulation that would otherwise violate the Federal Government's

[16] The ODC Defendants argue that the United States "mischaracterizes the misconduct that the Board found Clark committed" because it described the Board's disbarment recommendation as based on an "internal disagreement." ODC Br. at 5, ECF No. 24. But while ODC Defendants maintain that the Board's recommendation was based on false statements, no Party disputes that the letter never was issued and all discussions were internal. To the extent ODC Defendants suggest that this Court can take judicial notice of the facts *as the Board found them* when those purported facts conflict with the Complaint's factual allegations, *see* ODC Br. at 4 n.1, ODC Defendants are wrong. Judicial notice is reserved for "historical, political, or statistical facts, or any other facts that are verifiable with certainty." *Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012), *aff'd*, 560 F. App'x 4 (D.C. Cir. 2014). Thus, while the Court may take judicial notice of the existence of Clark's disciplinary proceedings, it cannot take judicial notice of the truth of the factual determinations made in those proceedings and use that as a basis for its decisions. *See Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446, 464 (D.C. Cir. 2018) ("Therefore, in the foregoing discussion, we have noticed section 1634's legislative record not for its truth, but for its existence.").

intergovernmental immunity." *United States v. Washington*, 596 U.S. 832, 839 (2022). But Congress must provide a "clear and unambiguous authorization for" this otherwise impermissible state regulation. *Goodyear Atomic Corp. v. Miller*, 486 U.S. at 180 (citations and quotation marks omitted); *Washington*, 596 U.S. at 840. The Supreme Court has cautioned for "the need to read waivers of intergovernmental immunity narrowly." *Washington*, 596 U.S. at 842. "Any such waiver must be strictly construed in favor of the United States." *Ardestani v. INS,* 502 U.S. 129, 137 (1991). This Court should find that the McDade Amendment does not waive the federal government's intergovernmental immunity when Defendants' application of the ethics rule conflicts with federal substantive law—especially the Constitution's command that the executive branch "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Enacted in 1998, the McDade Amendment provides that "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). Congress did not define the ethics rules covered by the McDade Amendment or what it means for federal attorneys to be subject to those rules "to the same extent" as other attorneys. Instead, Congress directed that "[t]he Attorney General shall make and amend rules of the Department of Justice to assure compliance" with the McDade Amendment. 28 U.S.C. § 530B(a), (b). In 1999, the Attorney General issued those regulations that, among other things, clarify that the McDade Amendment "should not be construed in any way to alter federal substantive, procedural, or evidentiary law." 28 C.F.R. § 77.1(b).

Those regulations were adopted contemporaneously with the Act and pursuant to the Act's specific grant of rulemaking authority. 28 U.S.C. 530B(b); *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."). These regulations ensure that the McDade Act is applied consistent with "federal substantive" law, and thus preserve the federal government's autonomy and independence when acting within its lawful sphere. They also "dispel the notion that [the McDade Amendment] grants states . . . the power, in the guise of regulating ethics, to impose strictures that are inconsistent with federal law." *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 20 (1st Cir. 2000).[17]

This syncs with the McDade Amendment's requirement that federal attorneys conform to a state's ethics rules to "the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). Under basic preemption principles, *no* attorney can be required to comply with a state rule that conflicts with—and is thus preempted by—federal law. For example, the Supreme Court held that a state may not apply its attorney-licensing requirements to prohibit non-lawyers from engaging in conduct authorized by the United States Patent and Trademark Office. *Sperry v. Florida,* 373 U.S. 379, 385 (1963). Attorneys other than federal attorneys are

[17] Amici point to the McDade Amendment's "legislative history." *See* Amicus Legal Ethics Scholars Br. at 12-20, ECF No. 35; Amicus Colorado, Minnesota, and 18 Other States Br. at 11-16, ECF No. 26. Whether this has any reliable interpretive value at all is questionable. *See FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, 146 S. Ct. 1546, 1557 (2026) ("[W]e are governed by laws, not by the intentions of legislators." (quoting *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in judgment))). But regardless, this Court should dismiss these briefs' reliance on individual floor statements and post enactment history. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").

thus not required to comply with state ethics rules "when compliance with both state and federal law is impossible, or when the state [rule] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *California v. ARC Am. Corp.,* 490 U.S. 93, 100-01 (1989) (citations omitted). And because federal attorneys are subject to state ethics rules only "to the same extent" as other attorneys, they too are not required to comply with rules that conflict with federal law.

Accordingly, while the McDade Amendment specifies that federal attorneys must conform their conduct to generally applicable state ethics rules, those rules apply only to the extent that federal law does not require a different result, whether categorically or as applied in the circumstances of a particular case. Multiple circuits have so held. *See United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 921-28 (10th Cir. 2016) (finding, despite the McDade Amendment, that professional responsibility rule conflict preempted by constitutional role of the grand jury); *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 19 (1st Cir. 2000) ("[I]t simply cannot be said that Congress, by enacting section 530B, meant to empower states (or federal district courts, for that matter) to regulate government attorneys in a manner inconsistent with federal law."); *United States v. Lowery*, 166 F.3d 1119, 1125 (11th Cir. 1999) ("When it comes to the admissibility of evidence in federal court, the federal interest in enforcement of federal law, including federal evidentiary rules, is paramount. State rules of professional conduct, or state rules on any subject, cannot trump the Federal Rules of Evidence . . . There is nothing in the language or legislative history of the [McDade Amendment] that would support such a radical notion.").[18]

[18] Defendants' reliance (at 41 n.6) on *United States v. Ferrara*, 847 F. Supp. 964 (D.D.C. 1993), is misplaced. The *Ferrara* court dismissed the case for lack of personal jurisdiction, *id.* 967-68, 970, making any discussion of the scope of Supremacy Clause immunity dicta. As Defendants

Even if this Court had any doubt, that doubt must swing "in favor of the United States." *Ardestani,* 502 U.S. at 137, because waivers need to be read "narrowly," *Washington*, 596 U.S. at 842, and Congress must provide a "clear and unambiguous authorization for" otherwise impermissible state regulation, *Goodyear Atomic*, 486 U.S. at 180. *See also Hancock*, 426 U.S. at 173, 182 n.41 (concluding that Congress did not "evince[ ] with satisfactory clarity" the intent to "subject[ ] federal installations to state permit requirements" when it enacted a statute requiring federal agencies engaged in activities producing air pollution to comply with state "requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements").

In this case, Defendants' attempted regulation of Clark for internal communications runs headfirst into Article II. Defendants' attempt to exercise supervisory or coercive authority over internal federal executive deliberations conflicts with the President's core Article II responsibility to faithfully enforce Federal law and direct the executive branch.

That the substantive law is Article II itself provides yet another reason to find the McDade Amendment inapplicable here. The canon of constitutional avoidance counsels that this Court should interpret the McDade Amendment to avoid raising serious constitutional problems. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

---

note, *Ferrara* also predates the McDade Amendment. More recent decisions clarify that the federal government's consent to the neutral application of traditional state ethics rules does not subject federal attorneys to state regulation that conflicts with federal law. *See Stern*, 214 F.3d at 19-21; *United States v. Colorado Supreme Ct.*, 189 F.3d 1281, 1284-89 (10th Cir. 1999).

This Court should accordingly find the McDade amendment does not apply here.

***2. Count 2 – Unlawful Discrimination***

Count 2 plausibly alleges Defendants' actions discriminate against the federal government. "[P]reventing discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Washington*, 596 U.S. at 841 (citation omitted).

Count 2 alleges Defendants' application of professional conduct rules against Clark for "his pre-decisional and deliberative work as Assistant Attorney General constitutes unlawful discrimination against the Federal Government." For comparison, Count 2 alleges that "Defendants have never penalized a state, local, or private attorney for an unsent pre-decisional and deliberative draft document." Compl. ¶¶ 120. Nor have they ever "recommended for disbarment a state, local, or private attorney for allegedly 'attempting to lie' once." *Id.* ¶¶ 120-21. The Count even reverences the Board's "Separate Recommendation" where Board members relayed they had "not identified any case in which the Court disbarred a respondent over a single dishonest statement supported by a false citation." *Id.*

Defendants complain (at 42) that the United States has pointed to no comparator attorney outside the federal government that engaged in conduct similar to Clark who was not disciplined. But that's the point. Defendants are not going after—or even looking at—non-federal government attorneys for similar conduct or their confidential internal law firm deliberations. Defendants presumably have been combing their files for a time where they sanctioned or even investigated a non-federal attorney for conduct similar to Clark's, but they've pointed to no such example. Moreover, the allegation that Defendants "have never recommended for disbarment a state, local, or private attorney for allegedly 'attempting to lie' once" is a comparator that comes directly from an admission by members of the Board.

The Complaint's allegations of Defendants' animus toward federal attorneys overseen by the current President provides additional support for this discrimination Count. Defendants are presently prosecuting a current Department of Justice attorney, Edward Martin, for purportedly violating his federal "Oath of Office" based on acts Defendants deem do not "comport with the Constitution." Compl. ¶ 25. The Complaint also alleges that, compared to Clark, Defendants gave much more lenient treatment to FBI agent Clinesmith who "pled guilty to a felony for materially altering a document that he knew would be presented to obtain a surveillance warrant against" a campaign advisor to the President. *Id.* ¶ 85; *id.* ¶¶ 84-88. And the Complaint makes multiple allegations illustrating Defendant ODC Assistant Counsel Metzler's animus towards the current Administration, including his calling the "debate about birthright citizenship" "unethical," and his hostile criticism of purported "Trump judges." *Id.* ¶¶ 92-105.

This "weaponization" of the Defendants' bar process, Compl. ¶ 25, explains why Defendants are not going after—or even looking at—non-federal government attorneys for conduct similar to Clark's, and why they "have never recommended for disbarment a state, local, or private attorney for allegedly 'attempting to lie' once"—before Clark. This Court should accordingly find Count 2 states a plausible discriminatory treatment claim.

### *3. Count 3 – Interference with Executive Authority*

Count 3—alternatively[19] to Counts 1 and 2—plausibly alleges that Defendants' disciplinary proceedings against Clark unconstitutionally interfere with the President's exclusive

[19] Federal Rule of Civil Procedure 8 specifically authorizes pleading in the alternative. *See, e.g.*, *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999) ("Our ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to "set forth two or more statements of a claim or defense alternately or hypothetically," and to "state as many separate claims or defenses as the party has regardless of consistency." (quoting Fed. R. Civ. P. 8(e)(2))).

Article II "to administer and enforce Federal law and direct the Executive Branch." Compl. ¶ 129. Count II explains that Defendants' disciplinary proceedings against Clark for internal "Executive Branch deliberations" unconstitutionally "intrude upon the President's and Attorney General's core Article II prerogatives" to enforce federal law and direct the Executive Branch. *Id.* ¶¶ 130-31. This "impair[s] the President's and Attorney General's ability to ensure the faithful execution of Federal law by subjecting Federal Executive Branch decisionmaking to local control." *Id.* ¶ 132. And Count III explains that Congress did not attempt to limit the President's Article II power to "administer and enforce Federal law and direct the Executive Branch," *id.* ¶ 129, with the McDade Amendment, *id.* ¶¶ 133-34.

Defendants argue (at 44-46) that Article II does not render the "structure or existence of the D.C. Court of Appeals unlawful," or generally incapable of hearing immunity and other constitutional claims, or prohibit the DCCA from conducting the Clark proceeding simply because it is a "local" entity. But the United States does not contend any of those things.

Defendants take issue (at 43-45) with the allegations that the disciplinary proceedings are "prosecuting and punishing" Clark and "intruding into [the Executive Branch's] internal affairs" and subject[ing] Federal Executive Branch decisionmaking to local control." Compl. ¶¶ 132, 135. They do so because the DCCA has not issued its determination on Clark. But Count II alleges that Article II prevents any regulation of the executive branch's internal deliberations and accordingly that Defendants have no authority to even initiate their disciplinary process. And for the reason explained above, the McDade Amendment does not grant Defendants this authority.

This Court should accordingly find that Count 3 states a plausible interference with executive authority claim.

## V. CONCLUSION

For the above reasons, this Court should deny Defendants' Motion to Dismiss the Complaint, ECF No. 23, in its entirety.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
D.C. Bar No. 997320

*/s/ Matthew J. Donnelly*
MATTHEW J. DONNELLY
IL Bar No. 6281308
Attorney
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 616-2788
Email: matthew.donnelly@usdoj.gov

Dated: August 17, 2026