**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br>HAMILTON P. FOX III, *et al.*,<br>*Defendants*. | No. 1:26-CV-01658-RJL |

**BRIEF OF FORMER U.S. ATTORNEYS GENERAL AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF UNITED STATES OF AMERICA**

Michael B. Buschbacher
James R. Wedeking
BOYDEN GRAY PLLC
800 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
jwedeking@boydengray.com

Counsel for *Amici Curiae*

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* ..... 1

INTRODUCTION ..... 2

ARGUMENT ..... 3

I. Disciplining DOJ Attorneys For Internal Deliberations Injures The United States ..... 4

A. Disciplinary Proceedings Involving Internal Departmental Affairs Improperly Chill Attorney Deliberations ..... 4

B. Defendants' Disciplinary Proceedings Against DOJ Attorneys For Internal Discussions Violate the Separation of Powers ..... 9

1. Weaponizing Bar Discipline Interferes with Department Functions ..... 9

2. The Judiciary Cannot Act as a *De Facto* Regulator of the Department's Internal Affairs ..... 11

II. The McDade Amendment Precludes Defendants From Enforcing D.C. Attorney Ethics Rules Against Department Attorneys ..... 17

CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. Fed. Election Comm'n*,
333 F.3d 168 (D.C. Cir. 2003) .................... 7

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) .................... 5, 10

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) .................... 8, 9

*In re Doe*,
801 F. Supp. 478 (D.N.M. 1992).................... 18, 19

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) .................... 6

*Loving v. United States*,
517 U.S. 748 (1996) .................... 9, 11

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................... 8

*Myers v. United States*,
272 U.S. 52 (1926) .................... 9

*Nixon v. Adm'r of Gen. Servs.*,
433 U.S. 425 (1977) .................... 5

*United States ex rel. O'Keefe v. McDonnell Douglas Corp.*,
132 F.3d 1252 (8th Cir. 1998) .................... 19

*San Diego Building Trades Council v. Garmon*,
359 U.S. 236 (1959) .................... 11

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .................... 5

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .................... 15

*Trump v. Thompson*,
142 S. Ct. 680 (2022) .................... 6

*Trump v. United States*,
603 U.S. 593 (2024) .......... 10

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) .......... 20

*United States v. Nixon*,
418 U.S. 683 (1974) .......... 4, 5, 6, 10

*Virginia v. Hicks*,
539 U.S. 113 (2003) .......... 4

**Statutes**

28 U.S.C. §§ 352–355 .......... 19

28 U.S.C. § 506 .......... 12

28 U.S.C. § 511 .......... 9, 13

28 U.S.C. §§ 516–520 .......... 9

28 U.S.C. § 530B .......... 17, 21

28 U.S.C. § 530B(a) .......... 20

28 U.S.C. § 530B(b) .......... 20

28 U.S.C. § 533 .......... 19

Act to Establish the Department of Justice, 16 Stat. 162 (1870) .......... 13

Pub. L. No. 105-277, 112 Stat. 2681 (1998) .......... 20

**Constituional Provisions**

U.S. Const. art. II, § 2 .......... 13

**Regulations**

28 C.F.R. §§ 77.1–77.5 (2026) .......... 21

28 C.F.R. § 77.12 (1995)........................................................................................ 19

91 Fed. Reg. 10,780 (Mar. 5, 2026)........................................................................ 21

**Other Authorities**

Comment of William P. Barr & Boyden Gray PLLC, Doc. No. DOJ-OAG-2026-0001-48545 (Apr. 5, 2026), https://www.regulations.gov/comment/DOJ-OAG-2026-0001-48545.................................................. 21

D.C. Rules of Pro. Conduct R. 2.1 (2025) ..................................................................... 10

H.R. Rep. No. 105-636 (1998) ......................................................................................... 20

*Liar Liar* (Universal Pictures 1997) ............................................................................ 11

Model Rules of Pro. Conduct R. 4.2 (A.B.A. 2023).................................................... 18

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are three former United States Attorneys General, William P. Barr, Jeff Sessions, and Michael Mukasey.[2] Together, we have a deep understanding of, and interest in, the inner workings of the U.S. Department of Justice ("DOJ" or "the Department") and its important role within the Executive Branch. We write to explain how the disciplinary proceedings against Jeffrey Bossert Clark instituted by the District of Columbia ("D.C.") Office of Disciplinary Counsel, recommended by the D.C. Board on Professional Responsibility ("Board"), and ultimately to be adjudicated by the D.C. Court of Appeals, inflict a severe injury on the Department and its lawyers. Even if Mr. Clark is cleared of all allegations, the Defendants' ruination of his name, damage to his career, and—most important—interference with DOJ's internal operations all cast a chilling pall over how Department lawyers do their jobs.

While *amici* may not have agreed with the legal strategy then-Assistant Attorney General Clark advanced, we believe that only DOJ and, if necessary, the President, may discipline or punish a senior DOJ lawyer for privileged and confidential internal deliberations, such as providing legal advice, weighing the credibility and

---

[1] This brief was authored entirely by *amici curiae* and their attorneys. It was not authored, in whole or in part, by counsel for any other party. No party, or counsel for any party, contributed money intended to fund the preparation or submission of this *amicus* brief.

[2] Former Attorney General Barr worked as Jeffrey Clark's superior from February 2019 to December 23, 2020. None of us had any involvement with, or direct knowledge of, the events involved in this suit and the disciplinary proceedings against Mr. Clark. It should be noted that former Attorney General Barr has publicly criticized Mr. Clark's proposed legal strategy that is at the heart of these matters in no uncertain terms.

importance of evidence, and recommending a course of action. That's especially so here where the advice and deliberations concerned matters of the highest importance and sensitivity.

## INTRODUCTION

The disciplinary jihad against Mr. Clark warns Department lawyers to keep their mouths shut—even in the Oval Office, DOJ conference rooms, and other places that should be sanctuaries for candid opinions, advice, and discussion. The threat is clear: "Little Brother is watching you." The Board itself declared that disbarring Mr. Clark will "send a message to members of the Bar" that confidentially debating politically sensitive matters it disapproves of could cost them their privilege to practice law. Report & Recommendation of the Board on Professional Responsibility, *In the Matter of Jeffrey B. Clark*, Bd. Docket No. 22-BD-039 (July 31, 2025) ("Report") at 94; Disciplinary Counsel's Proposed Findings of Fact and Conclusions of Law, *In the Matter of Jeffrey B. Clark*, Bd. Docket No. 22-BD-039 (Apr. 29, 2024) ("Proposed Findings") at 3. And as the flood of subsequent "barfare" complaints against many other DOJ attorneys demonstrates, that "message" is clearer now than ever.

This interference impedes the Department's core mission. Department attorneys will self-censor their views on the credibility of allegations, the sufficiency of evidence, or the need for additional investigation on controversial or politically sensitive matters. It is grossly naïve to believe, as some Defendants claim, that in a fast-moving, high-pressure environment what is "fact" and what is "true" will be so obvious to all honest lawyers as to preclude discussion or intense debate. Former Attorney

General Barr formed views of the facts known at the time that differed from Mr. Clark's views and said so publicly. *See* Report at 17. But that does not make Mr. Clark's differing beliefs dishonest or sanctionable, and it certainly does not justify D.C.'s disciplinary intrusion into the internal discussions of DOJ and the White House.

This Court should deny Defendants' motion to dismiss. Allowing a D.C. professional licensing body to investigate, prosecute, or discipline DOJ attorneys for such internal deliberative actions obviously injures the Department by subjecting it to oversight from local authorities not under Presidential control. This intrusion violates the Separation of Powers doctrine and is precluded by the McDade Amendment.

## ARGUMENT

The United States filed this suit to protect DOJ attorneys from Defendants' abuse of the disciplinary process. The complaint's claims are well pled, and Defendants' arguments for dismissal are wrong. First, the United States has standing because allowing Defendants to investigate and discipline current and former DOJ attorneys for internal deliberations by its very nature interferes with the Department's work. Defendants' claim of authority to police the content of the Department's confidential deliberations, legal strategies, and privileged internal documents obstructs its core litigation and advisory functions. To describe this injury is also to explain why it transgresses the Constitution's separation of powers. Second, Defendants and their supporting *amici* misread the McDade Amendment by ignoring its second

subsection, which vests exclusive authority for enforcing rules of professional conduct against Department lawyers in the Attorney General, not Defendants.

## I. Disciplining DOJ Attorneys For Internal Deliberations Injures The United States

Defendants argue that the United States has not suffered any cognizable injury because Mr. Clark no longer works at DOJ. *See* Memorandum of Points and Authorities in Support of Defendants' Consolidated Motion to Dismiss Plaintiff's Complaint ("MTD"), Doc. 23-1 (July 10, 2026) at 13. This ignores the obvious chilling effect that these ongoing disciplinary proceedings have on current DOJ attorneys, especially on matters where those attorneys' positions might differ from or offend the political beliefs of Defendants, e.g., Defendant Assistant Disciplinary Counsel Jack Metzler's public declaration that merely *debating* questions of birthright citizenship is unethical. Compl. ¶ 16.

### A. Disciplinary Proceedings Involving Internal Departmental Affairs Improperly Chill Attorney Deliberations

The proceedings against Mr. Clark improperly chill confidential debates among DOJ lawyers regarding sensitive legal and policy matters that are protected by law. Such chilling effects are well understood. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (government actions "deter or 'chill' constitutionally protected speech" where "persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech … harming not only themselves but society as a whole"); *United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with

a concern for appearances and for their own interests to the detriment of the decisionmaking process.”).

Equally well understood is the importance of candid discussion to the functioning of the Executive Branch. “Under our Constitution, the ‘executive Power’—all of it—is ‘vested in a President,’ who must ‘take Care that the Laws be faithfully executed.’ Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance.” *Seila Law LLC v. CFPB*, 591 U.S. 197, 203–04 (2020) (quoting U.S. Const. art. II, §§ 1, 3). One important way these subordinates assist the President is by discussing and debating ideas and legal theories internally and in confidence. “A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.” *Nixon*, 418 U.S. at 708; *see also Dep’t of Interior v. Klamath Water Users Protective Ass’n*, 532 U.S. 1, 8–9 (2001) (Executive Branch deliberations are generally protected from disclosure based on “the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news”).

This confidentiality does not end once the discussion concludes or a Presidential administration ends. It abides since, “[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends.” *Nixon v. Adm’r of Gen. Servs.*, 433 U.S. 425, 488–89 (1977); *see also Trump v.*

*Thompson*, 142 S. Ct. 680, 681 (2022) (Kavanaugh, J., statement respecting denial of application) ("Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends."). This is not a matter of convention or prudence but of constitutional principle "inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

These cases explain that the mere disclosure of confidential deliberations imposes a chilling effect that harms the Executive Branch. That effect is greatly amplified where attorneys face threats of discipline for confidential discussions or drafting internal documents that are subsequently leaked. Whether attorneys have senior DOJ leadership roles, or are among the rank-and-file, all must speak freely and candidly without the threat of reprisal by outsiders for alleged wrongthink.

Despite the well-recognized harms of disclosing internal deliberations, Defendants claim that *threatening punishment* for such deliberations inflicts no harm at all. *See* MTD at 1, 13–17. Defendants cite no legal authority for their extraordinary demand for detailed evidence of a chilling effect, such as specific examples of DOJ attorneys refusing to dissent or altering their advice. *Id.* at 14. Self-censorship does not work that way. And courts do not require such evidence—particularly at the pleading stage—to recognize threats that chill protected speech. *See, e.g.*, *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965) (allowing challenge to statute that merely "creates a 'danger zone' within which protected expression may be inhibited" where "the threat of prosecutions of protected expression is a real and substantial one. Even the

prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression"); *AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003) (rejecting demand for evidence by noting that the Supreme Court recognized a chilling effect "without considering … any specific evidence of retaliation") (citing *Buckley v. Valeo*, 424 U.S. 1 (1976)).

Defendants also ignore that the process is the punishment. Even if Mr. Clark were to prevail in his disciplinary proceedings on all points and avoid any sanction whatsoever, the intrusion into the confidential deliberations and the message sent by his political show trial cannot be undone. The record shows just how out of the ordinary these proceedings have been. Disciplinary Counsel's own statements seek to inflict maximum reputational damage, accusing Mr. Clark of everything from a "dishonest attempt to create national chaos," to intentionally attempting to create "a constitutional crisis unparalleled since 1861." Proposed Findings at 2–3, 27. Disciplinary Counsel has characterized Mr. Clark's confidential debates with other DOJ leaders as coercion, fraud, and deceit, *id.* at 22–23, an attempt "to corrupt the United States Department of Justice" that was "at least as reprehensible as bringing baseless legal cases, perhaps more so." Disciplinary Counsel's Reply Brief, *In the Matter of Jeffrey B. Clark*, Bd. Docket No. 22-BD-039 (June 7, 2024) ("Reply") at 35–36. And Disciplinary Counsel has claimed that Mr. Clark wanted to instigate "riots in every city," while declaring that "[l]awyers who betray their country must be disbarred." Proposed Findings at 27, 39, 41. Indeed, Disciplinary Counsel compared Mr. Clark's actions to a conviction for espionage. *Id.* at 41. One would think that Mr. Clark nearly

succeeded in a modern-day Gunpowder Plot instead of discussing his sincerely held minority views of what election investigations had already uncovered.[3]

The chill created is *intentional*. "It is not enough that the efforts of these lawyers," lumping Mr. Clark in with private attorneys representing President Trump in election litigation, "ultimately failed. As a profession, we must do what we can to ensure that this conduct is never repeated." Proposed Findings at 3; *see also id.* (Disciplinary Counsel's "goal is to remove from the profession lawyers who" he believes "betrayed their constitutional obligations and their country"); Report at 92–94 (Mr. Clark's disbarment will "send a message to members of the Bar—and the public"). Thus, the "record evidence confirms what common sense tells us," *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 118 (2025), for any "lawyers who might be tempted to engage in similar misconduct [*sic*]," such as authoring privileged internal drafts advocating positions that Disciplinary Counsel dislikes, those actions "will cost them their privilege to practice law," Proposed Findings at 3.

Internal deliberations of Department attorneys are thus an obvious "object" of Defendants' conduct. So standing is easy. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (When the plaintiff is "an object of the action (or forgone action) at issue," then "there is ordinarily little question that the action or inaction has caused

[3] The Board conceded that Mr. Clark's views were sincerely held. Report at 77. Disciplinary Counsel now argues it is "wrong to claim that the Board found that Clark's letter 'reflected' his 'sincere view of the law and facts'—not intentional misrepresentations of fact." ODC Defendants' Supplemental Memorandum of Points and Authorities in Support of Defendants' Consolidated Motion to Dismiss Plaintiff's Complaint, Doc. 24 (July 10, 2026) at 5. Disciplinary Counsel's dispute with the Board's finding is unaccompanied by citation or explanation.

him injury, and that a judgment preventing or requiring the action will redress it."). Indeed, Defendants' "own actions—their statements, their enforcement decisions, their litigation positions—undermine the central premise of their" standing argument. *Diamond Alt. Energy*, 606 U.S. at 122.

### B. Defendants' Disciplinary Proceedings Against DOJ Attorneys For Internal Discussions Violate the Separation of Powers

1. Weaponizing Bar Discipline Interferes with Department Functions

The Separation of Powers doctrine (or, when the bar authority is a state instrumentality, principles of federalism) protects DOJ attorneys from bar disciplinary proceedings that interfere with their ability to perform their duties. Bar authorities cannot use disciplinary proceedings to indirectly police DOJ internal affairs. Bar associations are typically arms of their state's judiciary, created to regulate lawyers practicing in that state. The D.C. Bar functions similarly, though as a creature of the District (and thus Congress), not a sovereign state. *See* MTD at 2–5 (creation of the D.C. Court of Appeals, the Board, and the Office of Disciplinary Counsel and their respective authorities over attorney discipline).

It is "a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another" or "impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996). "[T]he President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926). DOJ attorneys assist the President by providing him with legal advice and representing the United States in court. 28 U.S.C. §§ 511, 516–520. As

discussed above, confidentiality is essential to promote the free and frank internal deliberations that inform and effectuate the President's policies. *Nixon*, 418 U.S. at 708; *Klamath Water Users Protective Ass'n*, 532 U.S. at 8–9.

The chilling effect on DOJ attorneys, *see* Section I.A., *supra*, is amplified greatly where bar disciplinary proceedings pry into core DOJ functions, including internal debates, the circulation of drafts, and advising the President. *See Trump v. United States*, 603 U.S. 593, 612–13 (2024) (the need for candor and objectivity from Presidential advisors is rooted in the separation of powers). The purpose of state bars in licensing and disciplining attorneys is to ensure that those holding themselves out to the public meet certain minimum standards for competency and integrity. Yet too many of the complaints lodged against DOJ attorneys of late are targeted at the Executive Branch's *work*—the policies it implements and the cases it brings. The proceedings against Mr. Clark do not involve representations to courts, a failure to obtain client conflict waivers, the mismanagement of client funds, or similar matters that occupy virtually all of the Board's disciplinary docket.

Instead, Mr. Clark faces discipline for his role as an "Advisor" to the President and to Acting Attorney General Rosen. As an "Advisor," D.C. Rules of Professional Conduct require him to "exercise independent professional judgment and render candid advice" that includes "other considerations such as moral, economic, social, and political factors, that may be relevant to the client's situation." D.C. Rules of Pro. Conduct R. 2.1 (2025). However, Mr. Clark now faces potential disbarment because that advice recommended a position that Disciplinary Counsel subjectively believes

to be the equivalent of "undermin[ing] the democratic foundation of the republic." Reply at 35. Providing legal advice regarding controversial, novel, or high-stakes matters is difficult enough without fearing punishment for the nebulous, indeed, incoherent, charge of "attempted dishonesty."[4] Thus, Mr. Clark's disciplinary proceedings quite obviously chill the free exchange of ideas within DOJ, impermissibly "intrud[ing] upon the central prerogatives" of the Executive Branch and "impair[ing] … the performance of its constitutional duties." *Loving*, 517 U.S. at 757.

2. <u>The Judiciary Cannot Act as a *De Facto* Regulator of the Department's Internal Affairs</u>

Just as a state may indirectly regulate conduct through tort law damage awards, Defendants attempt to indirectly regulate Department affairs through disciplinary actions. *Cf. San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("Such regulation can be as effectively exerted through an award of damages as through some form of preventative relief. The obligation to pay compensation can

[4] Defendants' theory of "attempted dishonesty" is dizzying. The theory is not that of the movie "Liar Liar," where an attorney tries to lie but finds his tongue and lips won't cooperate. *Liar Liar* (Universal Pictures 1997). Rather, the Board asserts that Mr. Clark held onto his views too long. Thus, it concluded that Mr. Clark "is not facing discipline because he sent the [Proof of Concept] letter for Mr. Rosen and Mr. Donoghue's approval; he is facing discipline because of what he did afterwards." Report at 75. However, the Board simultaneously asserts that Mr. Clark must be disciplined because "the factual assertions contained in the Proof of Concept letter that he authored" were untrue, *id.* at 5, and Defendants repeatedly describe that letter as "false." *See*, *e.g.*, *id.* ("a letter containing falsehoods"); *id.* at 25–26; *id.* at 44 ("false letter"). Their theory is that the letter became false *retroactively* because Mr. Clark's superiors disagreed with it. *See id.* at 19 ("After the meeting, [Mr. Clark] knew that the letter was false"). Under such a theory, every discussion draft is Schrödinger's Draft, being both true and false until a more senior DOJ official pronounces their views on it.

be, indeed is designed to be, a potent method of governing conduct and controlling policy"). Defendants, most of whom are arms of the District judicial branch and thus, ultimately, of Congress, purport to "govern[ ] conduct and control[ ] policy" by establishing vague and subjective standards that DOJ attorneys (or at least those working on politically controversial matters) must apparently follow to avoid investigations and professional discipline. Thus, Defendants improperly attempt to establish themselves as *de facto* regulators over the Department's internal affairs.

Even a cursory review of the record in Mr. Clark's proceedings establishes that Defendants seek to police the substantive content of confidential, internal deliberations and legal advice at the highest level—including discussions with the President—and mete out discipline accordingly to their own views of how the Department should be managed. Mr. Clark's case involves several purported factual and legal pronouncements about the Department's core functions and inner workings that Defendants are not competent to make. Examples include:

- The Board's erroneous claim that Mr. Clark was not "part of Justice Department leadership" and that his argument to the contrary was "disingenuous." Report at 80–81.[5]

- Disciplinary Counsel's incorrect claim that the Department of Justice's client is "the Department of Justice or the American people," but not the President. Reply at 35; *see also* Disciplinary Counsel's Reply to Respondent Jeffrey B. Clark's Response to Order to Show Cause, *In the Matter of Jeffrey B. Clark*, Bd.

[5] Mr. Clark was appointed Assistant Attorney General for the Environment and Natural Resources Division by President Trump under 28 U.S.C. § 506 and confirmed by the Senate in October 2018. By September 2020, Mr. Clark was also serving as Assistant Attorney General for the Civil Division, supervising approximately 1,400 lawyers across two of DOJ's seven litigating divisions. Mr. Clark was unquestionably among the senior DOJ leadership. Because he was a Senate confirmed officer, moreover, Mr. Clark was eligible to serve as Acting Attorney General.

Docket No. 22-BD-039 (Oct. 15, 2025) ("Show Cause Reply") at 25 ("the President was not Mr. Clark's client, and the Department of Justice is not the President's law firm").[6]

- Disciplinary Counsel's declaration that Mr. Clark's distinction between DOJ investigations of "fraud rather than irregularities" is "an exercise in semantic sophistry" while opining on the perceived limits of DOJ's authority to prosecute criminal election fraud. Reply at 4–6.

- Disciplinary Counsel's parsing of whether the Department did or did not open an investigation into election irregularities and opining on what matters fall within the jurisdiction of the Georgia Secretary of State. *Id.* at 5.

- Determining who at the Department is the most knowledgeable on certain issues and, therefore, qualified to have opinions on sensitive law enforcement and policy matters. Proposed Findings at 30; Report at 9–11, 18; Show Cause Reply at 8.

- Deciding how and when the Department's White House contact policy memo will be enforced. Proposed Findings at 31; Report at 12 n.5, 20 n.8.

- The Board's incorrect claim that sanctioning a legal advisor to the President for providing legal advice will not inhibit the provision of legal advice to the President. Report at 94 ("Prejudice to the [c]lient … is not a factor here").

Most importantly, the case against Mr. Clark turns on *Defendants*' standards for internal Department deliberations, not those of the Attorney General or senior DOJ leadership. For instance:

- Mr. Clark's opinions and concerns were "false" because they were not supported by what some Defendants considered to be legitimate evidence. Proposed Findings at 29 ("crank complaints by election deniers"); Report at 22

[6] *See* Act to Establish the Department of Justice, ch. 150, § 14, 16 Stat. 162, 164 (1870) (law establishing the Department of Justice states that it "shall give all opinions and render all services requiring the skill of persons learned in the law, necessary to enable the President and heads of the executive Departments … to discharge their respective duties"); 28 U.S.C. § 511 ("The Attorney General shall give his advice and opinion on questions of law when required by the President"). The Constitution says the same. *See* U.S. Const. art. II, § 2 (The President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices").

("two allegations of ballot shredding in Georgia" were not enough to support Mr. Clark's views), 79–80 (Ligon Report was not "evidence" that Mr. Clark could cite to because it "was not an official" Georgia "legislative report").

- Disciplinary officials will decide how much evidence is required to justify a DOJ lawyer advocating minority views during internal deliberations. Proposed Findings at 18, 27–30; Report at 3 (Mr. Clark "had developed no evidence to contradict Messrs. Rosen or Donoghue"), *id.* at 21–22 (recounting and criticizing Mr. Clark's "minimal investigation" and declaring there was insufficient evidence to maintain his position); *id.* at 70–71 (continuing to debate an issue constitutes "substantial steps toward causing the Justice Department to issue a false statement" because Mr. Clark "continued to advocate that the false statement be sent even though he had no facts" that Defendants deemed persuasive "to contradict Messrs. Rosen and Donoghue's clear and repeated warnings").

- Disciplinary officials will set standards for how senior DOJ leaders brief the President. Proposed Findings at 31–32; Report at 74 (Mr. Clark did not have evidence supporting his views that Defendants deemed persuasive, "[y]et he persisted in his effort all the way to a meeting in the Oval Office").

- Disciplinary Counsel will determine whether a Department investigation "constitute[s] an improper interference by the Department into determinations assigned by the Constitution to the states." Proposed Findings at 35.

- According to some Defendants, once a DOJ lawyer encounters disagreement, legitimate debate ends once Defendants determine that there was "nothing to debate." Report at 5, 95; *see also id.* at 73 (Mr. Clark's views were not "a debatable point" once he learned his superiors disagreed); *id.* at 94 (Mr. Clark's debate became a "plan to lie" once his superiors disagreed with him).

- Disciplinary Counsel will place limitations on what language may be used in privileged and confidential internal draft documents. *See* Show Cause Reply at 22–23 (dictating the language that Mr. Clark should have used in draft letter to avoid disbarment).

- Disciplinary officials will draw the line between when debate is legitimate and when it is "coercion." Reply at 18, 21, 33.

More fundamentally, Defendants do not seem to understand how internal deliberations work. They repeatedly distinguish between what Mr. Clark, the Respondent in the disciplinary proceedings, "sincerely believed" and what the Justice

Department "had uncovered" and believed. Report at 77–78. The key "question," according to the Board, "is *not* whether *Respondent* believed there were problems with the election, the question is whether the *Justice Department*" agreed with that view. *Id.* at 78. The entire point of the draft letter and subsequent deliberations between Messrs. Clark, Rosen, and Donoghue *was to determine* the Justice Department's ultimate position. Defendants' demand that an attorney *be disbarred* for asserting views during confidential internal deliberations that ultimately did not carry the day is a recipe for producing timid yes-men, fearing to speak up on fluid, high-pressure, and politically sensitive issues lest Defendants swoop in, years afterwards, and declare that a lawyer's privileged, good-faith advocacy was "false."

Of course, internal debate must end, but that is not an ethics matter, it is a matter of management. Mr. Rosen or the President could have, at any time, ordered Mr. Clark to drop the matter or reprimanded him. And, of course, "[s]ubordinates who exercise the President's power are subject to removal by him." *Trump v. Slaughter*, 146 S. Ct. 2283, 2310 (2026). Not even Congress may remove a federal officer short of impeachment. Yet, Defendants believe they may stand in the shoes of the Attorney General and President to dole out punishment to DOJ attorneys up to disbarment, which is indistinguishable from firing. Defendants' attempt to wrest control of such matters away from the Attorney General and the President is a serious intrusion on Executive Branch prerogatives and a violation of the Separation of Powers doctrine.

Defendants' newly claimed power to act as the Department's hall monitor has no limiting principle. There is no difference between Mr. Clark's draft letter—

asserting tentative legal theories and proposals that Defendants dislike—and draft DOJ briefing or memoranda asserting factual claims or legal theories that the Defendants find equally disagreeable. Defendants would be free to intrude on internal disagreements based on whispers and unlawful leaks even after they are resolved by DOJ leadership. This would create an all-but irresistible incentive to play politics with the disciplinary process.

Indeed, Mr. Clark's proceedings have all the hallmarks of a political crusade, highlighted by the extraordinary abandonment of dispassionate professionalism by Disciplinary Counsel. *See, e.g.*, Report & Recommendation of Hearing Comm. Number Twelve, *In the Matter of Jeffrey B. Clark*, Bd. Docket No. 22-BD-039 (Aug. 1, 2024) at 2 (Disciplinary Counsel "call[ed] Mr. Clark's conduct 'the second greatest internal threat' to democracy, behind only the Civil War."); Proposed Findings at 27 (Mr. Clark wanted to create "a constitutional crisis unparalleled since 1861"); *id.* at 41 (Mr. Clark betrayed his country); Reply at 1 (Mr. Clark "attempted to pervert the authority of the Department of Justice to serve a partisan political purpose. His methodology was dishonest and a threat to the Constitutional order"); Show Cause Reply at 22 (comparing Mr. Clark to violent rioters that assaulted police officers). Threatening DOJ lawyers with such political retribution chills internal deliberations, invites internal dysfunction, subverts the Attorney General and the President, and violates the Separation of Powers doctrine.

## II. The McDade Amendment Precludes Defendants From Enforcing D.C. Attorney Ethics Rules Against Department Attorneys

Defendants and their supporting *amici* incorrectly argue that the McDade Amendment abandons Department attorneys to the mercies of State and D.C. bar enforcement authorities. *See* MTD at 39–41; Brief of *Amici Curiae* Former Presidents of the District of Columbia Bar *et al.*, Doc. 25-1 (July 16, 2026) at 12–15; *Amicus* Brief of Colorado, Minnesota, and 18 Other States, Doc. 26 (July 17, 2026) at 12–17. Although Subsection (a) of the McDade Amendment subjects federal government attorneys "to State laws and rules … to the same extent and in the same manner as other attorneys in that State," Defendants and their *amici* ignore subsection (b): "*The Attorney General* shall make and amend rules of the Department of Justice to *assure compliance with this section*." 28 U.S.C. § 530B (emphases added). Thus, while States (which we'll assume includes the District of Columbia) supply the substantive standards that each federal government attorney must follow, Congress vested the Attorney General with exclusive authority to enforce those standards. Under the best reading of the statute, this leaves no role for Defendants to discipline DOJ attorneys.

The McDade Amendment's division of substance and process, where state bar associations supply the standards to which federal attorneys are subject but the Attorney General enforces those standards, is a compromise based on a long and contentious history. Amendments to state bar rules of professional conduct in the 1980s, implementing a new version of an American Bar Association model rule, created conflicts for federal prosecutors. Disciplinary Rule 7-104(A)(1) of the ABA Model Code of Professional Responsibility (now Rule 4.2 of the ABA Model Rules of Professional

Conduct), prohibited attorneys from communicating, or causing another to communicate, with a subject known to be represented by counsel unless they had consent or were "authorized by law to do so." Model Rules of Pro. Conduct R. 4.2 (A.B.A. 2023). According to the state bars, federal prosecutors were prohibited in many instances from contacting, or having undercover agents or informants contact, criminal investigation targets even where the constitutional right to counsel had not attached. Memorandum from Dick Thornburgh, Att'y Gen., Communication with Persons Represented by Counsel (June 8, 1989) (the "Thornburgh Memo") (reprinted as Exhibit E to *In re Doe*, 801 F. Supp. 478, 489 (D.N.M. 1992)). Attorneys General Thornburgh (a Republican) and later Janet Reno (a Democrat) each determined that such rules were preempted as they infringed on legitimate federal law enforcement practices.

The Thornburgh Memo asserted that, because some were interpreting the rule to create "a right to counsel at the investigative stage of a proceeding," it "threaten[ed] to become a substantial burden on the law enforcement process." *In re Doe*, 801 F. Supp. at 489. It further threatened "the legitimacy of undercover operations" that were previously deemed legitimate by courts "even when they involve the investigation of individuals who keep an attorney on retainer." *Id.*; *see also id.* at 491–93 (rules inhibited interviewing corporate employees without the company's counsel present even when employees contacted the Department to provide information). Therefore, the Thornburgh Memo reiterated the Department's position that state bars may regulate "federal attorneys only if the regulation does not conflict with the federal law or with the attorneys' federal responsibilities." *Id.* at 490.

This position was generally criticized, including by a district court judge who took umbrage at the notion that the Attorney General would enforce ethical standards against DOJ attorneys. *See id.* at 486 ("placing the discretion for a rule's interpretation and enforcement solely in the hands of those governed by it not only renders the rule meaningless, but the notion of such an idea coming from the country's highest law enforcement official displays an arrogant disregard for and irresponsibly undermines ethics in the legal profession").[7] Further, it rejected the Department's position that the model rules' allowance for contacting represented parties when "authorized by law" included DOJ's statutory directive to investigate and prosecute crimes, 28 U.S.C. § 533, as being too broad to fit into what the court believed was a narrow exemption. *In re Doe*, 801 F. Supp. at 486–87.

Nevertheless, Attorney General Reno imported key aspects of the Thornburgh Memo into DOJ's regulations a few years later (referred to as the "Reno Rules"). *See* 28 C.F.R. § 77.12 (1995) (federal regulations "preempt and supersede the application of state laws and rules and local federal court rules to the extent that they relate to contacts by attorneys for the government"). However, a court ruled that DOJ lacked statutory authority for such preemptive regulations. *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998).

[7] The judge ignored that, under the Judicial Conduct and Disability Act of 1980, complaints against judges, as well as the interpretation and enforcement of ethical rules applying to judges, are handled by judges. *See* 28 U.S.C. §§ 352–355.

Congress passed the McDade Amendment ten months later. Pub. L. No. 105-277, § 801, 112 Stat. 2681, 2681-118 (1998).[8] That statute includes two relevant provisions. First, DOJ attorneys "shall be subject to State laws and rules … governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). This cannot be read as anything other than a rebuke of the Thornburgh Memo and Reno Rules. The next sub-section, however, clearly shows a Congressional compromise: "The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section." *Id.* § 530B(b).

The best reading of the McDade Amendment is that, while DOJ attorneys are subject to state rules of professional conduct, including (we'll assume) those of the District of Columbia, it vests the Attorney General with exclusive authority to "assure compliance with" those rules.[9] Allowing Defendants to initiate disciplinary proceedings against DOJ attorneys would render Section 530B(b) superfluous, as the Attorney General could do nothing "to assure compliance with this section." *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory

[8] There is virtually no legislative history for the McDade Amendment other than a statement in the Committee Report for the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999 that the bill "addresses the concerns of the Committee about the Department of Justice's issuance of a regulation that exempts its attorneys from the same State laws and rules of ethics which all other attorneys must follow." H.R. Rep. No. 105-636, at 154 (1998).

[9] Because Defendants were directly or indirectly created by federal law, MTD at 2–4, it is not right to say that one federal law (the McDade Amendment) preempts other federal laws authorizing Defendants to discipline licensed attorneys. The key point is that the phrase "The Attorney General shall … assure compliance" cannot be interpreted to also mean that Defendants "shall … assure compliance" concurrently.

construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Defendants and their supporting *amici* completely ignore Section 530B(b), leaving it with no purpose in the statutory scheme.[10]

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss should be denied.

August 24, 2026

Respectfully submitted,
/s/ Michael B. Buschbacher

Michael B. Buschbacher
D.C. Bar No. 1048432
James R. Wedeking
D.C. Bar No. 500033
BOYDEN GRAY PLLC
800 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
jwedeking@boydengray.com

Counsel for *Amici Curiae*

[10] The job of enforcing state ethics rules is not supposed to be performed *ad hoc* by the Attorney General, but accomplished through "rules." 28 U.S.C. § 530B(b). Current Department regulations may not fully implement Section 530B(b). Those regulations, found at 28 C.F.R. §§ 77.1 to 77.5 reiterate only that Department attorneys must follow the rules of the states where they are admitted and the courts where they are practicing, leaving the question of enforcement unspecified. However, the Justice Department is currently considering amending these regulations. *See* 91 Fed. Reg. 10,780 (Mar. 5, 2026); *see also* Comment of William P. Barr & Boyden Gray PLLC, Doc. No. DOJ-OAG-2026-0001-48545 (Apr. 5, 2026), https://www.regulations.gov/comment/DOJ-OAG-2026-0001-48545.