# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

HAMILTON P. FOX III, et al.,

*Defendants.*

Civil Case No. 1:26-cv-01658-RJL

# BRIEF FOR AMICI CURIAE THE STATE OF TEXAS AND FOURTEEN OTHER STATES IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS

## TABLE OF CONTENTS


Table of Authorities ........ ii

Interests of Amici Curiae ........ 1

Argument ........ 3

I. The Practice of Law by Attorneys Employed by State Attorneys General and the Department of Justice Is an Exercise of Executive Power. ........ 3

II. State Courts Have Recognized that Separation-of-Powers Principles Limit Discipline of State Attorneys General. ........ 4

III. The Supreme Court Has Recognized that the Constitution Protects the Operation of the Executive Branch. ........ 7

IV. Disciplinary Proceedings Have the Potential to Interfere with the Functioning of the Federal Executive Branch. ........ 10

Conclusion ........ 15

Certificate of Compliance ........ 167

## TABLE OF AUTHORITIES

**Cases:**

*Agey v. Am. Liberty Pipe Line Co.*,
172 S.W.2d 972 (Tex. 1943) .......... 5
*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .......... 10
*In re Clark*,
678 F. Supp. 3d 112 (D.D.C. 2023) .......... 9
*In re Clark*,
No. 23-7073, 2024 WL 3385251 (D.C. Cir. July 12, 2024) .......... 9
*In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457 (3d Cir. 2015) .......... 9, 10
*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 12
*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 3-4
*Johnson v. Maryland*,
254 U.S. 51 (1920) .......... 8
*In re Knudsen*,
582 P.3d 87 (Mont. 2025) .......... 6
*Kolibash v. Comm. on Legal Ethics of W. Virginia Bar*,
872 F.2d 571 (4th Cir. 1989) .......... 9
*M'Culloch v. Maryland*,
17 U.S. 316 (1819) .......... 7
*Marbury v. Madison*,
5 U.S. 137 (1803) .......... 4
*Martin v. Hunter's Lessee*,
14 U.S. 304 (1816) .......... 8
*Massameno v. Statewide Grievance Comm.*,
663 A.2d 317 (Conn. 1995) .......... 6, 10
*Mitchell v. Forsyth*,
472 U.S. 511 (1985) .......... 3
*In re Neagle*,
135 U.S. 1 (1890) .......... 8
*Osborn v. Bank of U.S.*,
22 U.S. 738 (1824) .......... 7
*Perry v. Del Rio*,
67 S.W.3d 85 (Tex. 2001) .......... 5
*Pub. Citizen v. U.S. Dep't of Just.*,
491 U.S. 440 (1989) .......... 12

*Tennessee v. Davis*,
100 U.S. 257 (1879) ........ 8
*Trump v. United States*,
603 U.S. 593 (2024) ........ 3
*United States v. Supreme Court of New Mexico*,
839 F.3d 888 (10th Cir. 2016) ........ 11, 12
*United States v. Texas*,
599 U.S. 670 (2023) ........ 3, 13
*United States v. Washington*,
596 U.S. 832 (2022) ........ 7
*In re Waite*,
81 F. 359 (N.D. Iowa 1897) ........ 8
*Webster v. Comm'n for Lawyer Discipline*,
704 S.W.3d 478 (Tex. 2024) ........ *passim*

**Constitutional Provisions, Statutes and Rules:**

U.S. Const.
art. II ........ 3, 12
art. II § 1 ........ 3
art. II § 3 ........ 3
amend. V ........ 12
28 U.S.C. § 530B ........ 10, 11, 12, 15
Mont. Const. art. III, § 1 ........ 6
D.C. Code § 11-2501(a) ........ 4
D.C. R. Prof'l Conduct
8.4(b) ........ 10
8.4(f) ........ 10
N.M. R. Prof'l Conduct 16-308(E) ........ 12

**Other Authorities:**

28 C.F.R. § 77.2(k) ........ 11, 14
*The Federalist No. 44* (James Madison) ........ 8

## INTERESTS OF AMICI CURIAE

Amici curiae are the States of Texas, Alabama, Alaska, Florida, Idaho, Indiana, Iowa, Kansas, Louisiana, Montana, Nebraska, North Dakota, South Carolina, South Dakota, and West Virginia, each of which has an elected or appointed Attorney General. These States each have an interest in ensuring that their Attorneys General may exercise their discretionary authority conferred by their respective state constitutions or statutes without improper interference or distraction. Amici provide an important perspective on the ethical obligations of government attorneys and potential for bar disciplinary proceedings to interfere with those duties, including the separation-of-powers concerns raised by discipline based on the internal deliberative processes of executive agencies.

In particular, Amici States respond to the amicus brief of Colorado, Minnesota, and eighteen other States, which does not acknowledge the unique concerns when disciplinary proceedings are brought against government attorneys. Around the country, disciplinary grievances are increasingly directed at the discretionary choices of state Attorneys General, frequently by complainants outside the State who have no connection to the underlying matter. Invoking rules of professional conduct, they ask the State Bar to treat certain discretionary choices as unacceptable and deserving of discipline.

Neither state bars nor the federal courts are the appropriate forum for resolving disagreements over the discretionary decisions of an attorney employed in the state or federal executive branch or the internal deliberations of that branch. While Attorneys General and attorneys at the Department of Justice are subject to general rules of professional conduct, those rules cannot be applied to limit discretionary executive authority or interfere with internal deliberations at executive agencies. As the Complaint demonstrates, such proceedings can pose a serious threat to the separation of powers and operation of a coordinate branch of government.

The practice of law by a state Attorney General and by a Department of Justice attorney is the exercise of executive power. That power is committed to politically accountable officials, and the primary check on how they exercise their discretion is political, not professional discipline.

## ARGUMENT

### I. The Practice of Law by Attorneys Employed by State Attorneys General and the Department of Justice Is an Exercise of Executive Power.

State Attorneys General are, like other attorneys, subject to the rules of professional conduct. But Attorneys General are unlike other members of the bar in two important ways. First, the practice of law by Attorneys General involves exercising executive power conferred by the state constitution or statutes. Second, Attorneys General represent the public that elected them, and if voters do not approve of the way Attorneys General wield that power, they can divest them of it.

The same is true of the federal government. "[T]he Constitution vests the entirety of the executive power in the President." *Trump v. United States*, 603 U.S. 593, 620 (2024) (citing U.S. Const. art. II, § 1). The Attorney General and the Department of Justice assist the President in carrying out his constitutional duty to "take Care that the Laws be faithfully executed," *id.* (quoting U.S. Const. art. II, § 3), and the Attorney General acts as the President's "'chief law enforcement officer' who 'provides vital assistance to [him] in the performance of [his] constitutional duty to preserve, protect, and defend the Constitution,'" *id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985)). The political accountability of the President extends to the Justice Department as well. To the extent that voters do not approve of the way that a President exercises executive authority through subordinates, the voters' remedy is through the ballot box.

The Supreme Court has recognized, for example, that the decisions about whether and how to enforce the law are for the Executive, not the courts. Article II gives the Executive Branch "authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," decisions within the "special province of the Executive Branch." *Id.* (quoting *United States v. Texas*, 599 U.S. 670, 678–679 (2023); *Heckler v. Chaney*, 470 U.S. 821,

832 (1985)). The President has "exclusive authority over the investigative and prosecutorial functions of the Justice Department and its officials." *Id.* at 621. The President answers to the electorate for how executive authority is exercised. Chief Justice Marshall explained that "[t]he province of the court is . . . not to enquire how the executive, or executive officers, perform duties in which they have a discretion." *Marbury v. Madison*, 5 U.S. 137, 170 (1803).

These features are not confined to the federal executive branch. State Attorneys General wield analogous executive authority under their own constitutions and are similarly subject to political accountability.

## II. State Courts Have Recognized that Separation-of-Powers Principles Limit Discipline of State Attorneys General.

Because of those unique features of government attorneys' law practice, separation-of-powers principles insulate certain actions from review by the state bar's disciplinary body, a creature of the judiciary. D.C. Code § 11-2501(a). Although the precise limits differ from State to State, courts that have considered bar discipline of attorneys within the executive branch have generally recognized that separation-of-powers principles place limits on this discipline, and a court must respect the constitutional prerogatives of a coordinate branch even as it regulates the bar.

*Webster v. Commission for Lawyer Discipline* involved a disciplinary proceeding brought against the first assistant attorney general of Texas based on a filing before the Supreme Court of the United States. 704 S.W.3d 478, 486 (Tex. 2024). The Texas Supreme Court recognized the separation of powers concerns created by two separate powers: "the judiciary's authority to regulate the practice of law and the attorney general's exclusive authority to determine the arguments and assess the evidence that warrant bringing suit on behalf of the State." *Id.* at 489. The attorney general is "an executive-department officer 'whose primary duties are to render legal

advice in opinions to various political agencies and to represent the State in civil litigation,'" and "when the first assistant acts under the direction of the attorney general, he does so as if the attorney general himself had acted." *Id.* at 494 (quoting *Perry v. Del Rio*, 67 S.W.3d 85, 91 (Tex. 2001)). The Texas Attorney General exercises broad judgment and discretion, including "not only bringing and defending lawsuits" but also "'investigat[ing] the facts and . . . exercis[ing] his judgment and discretion regarding' the suits in which the State is an interested party." *Id.* at 495 (quoting *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943)). Because of the constitutional authority given to him, "the attorney general's assessments in bringing suit are privileged at a *constitutional* level from collateral review by the other branches." *Id.* at 495–96.

Balancing these concerns, the Texas Supreme Court held that direct scrutiny by a court "within the judicial process accommodates the inherent authority and responsibility of the judicial branch." *Id.* at 496. But the Commission for Lawyer Discipline would violate the separation-of-powers doctrine by "second-guess[ing] the attorney general's and his first assistant's exercise of discretion in making initial filings that is wholly divorced from and collateral to the litigation in which those filings are made." *Id.* The Texas Supreme Court thus held that the attorney general "is not subject to collateral review of either the choice to file a lawsuit or the representations in the suit's initial pleadings" and that only "direct scrutiny—that is, by the court to whom the pleadings are presented—is permissible." *Id.* at 497.

The Texas Supreme Court did not create a blanket immunity: "All lawyers are bound by the rules," but in the "narrow circumstance" of alleged violations "based wholly on representations in initial pleadings," the separation of powers requires that they "be addressed directly by the court to whom the pleadings are presented." *Id.* at 503. Moreover, the Texas Supreme Court recognized,

disciplinary proceedings based on vague prohibitions and novel theories pose a particular threat to "the presumptions each branch owes to the others." *Id.* at 501.

In discussing bar discipline of the Montana Attorney General, the Montana Supreme Court acknowledged the same separation-of-powers concerns:

> In exercising that authority [to regulate the practice of law], however, we must still respect the constitutional prerogatives of other constitutional branches, even of an officer who is partially subject to our regulation, and with whom we may disagree from time to time. We must carefully identify the line between permissible regulation and impermissible exercise of powers assigned to another governmental branch. Mont. Const. art. III, § 1.

*In re Knudsen*, 582 P.3d 87, 104 (Mont. 2025). Although the Montana Supreme Court ultimately held the Attorney General subject to its authority over the practice of law, it recognized as "persuasive" the "potential dangers the Texas Supreme Court warned of" in *Webster* and noted that the Montana case concerned "the direct refusal to comply with a court order," very different allegations than those in *Webster*. *Id.* at 105. Nonetheless, in discussing bar oversight, it "agree[d] the Attorney General must be free to discharge his duties as an Executive Branch officer . . . without continual concern about the Commission's, and ultimately this Court's, approval of his tactics." *Id.*

Decades earlier, in discussing discipline of a prosecutor, the Connecticut Supreme Court recognized the "fundamental importance of the unique role [prosecutors] play in our society" and "that judicial intrusion may disproportionately impact particular aspects of the prosecutorial function." *Massameno v. Statewide Grievance Comm.*, 663 A.2d 317, 336 (Conn. 1995). Although prosecutors are not wholly immune from judicial discipline, the Connecticut Supreme Court recognized that "in a particular grievance proceeding, a prosecutor subject to investigation may be

able to allege that, because of separation of powers principles, different substantive or procedural rules apply to him or her than to the average attorney." *Id.*

Each decision recognizes the principle that disciplining an attorney in the executive branch implicates the separation of powers and requires balancing the judiciary's regulation of the bar with the executive's internal operations.

**III. The Supreme Court Has Recognized that the Constitution Protects the Operation of the Executive Branch.**

These considerations resemble the protections from state oversight that the Supreme Court has recognized that the Supremacy Clause provides to the federal executive branch. States may not "interfer[e] with or contro[l] the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022); *see also M'Culloch v. Maryland,* 17 U.S. 316, 436 (1819) ("[T]he [S]tates have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government."). Employees of public institutions are necessarily "exempt[ed] from State control" "while in the line of duty." *Osborn v. Bank of U.S.*, 22 U.S. 738, 865 (1824). This exemption is "incidental to, and is implied in the several acts by which these institutions are created." *Id.* at 865–66.

Even when federal officers are alleged to violate state criminal laws in the performance of their duties, the Constitution provides protection because a State cannot arrest "the operations of the general government":

> [The general government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection, . . . the

> operations of the general government may at any time be arrested at the will of one of its members.

*Tennessee v. Davis*, 100 U.S. 257, 263 (1879). The principle is not unbounded—a federal employee does not possess "general immunity from state law while acting in the course of his employment"—but "even the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920). Nor can States "la[y] hold of [federal employees] in their specific attempt to obey orders and requir[e] qualifications in addition to those that the Government has pronounced sufficient." *Id.* at 57.

Under the Supremacy Clause, "[t]he mode or manner in which the officer or agent undertakes to perform the duty imposed upon him by the laws or authority of the United States is not a matter of state cognizance." *In re Waite*, 81 F. 359, 371 (N.D. Iowa 1897), *aff'd sub nom. Campbell v. Waite*, 88 F. 102 (8th Cir. 1898). The Supremacy Clause prevents "inversion of the fundamental principles" that would result if "authority of the whole society [were] every where subordinate to the authority of the parts." The Federalist, No. 44 (James Madison). "The general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers." *In re Neagle*, 135 U.S. 1, 61-62 (1890) (quoting *Martin v. Hunter's Lessee,* 14 U.S. 304, 363 (1816) (Johnson, J., concurring)).

In a case involving removal of a state bar disciplinary proceeding against a federal prosecutor, the Fourth Circuit recognized the need to prevent interference with the duties of federal officials. The opinion acknowledges that "[r]egulation of the legal profession admittedly implicates significant state interests," but the "paramount" interest is "in protecting federal officials in the

performance of their federal duties." *Kolibash v. Comm. on Legal Ethics of W. Virginia Bar*, 872 F.2d 571, 575 (4th Cir. 1989). "Many federal officials may be subject to potentially abusive state process." *Id.*

> [S]tate professional disciplinary proceedings could be used to interfere with the duties of federal officials, including the President of the United States, the Secretary of State, and the Attorney General of the United States, all of whom may be lawyers. Federal prosecutors too may be targets of retaliatory state proceedings and the existence of the various forms of immunity available to federal officials raises at least a colorable issue as to whether they also are immune from state professional disciplinary actions.

*Id.*[1]

The Third Circuit applied conflict preemption principles when considering efforts by Pennsylvania "to bar attorneys from the Capital Habeas Unit of the Federal Community Defender Organization for the Eastern District of Pennsylvania ('Federal Community Defender') from representing clients in state post-conviction proceedings." *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 461 (3d Cir. 2015), as amended (June 16, 2015) (involving allegations regarding the use of federal grant funds). Although "the States have a long history of regulating the conduct of lawyers, who are officers of the courts," the disqualification proceedings "s[ought] to supplant the [Administrative Office of the United States Courts] by allowing the Commonwealth's courts to determine whether a Community Defender Organization has complied with the terms of its federal grants and to attach consequences to

[1] The district court in the related disciplinary proceedings rejected *Kolibash*'s removability analysis. *In re Clark*, 678 F. Supp. 3d 112, 125 (D.D.C. 2023), *aff'd,* No. 23-7073, 2024 WL 3385251 (D.C. Cir. July 12, 2024) (per curiam). Amici cite *Kolibash* for its analysis of immunity and acknowledgment of the potential for state professional disciplinary proceedings to interfere with the duties of federal officials. The D.C. Circuit affirmed the remand of the disciplinary proceeding on the basis that "even if that proceeding were removable, Clark's notice of removal was untimely." *In re Clark*, 2024 WL 3385251, at *1.

noncompliance." *Id.* at 476–77. The disqualification proceedings were thus preempted as conflicting with federal objectives. *Id.* at 477; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives.").

## IV. Disciplinary Proceedings Have the Potential to Interfere with the Functioning of the Federal Executive Branch.

To be clear, Amici do not suggest that attorneys employed by state governments or by the federal government receive a blanket immunity from discipline. As a general matter, attorneys for the federal government "shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). Actions unrelated to the attorney's governmental duties may well warrant discipline without threatening the operation of a different branch of government. *See, e.g., Webster*, 704 S.W.3d at 500 (identifying private-capacity representation, ultra vires conduct, or criminal conduct). Consider, for example, Rule 8.4(b) of the D.C. Rules of Professional Conduct, which provides that a lawyer shall not "[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Rule 8.4(f) provides that a lawyer shall not "[k]nowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law." Subjecting government employees to discipline for violation of these prohibitions would not seem to create any potential for interference with the executive's internal operations.

But this general prohibition does not eliminate the possibility that a particular disciplinary proceeding might impermissibly interfere with the operation of the executive branch. *See Massameno*, 663 A.2d at 336 (suggesting that "in a particular grievance proceeding, . . . because of

separation of powers principles, different substantive or procedural rules [might] apply"). An attorney employed by the Department of Justice exercises portions of the executive power in ways that "other attorneys" do not, and state disciplinary proceedings concerning the internal operations of the executive branch of the federal government necessarily do not occur "to the same extent and in the same manner as [discipline of] other attorneys in that State." 28 U.S.C. § 530B(a). The constitutional concerns and protections that arise in this context simply do not exist when a private attorney is disciplined. This is not "the same" as discipline of private attorneys—it is qualitatively different and involves qualitatively different considerations.

By its own terms, the McDade Amendment applies only to generally applicable rules of professional conduct. Regulations confirm that "Department attorneys shall only be subject to laws and rules of ethical conduct governing attorneys in the same manner as such rules apply to non–Department attorneys." 28 C.F.R. § 77.2(k). The Tenth Circuit has correctly recognized that § 530B does not exempt state ethics rules from ordinary principles of preemption. *See United States v. Supreme Court of New Mexico*, 839 F.3d 888, 895 (10th Cir. 2016) ("[W]e proceeded to determine whether this ethics rule was otherwise 'inconsistent with federal law' and thus preempted."). Even if an ethics rule is "permitted by the McDade Act," a court must still consider "whether it nonetheless conflicts with federal law." *Id.* at 904. "[T]he fact that a challenged state rule is determined to be an ethics rule within the McDade Act's ambit does not necessarily mean that Congress intended that rule to trump or impede the effectuation of otherwise applicable federal law." *Id.* at 921; *see also id.* ("[A] Supremacy Clause analysis may still be appropriate and necessary in instances where Congress has granted states regulatory authority through language similar to that employed by the McDade Act.").

In that case, because the "the federal grand jury has an independent constitutional stature," the Tenth Circuit recognized that "Congress's power to authorize states to burden the grand jury's investigative functions is not unbounded." *Id.* at 926-27. At a minimum, if Congress intended to allow state ethical rules to place burdens on federal prosecutors practicing before grand juries, then Congress would need to "speak more clearly than it has in the McDade Act." *Id.* at 927. "[B]ecause such heightened requirements for attorney subpoenas would impede the grand jury's broad investigative mandate—which the Framers specifically envisioned in enacting the Grand Jury Clause of the Fifth Amendment—the challenged provisions of Rule 16–308(E) conflict with federal law and are preempted." *Id.* at 928.

This analysis applies with even greater force to the federal executive branch. Article II provides the Executive with far greater independent constitutional stature than a grand jury, and Congress does not have unbounded power to authorize States to regulate the internal deliberations of the President's subordinates. Even when a State seeks to apply a generally applicable ethical rule under the McDade Amendment, application of that rule in a particular instance may well conflict with the constitutional allocation of authority. At a minimum, interpreting § 530B to permit state regulation of internal executive branch deliberations would require a much clearer statement. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 466 (1989) ("[W]e are loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils. That construing FACA to apply

to the Justice Department's consultations with the ABA Committee would present formidable constitutional difficulties is undeniable.").

Amici Colorado and Minnesota contend that the States "have long-settled sovereign rights to regulate the practice of law within their borders, including the practice of law by attorneys employed by the federal government." Dkt. 26 at 4. But their brief cites no examples of bar discipline against attorneys employed by the federal government based on internal deliberations of the executive branch that would interfere with the operations of that branch.

The Supreme Court of the United States has recognized that judicial intrusion on executive discretion violates the separation of powers. *See Texas*, 599 U.S. at 678-79 (citing cases involving "problems raised by judicial review" over executive "discretion" in various contexts). There is no reason that bar disciplinary proceedings would be exempt from these general separation-of-powers principles.

The disciplinary proceedings at issue illustrate the potential for interference with the operation of the executive branch. The United States alleges that the D.C. Office of Disciplinary Counsel is pursuing a former Assistant Attorney General based on the preparation of and advocacy regarding a draft letter that was never released. Dkt. 1, ¶ 120. According to the Complaint, the discipline concerns only internal deliberations within the Department of Justice. Dkt. 1, ¶ 130. And the Complaint plausibly alleges that this investigation burdens the internal operations of the executive branch of the federal government because an attorney is facing potential punishment for preparing a draft and discussing proposed courses of action with his superiors and coworkers. Dkt. 1, ¶¶ 59–67, 112–14. Whatever role the D.C. Office of Disciplinary Counsel might permissibly

play in regulating a lawyer's conduct after the Department of Justice has acted, the Constitution surely protects the Department's internal deliberations from punishment by third parties.

Attempting to persuade senior leadership that the Department of Justice should adopt a different position regarding what it found and believed, Dkt. 23-1 at 8–9, is not a misrepresentation of the agency's position; it is an attempt to change that position. For the executive branch (like the judicial branch) to function, employees must be free to attempt to persuade others that the agency should adopt a different position or change its mind on an issue. Nor is this disciplinary theory applied "in the same manner as such rules apply to non–Department attorneys." 28 C.F.R. § 77.2(k). The alleged theory of discipline at issue—that an employee in the executive branch attempts dishonesty by urging his superiors that the executive agency should adopt different views and make different findings, Dkt. 1, ¶ 112–14—is uniquely tied to government service. A lawyer in private practice *could not* commit a comparable act.

The novelty of the theory advanced only reinforces the danger. The United States alleges that the Office has "never penalized a state, local, or private attorney for an unsent pre-decisional and deliberative draft document," Dkt. 1, ¶ 120, and Amici have not identified any such proceeding. Deploying a novel theory of bar discipline against a member of the executive branch based on internal deliberations poses a particular threat to candid communication within the executive.

The consequences of permitting discipline on this theory reach beyond this case. If internal discussions regarding an unsent, internal draft can form the basis for professional discipline, the effect falls not only on the official charged but on every lawyer serving in an executive agency who must advise, propose, and debate courses of action before a decision is made. Candid internal deliberation, a necessity for offices of Attorneys General and the Department of Justice to fulfill

their duties, depends on the freedom to consider, propose, and reject options in confidence, without fear that a rejected proposal regarding the agency's position will be recast as an ethical violation and prosecuted in the bar of any jurisdiction in which the lawyer happens to be licensed.

## CONCLUSION

A disciplinary regime that punishes internal deliberation within the executive branch would make government lawyers overcautious and prevent the government from receiving the full benefit of their advocacy and ideas. Amici acknowledge that the rules of professional conduct generally apply to government attorneys, but attorney discipline based on internal deliberations and advocacy within the federal executive branch is not discipline "to the same extent and in the same manner" as other attorneys. 28 U.S.C. § 530B(a). As courts have recognized, particular instances of discipline can interfere with the operation of government, and attorney discipline involving the executive branch of state and federal government is constrained by the separation of powers, the allocation of executive authority in state and federal constitutions, and (for the federal government) the Supremacy Clause.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

/s/ William R. Peterson
WILLIAM R. PETERSON
Solicitor General
*Counsel of Record*
William.Peterson@oag.texas.gov

Office of the Texas Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

*Counsel for the State of Texas*

Steve Marshall
Attorney General
State of Alabama

Cori Mills
Attorney General
State of Alaska

James Uthmeier
Attorney General
State of Florida

Raúl R. Labrador
Attorney General
State of Idaho

Theodore E. Rokita
Attorney General
State of Indiana

Brenna Bird
Attorney General
State of Iowa

Kris Kobach
Attorney General
State of Kansas

Liz Murrill
Attorney General
State of Louisiana

Austin Knudsen
Attorney General
State of Montana

Michael T. Hilgers
Attorney General
State of Nebraska

Drew Wrigley
Attorney General
State of North Dakota

Alan Wilson
Attorney General
State of South Carolina

Marty Jackley
Attorney General
State of South Dakota

J.B. McCuskey
Attorney General
State of West Virginia

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Local Civil Rule 7(o)(4) because it does not exceed 25 pages. This brief complies with the formatting requirements of Local Civil Rule 5.1 because it has been prepared in 12-point, double-spaced type.

/s/ William R. Peterson
WILLIAM R. PETERSON