IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>HAMILTON P. FOX III, *et al.*,<br><br>Defendants, | Civil Action No.<br><br>1:26-cv-01658-RJL |

**PROPOSED BRIEF OF JEFFREY BOSSERT CLARK**
**AS *AMICUS CURIAE***

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1634 I Street, NW
Suite 575
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400
Atlanta, Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

**Pro Hac Vice applications forthcoming*

## TABLE OF CONTENTS

Table of Authorities ..... iii
Identity and Interest of the Amicus ..... 1
Introduction ..... 1
Argument and Citation of Authority ..... 1
I. The Chilling Effect of Politically Weaponized Bar Discipline Is a Material Injury to the Interests of the United States. ..... 1
II. The Plain Text of 28 U.S.C. § 530B Does Not Grant the District of Columbia Disciplinary Authority Over Department of Justice Lawyers ..... 11
III. The Case Against Mr. Clark Violates Federal Supremacy and Separation of Powers. ..... 17
1. Supremacy ..... 17
2. Separation of Powers ..... 19
Conclusion ..... 22

# TABLE OF AUTHORITIES

**Cases**


*Arthur Andersen, LLP v. United States*, 544 U.S. 696 (2005) ........ 4

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ........ 17

*Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837 (1984) ........ 14

*City of Detroit v. The Murray Corp*., 335 U.S. 489 (1958) ........ 17

*District of Columbia v. Carter*, 409 U.S. 418 (1973) ........ 13

*General Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ........ 4

*German v. United States*, 525 A.2d 596 (D.C. 1987) ........ 3

*In re Clark*, 311 A.3d 882, 888 (D.C. 2024) ........ 15

*In re Clark,* 678 F.Supp.3d 112 (D.D.C. 2023) (*aff'd on other grounds, In re Clark*, 2024 WL 3385251 (D.C. Cir. July 12, 2024) ........ 15

*In re Ruffalo*, 390 U.S. 544 (1968) ........ 4

*Iselin v. United States*, 270 U.S. 245 (1926) ........ 12

*Johnson v. Maryland*, 254 U.S. 51 (1920) ........ 18

*Kolibash v. Committee on Legal Ethics of W. Va. Bar*, 872 F.2d 571 (1989) ........ 21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S.Ct. 2367 (2020) ........ 13

*Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244 (2024) ........ 14, 15

*Mayo v. United States*, 319 U.S. 441 (1943) ........ 17

*McClung v. Silliman*, 19 U.S. (6 Wheat.) 598 (1821) ........ 18

*McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819) ........ 17

*Nichols v. United States*, 578 U.S. 104 (2016) ........ 12

*Nixon v. Administrator of Gen. Servs. Admin.*, 433 U.S. 425 (1977) ........ 11

*Ohio v. Thomas*, 173 U.S. 276 (1899) .......... 18

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) .......... 2

*Rotkiske v. Klemm*, 140 S.Ct. 355 (2019) .......... 12, 13

*Russell v. Acme-Evans Co.*, 51 F.3d 64 (7th Cir. 1995) .......... 2

*Russello v. United States*, 464 U.S. 16 (1983) .......... 13

*Sessions v. Dimaya*, 584 U.S. 148 (2018) .......... 4

*Tarble's Case*, 80 U.S. (13 Wall.) 397 (1872) .......... 17

*Tennessee v. Davis*, 100 U.S. 257 (1880) .......... 18

*Texas v. Pennsylvania,* 141 S. Ct. 1230 (2020) .......... 20

*Trump v. Thompson*, 142 S. Ct. 680 (2022) .......... 10

*Trump v. United States*, 603 U.S. 593 (2024) .......... 19, 22

*United States v. National Dairy Corp.*, 372 U.S. 29 (1963) .......... 4

*United States v. Price*, 383 U.S. 787 (1966) .......... 13

*United States. v. Nixon*, 418 U.S. 683 (1974) .......... 10

*Webster v. Commission for Law. Discipline,* 704 S.W.3d 478 (Tex. 2024) .......... 20

**Statutes**

1 U.S.C. § 101 .......... 3

26 U.S.C. § 170 .......... 14

28 U.S.C. § 1257 .......... 14

42 U.S.C. § 1983 .......... 13

42 U.S.C. § 8285a .......... 14

Public Law 105-277, 112 Stat. 2681 .......... 13

**Other Authorities**

H.R. Conf. Rep. No. 105–825 (Oct. 19, 1998) .......... 13

**Rules**

Supreme Court Rule 47 .......... 14

**Treatises**

2 Wayne R. Lafave, SUBSTANTIVE CRIMINAL LAW §11.5(a) (3d ed. 2017, 2023 Update) .......... 3

A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) .......... 12

**Regulations**

28 C.F.R. § 77.2(h) .......... 11

28 C.F.R. Part 77 .......... 11, 14

**Constitutional Provisions**

art. I, § 8, cl. 17 .......... 19

art. II § 1, cl. 8 .......... 19, 22

art. II § 2, cl. 2 .......... 22

U.S. Const., art. I, § 8, cl. 17 .......... 13

## BRIEF OF JEFFREY BOSSERT CLARK AS *AMICUS CURIAE*

Jeffrey Bossert Clark submits this brief as *amicus curiae* in support of the position of the United States' response to the Defendants' motion to dismiss.

## IDENTITY AND INTEREST OF THE AMICUS

Mr. Clark is the respondent in the bar discipline case giving rise to this lawsuit. In that case the D.C. Office of Disciplinary Counsel seeks his disbarment. The D.C. Board of Professional Responsibility recommended he be disbarred. His case is presently on appeal to the D.C. Court of Appeals ("DCCA"). That appeal is stayed pending the resolution of this case. Mr. Clark accordingly has a personal stake of the highest order in the outcome of this litigation.

No party has written or paid for this brief.

## INTRODUCTION

Mr. Clark is the respondent in the bar discipline case that underlies this case. As such, the outcome of this case affects his interests more concretely and directly than anyone else. Mr. Clark has contended that the bar discipline case against him was an unconstitutional invasion of the prerogatives of the Article II Branch of government from the beginning, as well as a gross violation of his individual constitutional rights in multiple respects.

In this brief, Mr. Clark offers arguments not made by the United States and amplifies others that are made by the United States. Both lines of argument will be helpful to the Court.

## ARGUMENT AND CITATION OF AUTHORITY

### I. THE CHILLING EFFECT OF POLITICALLY WEAPONIZED BAR DISCIPLINE IS A MATERIAL INJURY TO THE INTERESTS OF THE UNITED STATES.

The government alleges injury in fact from the chilling effect of politically weaponized bar discipline on internal deliberations and candid, confidential deliberations of government attorneys. *See* Complaint, ¶¶ 1, 24-25, 28-29. The Defendants and their *amici* deny political motivation and

contend the allegation of chilling is unsupported, illusory, and insufficient to support the government's standing in this case. According to them, the case is much ado about nothing. It is anything but, as it threatens to upend the hierarchy of the Executive Branch and to exalt even non-appointee volunteers of a municipal enclave of the United States over the President and Senate-confirmed officials and their subordinate lawyers.

Under the standard of review on a motion to dismiss, the allegations of the complaint must be taken as true. The inferences should be drawn in favor of the plaintiff. Here, that the bar case against Mr. Clark is politically motivated lawfare can be readily inferred from its pretextual nature.

In the familiar context of employment discrimination, "proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination". *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143, 147 (2000) *quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993). "But neither in ordinary language nor in the law does [pretext] mean a mistake. It means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co*., 51 F.3d 64, 68 (7th Cir. 1995) (Posner, C.J.). The logical force of showing pretext is not limited to the employment context: where the proffered reason is a lie, another reason is at work. So it is here.

The D.C. Board of Professional Responsibility ("BPR") has recommended that Mr. Clark be disbarred for "attempted dishonesty." The accusation brought by Defendants Fox and his Office of Disciplinary Counsel ("ODC") was that Mr. Clark proposed that the Department of Justice, where he was a senior leader at the time, change its position on the 2020 election, which was alleged to be "attempted dishonesty" because the proposed position was different than the existing position. Dkt. 23-5, p. 51.

Mr. Clark's proposal was set out in a draft letter marked in the header on each page in red, bold type "**Pre-Decisional & Deliberative/Attorney-Client or Legal Work Product Georgia Proof of Concept**."[1] Had his proposal been adopted and the letter sent, then by definition it would have been a ***true*** statement of the Department's position. In the end, the letter was not approved and was never sent—remarkably, it was a draft that never left the office.

It is not unlawful to attempt an act that would be lawful if completed. Equally, a proposed change of position cannot be attempted dishonesty because, if the position is adopted, it would be true. "Legal impossibility occurs when a defendant's actions, or actions a defendant causes, even if fully carried out would not constitute a crime." *German v. United States*, 525 A.2d 596, 607 (D.C. 1987); 2 Wayne R. LaFave, SUBSTANTIVE CRIMINAL LAW §11.5(a) (3d ed. 2017, 2023 Update) ("If the case is one of legal impossibility, in the sense that what the defendant set out to do is not criminal, then the defendant is not guilty of attempt."). Logically and legally, attempting to send a letter that would be true, if sent, cannot constitute attempted dishonesty.

A rule of law that a proposed position advanced in confidence constitutes "attempted dishonesty" because it differs from some existing legal position would be a very poor rule indeed. It would apply, for example, to any losing legal argument, any dissenting judicial opinion, any order drafted by law clerks that was rejected by their judge, and any proposed federal legislation that does not pass, since they all begin as if they had: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled." 1 U.S.C. § 101.

The illogical nature of the charge against Mr. Clark helps explain why, as far as anyone can tell, no lawyer anywhere in America has ever been disciplined on such a theory—it makes no

---

[1] The version of the document in evidence in Mr. Clark's bar case has a watermark that reads "For Internal SJC Use Only Do Not Distribute." This was applied by the Senate Judiciary Committee (the "SJC" in the watermark) and not by anyone in the Executive Branch, a factual error made by the BPR at page 14 of its Report and Recommendation and inadvertently picked up by others.

sense. The maximally extreme novelty of ODC's theory is further proof of pretext. Among its many other offenses against law and logic, the charge and the recommended punishment violate Mr. Clark's due process right to fair notice. "[A] fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen, LLP v. United States*, 544 U.S. 696, 703-704 (2005) (cleaned up). "Perhaps the most basic of due process's customary protections is the demand of fair notice." *Sessions v. Dimaya*, 584 U.S. 148, 156-57 (2018). "The due process clause thus 'prevents … deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires.' *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986)." *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328, 1329 (D.C. Cir. 1995) ("Of course, it is in the context of criminal liability that this 'no punishment without notice' rule is most commonly applied.); *United States v. National Dairy Corp*., 372 U.S. 29, 32–33 (1963) ("[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." (discussing void for vagueness)). *See generally In re Ruffalo*, 390 U.S. 544, 551 (1968) (bar disciplinary proceedings are quasi-criminal in nature). None of this, however, has troubled ODC, the Hearing Committee or the BPR.

Since truth is stranger than fiction, the Kafkaesque qualities of the case are further compounded by the undisputed fact that Mr. Clark was "100 percent sincere in his views." Dkt. 23-9, pp. 5, 18. This states of mind is irreconcilable with dishonesty, but the BPR found through pretzel logic that Mr. Clark was dishonest because he persisted in his views after superiors disagreed with him until the ultimate authority, the President of the United States as the chief law enforcement officer of the United States, decided against sending the draft letter. *Id*. at 95. "[T]he question is not whether Respondent believed there were problems with the election, the question

is whether the Justice Department had uncovered potentially outcome-determinative issues with the election." *Id*. at 78. Mr. Clark was a leader in the Department, not a stranger to it.

The irreducible essence of the case against Mr. Clark thus rests on two *non sequiturs*—pretexts. So what is the real reason for the protracted war against Mr. Clark, for the overheated and hyperbolic rhetoric of Disciplinary Counsel during the trial, Dkt. 23-3, p. 2; Dkt. 23-7, p. 16, and his threat to "ratchet up the discipline" if Mr. Clark asserted his Fifth Amendment rights? *Id*. at 43.

The Complaint sufficiently alleges that the Defendants' motives are political, citing the pretextual nature of the charges, and inflammatory anti-Trump and anti-conservative social media postings by Assistant Disciplinary Counsel Jack Metzler who worked extensively on Mr. Clark's case, handling a considerable volume of briefing. But wait, there is more.

The lawyer who second-chaired Mr. Clark's evidentiary trial, Jason Horrell, is a self-avowed Marxist according to his own social media postings. Before his withdrawal from the case in January of 2026, Mr. Horrell was intimately involved in all proceedings in the case.

Posting under a since-deleted social media account as "Jason" (screen-name "jrudyesq"), Mr. Horrell replied with an animated GIF saying "You and me both" to a tweet lamenting that despite the poster having an undergraduate and two graduate degrees, they had only become a Marxist on their own time. *See* https://x.com/ItsYourGov/status/2060005850605879789?s=20 and https://x.com/ItsYourGov/status/2060005853680288147?s=20 (last visited Aug. 23, 2026):




Mr. Horrell also reposted a tweet from an account called The Magnificast, whose avatar features a hammer and sickle, commenting that it was Marx and not God that carried out the words of The Magnificat to cast the mighty from their thrones, lift up the lowly, fill up the hungry with good things, and send away the rich empty. https://x.com/ItsYourGov/status/2060005856293294567?s=20 (last visited Aug. 23, 2026).

In a separate social media post, Mr. Horrell attributed his decision to become a Marxist to the Magnificat. *See* https://x.com/ItsYourGov/status/2060005858688328181?s=20 (last visited Aug. 23, 2026):




Mr. Metzler and Mr. Horrell are entitled to hold their political opinions, but they are not entitled to wield their enforcement authority against those whom they regard as political enemies. And Metlzer's and Horrell's enemies are persons who, like Mr. Clark, are equally entitled to hold opinions of their own. And, most importantly for this case, the Constitution forbids local governments from impeding the operations of the national government for any reason, and especially not for political animus.

The cases against Mr. Clark and Ed Martin referred to in the Complaint and the brief of the United States are not isolated events. They are part of a broad campaign of lawfare against the administration through bar disciplinary processes. The following table is limited to lawyers serving either the first or second Trump Administrations:

| **Organization** | **Target** | **Reference**[2] | **Admin** |
|---|---|---|---|
| Lawyers Defending American Democracy (LDAD) | William P. Barr | https://ldad.org/wp-content/uploads/2022/12/Defending-Democracy-Report-121522-FINAL.pdf, p. 7 | Trump 45 |
| LDAD | Ken Paxton | *Id.* p. 8. | Texas AG |
| LDAD | Jeffrey B. Clark | *Id.* p. 8 | Trump 45 |

[2] All last visited Aug. 23, 2026.

| Organization | Target | Reference[2] | Admin |
|---|---|---|---|
| Sen. Richard Durbin (D. Ill.) | Jeffrey B. Clark | Docket No. 23-9, p. 3 (pdf p. 13). | Trump 45 |
| Democracy Defenders Fund (DDF), LDAD et al | Pam Bondi | https://www.democracydefendersfund.org/news/rule-of-law-advocates-file-ethics-complaint-against-attorney-general-pam-bondi/ | Trump 47 |
| DDF and LDAD | Attorney General Todd Blanche | https://www.msn.com/en-us/news/politics/todd-blanche-hit-with-state-bar-complaint-backed-by-101-former-judges/ar-AA26lVe5 | Trump 47 |
| Campaign for Accountability | Associate Attorney General Stanley Woodward | https://campaignforaccountability.org/watchdog-files-bar-complaint-against-associate-attorney-general-stanley-woodward/ | Trump 47 |
| DDF | Counselor to the President Boris Epshteyn | https://www.democracydefendersfund.org/news/ethics-complaint-targets-boris-epshteyns-alleged-role-in-trump-administration-campaign-to-pressure-law-firms/ | Trump 47 |
| LDAD | Deputy Assistant Attorney General Drew Ensign | https://ldad.org/letters-briefs/ldad-files-ethics-complaint-ensign | Trump 47 |
| LDAD | US Attorney, District of Columbia Jeanine Pirro | https://ldad.org/letters-briefs/ethics-complaint-pirro | Trump 47 |
| DDF and LDAD | DHS General Counsel James Percival | https://www.democracydefendersfund.org/news/ddf-ldad-and-128-former-judges-call-for-investigation-into-dhs-general-counsel-for-attacks-on-sitting-judges/ | Trump 47 |

The last listed complaint against James Percival was filed just days ago on August 19, 2026, and complains of social media posts critical of certain federal district court judges.

Democracy Defenders Fund and Lawyers Defending American Democracy, who collectively filed 9 of 11 of these complaints, are counsel for a group of *amici* in this case, the so-called "Legal Ethics Scholars and Experts."

One group made its motives particularly clear. The 65 Project filed bar complaints against ***more than 100 lawyers*** involved in the 2020 election cases. *See* Lachlan Markay & Jonathan Swan, *Scoop: High-Powered Group Targets Trump Lawyers' Livelihoods*, AXIOS (Mar. 7, 2022), https://www.axios.com/2022/03/07/trump-election-lawyers-disbar (last visited Aug. 23, 2026). They were not subtle about their goals. 65 Project founder David Brock "told Axios in an interview that the idea is to 'not only bring the grievances in bar complaints, but shame them and make them toxic in their communities and in their firms.'" The Axios story also quotes Brock saying "I think the littler fish are probably more vulnerable to what we're doing." "You're threatening their livelihood. And, you know, they've got reputations in their local communities." An anonymous source involved in the effort added "This is mostly important for the ***deterrent effect*** that it can bring ***so that you can kill the pool of available legal talent going forward***." *Id*. (Emphasis added).

The political animus within ODC is evident in its decision in recent years to allocate its limited resources to prosecuting discipline against no fewer than seven lawyers who represented Trump, served under him, or litigated in support of his reelection. (Clark, Edward Martin, Rudolph Giuliani, John Eastman, Lawrence Joseph, Julie Haller, Brandon Johnson).[3] Most of these respondents had no disciplinary history and were not representing clients drawn from the general public.

Moreover, many of these cases involved protracted investigations and trials, and, in most instances, the personal involvement of Mr. Fox as lead counsel. The odds of this pattern of behavior

[3] *See* Martin, https://www.dcbar.org/Attorney-Discipline/Disciplinary-Decisions/Disciplinary-Case?docketno=26-BD-013; Giuliani, https://www.dccourts.gov/sites/default/files/2024-09/In%20re%20Giuliani%20%2021-BG-0423.pdf; Eastman, https://www.dcbar.org/Attorney-Discipline/Disciplinary-Decisions/Disciplinary-Case?docketno=2022-D065; Joseph, https://www.dcbar.org/Attorney-Discipline/Disciplinary-Decisions/Disciplinary-Case?docketno=24-BD-002; Haller, https://www.dcbar.org/Attorney-Discipline/Disciplinary-Decisions/Disciplinary-Case?docketno=24-BD-003/JH; Johnson, https://www.dcbar.org/Attorney-Discipline/Disciplinary-Decisions/Disciplinary-Case?docketno=24-BD-003/BJ. (All last visited Aug. 23, 2026).

being explained by neutral application of accepted principles of prosecutorial discretion unaffected by politics are vanishingly low.

The purpose and effect of the flood of bar complaints against conservative lawyers is to deter lawyers from working for the Trump Administration or conservative causes. The destruction of Mr. Clark's legal career, reputation, and the loss of many millions in income as a partner in a large international law firm, stand as a grim warning of the risks faced by conservative lawyers who advocate controversial positions, even in the most privileged and confidential sanctums of the government. The chilling effect from the Barfare against Mr. Clark and others is real.

The political weaponization of bar discipline thus threatens the effective functioning of the federal government because it chills the candid exchange of views during policy deliberations, just as the government alleges in this lawsuit. Fostering candid and confidential discussion is the purpose of executive privilege and has obvious constitutional dimensions. In *United States. v. Nixon*, 418 U.S. 683 (1974) the constitutional foundations and policy interests behind executive privilege were explained as follows:

> The expectation of a President to the confidentiality of his conversations and correspondence … has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President ***and those who assist him*** must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and ***inextricably rooted in the separation of powers under the Constitution***.

*Id.* at 708 (1974) (emphasis added). "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id*. at 705. *See also Trump v. Thompson*, 142 S. Ct. 680 (2022) (Kavanaugh, J., respecting denial of petition); *Nixon v.*

*Administrator of Gen. Servs. Admin.*, 433 U.S. 425, 449 (1977) ("[T]he privilege is not for the benefit of the President as an individual, but for the benefit of the Republic.") In Mr. Clark's case, a story revealing his privileged discussions appeared in the *New York Times* two days after President Biden took office[4]—the precise scenario executive privilege is intended to prevent.

The chilling effect on candid internal deliberations and zealous advocacy caused by Barfare against Mr. Clark and others is a concrete and material injury to the operations and internal deliberations of the Executive Branch and the structural functioning of the United States government as a whole that warrants granting the relief sought in this case.

## II. The Plain Text of 28 U.S.C. § 530B Does Not Grant the District of Columbia Disciplinary Authority Over Department of Justice Lawyers.

The DCCA's claim of disciplinary authority over Mr. Clark and other federal lawyers in the District rests on 28 U.S.C. § 530B and the regulations issued thereunder at 28 C.F.R. Part 77.

This claim of authority has a grave textual flaw (albeit not one advanced by the United States): Section 530B grants disciplinary jurisdiction over federal attorneys to ***States*** but does not grant any such authority to the District of Columbia:

> (a) An attorney for the Government shall be subject to ***State*** laws and rules, and local Federal court rules, governing attorneys in each ***State*** where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that ***State***.

(Emphasis added). Notwithstanding the omission of the District, which is not a State, from this statute, the Department of Justice via a regulation never tested by notice and comment at the time purported to extend this grant of disciplinary authority to the District of Columbia in 28 C.F.R. § 77.2(h) ("The phrase state laws and rules and local federal court rules governing attorneys means

---

[4] *See* Katie Benner, *Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General*, NEW YORK TIMES (Jan. 22, 2021), *available at* https://www.nytimes.com/2021/01/22/us/politics/jeffrey-clark-trump-justice-department-election.html (last visited Aug. 23, 2026).

rules enacted or adopted by any State or Territory of the United States or the District of Columbia…").

Congress has in many contexts explicitly included the District of Columbia in statutes, either in a definitional code section, or by use of phrases like "States, territories or the District of Columbia." In fact, the Omnibus legislation that adopted what is now Section 530B repeatedly uses exactly such terms, making it all the more striking that Section 530B does not.

The Supreme Court has made plain that judges cannot rewrite statutes:

> We decline the Government's invitation to add an extra clause to the text of § 16913(a). As we long ago remarked in another context, "[w]hat the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function." *Iselin v. United States*, 270 U.S. 245, 251 (1926). Just so here.

*Nichols v. United States*, 578 U.S. 104, 110 (2016) (emphasis added). *Nichols* and *Iselin* make even a mistake by Congress irrelevant.[5] The same rule was applied in *Rotkiske v. Klemm*, a 2019 decision of the Supreme Court:

> It is a fundamental principle of statutory interpretation that "absent provision[s] cannot be supplied by the courts." A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 94 (2012). To do so "'is not a construction of a statute, but, in effect, an enlargement of it by the court.'" *Nichols v. United States*, 578 U.S. ——, ——, 136 S.Ct. 1113, 1118 (2016) (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926)).

---

[5] *Iselin* teaches that even if Congress left the District out of Section 530B by accident, judges cannot fix what Congress overlooked.

In any event, self-evident rationales for Congress to treat the District differently abound. Consider just these three: **(1)** the District is the seat of the federal government and subjecting national Executive Branch activities to local bar second-guessing because of the happenstance of geography would make little constitutional sense and runs contrary to placing the Nation's capital in a non-State; **(2)** District government is inherently controlled by Congress under the Seat of Government Clause and so denying the relevant disciplinary authority to the District avoids a serious and unique separation of powers issue; and **(3)** Section 530B was adopted largely with state-by-state U.S. Attorneys and their assistants in mind, not with the regulation of Main Justice lawyers in Washington, D.C. making national legal decisions.

> Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.

*Rotkiske v. Klemm*, 140 S.Ct. 355, 360–61 (2019) (emphasis added). The rule was followed in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2381 (2020).

The statutory interpretation question in this case is straightforward. Here, the omitted language that would include the District of Columbia in Section 530B was found in several other provisions in the very same piece of legislation. *Compare* H.R. Conf. Rep. No. 105–825 (Oct. 19, 1998), Title VIII, p. 123 (which does not include the District of Columbia) *with id*. at pp. 8, 9, 752, 865, 890, and 902 which do.[6] When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up).

All law in the District is federal law and Congress alone defines the nature, scope, and means of enforcement of all federal powers exercised here, including that of the DCCA. U.S. Const., art. I, § 8, cl. 17 ("Seat of the Government"). Due to its unique and distinct nature, specific language is ordinarily required to treat the District as if it were a State. *See, e.g., District of Columbia v. Carter*, 409 U.S. 418, 432-33 (1973) (D.C. not a State for purposes of 42 U.S.C. § 1983, and "'[w]e are not at liberty to seek ingenious analytical instruments' to avoid giving a congressional enactment the broad scope its language and origins may require," *quoting United States v. Price*, 383 U.S. 787, 801 (1966)). In addition to the very bill by which the McDade Act was adopted, the United States Code is replete with examples where Congress has ***specifically***

---

[6] In the finally adopted version of this legislation, Public Law 105-277, 112 Stat. 2681 (Oct. 21, 1998), the parallel page references are 112 Stat. 2681-118 which does not refer to the District of Columbia, vs. pp. 6, 7, 726, 836, 860 and 871, which do. In all contexts, the term "District of Columbia" appears ***456 times*** in the conference report and ***391 times*** in the Public Law. The bill included annual appropriations for D.C. for 1999. 112 Stat. 2681-121. Congress did not forget about the District of Columbia in this Omnibus bill.

***defined*** D.C. to fall within the meaning of the term "State," but only for purposes of that particular statute.[7] Indeed, by contrast, Chapter 31 of part II of title 28 of the United States Code lacks any specialized definition section. Congress thus knows how to confer power on District authorities when it wants to. And it expressly withheld conferring that substantial and capacious power here.

And for good reason. The conduct that Disciplinary Counsel seeks to investigate is not behavior committed in the presence of a court and found by it to have violated its rules of conduct. Mr. Clark was a senior Executive Branch official who served as the head of two of Main Justice's seven litigating divisions, each with nationwide jurisdiction. His client was the President of the United States in his capacity as the sole head of the Executive Branch. The power to define the nature and scope of his duties to that client and its member departments and agencies, and to investigate alleged violations of DOJ and other federal rules of lawyer conduct, rest in the first instance with the Executive Branch alone. The same holds true for allegations that an attorney employed by the federal government has violated federal law.

The DCCA and its disciplinary adjuncts and several of their *amici* argue that the District was granted authority to regulate federal lawyers by administrative regulations found in 28 C.F.R. Part 77. But it is elementary that a federal agency cannot grant or claim a power by regulation that was not given by the enabling statute. The doctrine of *Chevron* deference, first articulated in *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837, 843 n.9 (1984), was overruled in *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244 (2024), as Mr. Clark's briefing in the DCCA and its adjunct

---

[7] *See, e.g.*, 28 U.S.C. § 1257(b) ("For the purposes of this section, the term 'highest court of a State' includes the District of Columbia Court of Appeals."); 42 U.S.C. § 8285a(2) ("the term 'State' means any of the several States, the District of Columbia …"); *see also, e.g.*, 26 U.S.C. § 170(c)(1) (applying term "charitable contribution" for tax purposes to include gifts for the use of "States, a possession of the United States … or the United States or the District of Columbia");. And Supreme Court Rule 47 states that "[t]he term "state court," when used in these Rules, includes the District of Columbia Court of Appeals."

bodies anticipated it would. The DOJ regulations that purport to extend disciplinary authority jurisdiction to D.C. are therefore entitled to no deference whatsoever. Their plain inconsistency with Section 530B precludes any finding of jurisdiction.

The DCCA in *In re Clark*, 311 A.3d 882, 888 (D.C. 2024), and the D.C. District Court in *In re Clark,* 678 F.Supp.3d 112 (D.D.C. 2023) (*aff'd on other grounds, In re Clark*, 2024 WL 3385251 (D.C. Cir. July 12, 2024)), applied the absurdity canon to hold that that the District is included in Section 530B despite its absence from the text. The DCCA decision and the District Court decision came before *Loper Bright* and have thus been overtaken by subsequent developments in the law. But even taking them at face value, their application of the absurdity canon erroneously assumes that federal lawyers would otherwise be entirely ungoverned by any disciplinary authority. That is simply not true. Federal lawyers who appear ***in court*** are always subject to the inherent authority of the courts to regulate their conduct. In addition, DOJ has an internal disciplinary process administered by its Office of Professional Responsibility and supplemented by the Office of the Inspector General. The posited absurdity simply does not exist and so the rest of the analysis built upon this premise does not follow. The wailing and gnashing of teeth from the DCCA, its disciplinary adjuncts, and their *amici* over the implications of this argument are unfounded. In this regard, we emphasize that during the entirety of the Biden Administration, the Attorney General Garland Justice Department never took any steps to refer Mr. Clark for D.C. Bar discipline, because they would readily have understood the profound implications of doing so for preserving presidential and Departmental prerogatives and the prospect of such an approach boomeranging around to its leaders and lawyers after they left office.

The inference of absurdity cannot withstand scrutiny. Many federal lawyers in D.C. and not just at DOJ work on sensitive, classified matters of national security and diplomatic relations.

A far greater absurdity would be for disciplinary cases arising from such highly classified contexts to go through the DCCA's disciplinary processes. That system has ***zero expertise or capacity*** to handle classified information. The members of the Hearing Committees and the Board of Professional Responsibility are all ***volunteers*** and include ***lay participants***. None of them, to our knowledge, has ever had a security clearance for their bar work. They do not subscribe to any oaths, and by DCCA official policy are not bound by any full quasi-judicial standards of ethics or recusal Dkt. 23-3, p. 130-31.

Indeed, Mr. Clark's contends that having his fate determined by such bodies violates the both the Oath and the Appointments Clause of the Constitution. Dkt. 23-7, p. 23; *In Re: Jeffrey B. Clark,* DCCA NO. 25-BG-0731, Disciplinary Docket No. 2021-D193, BDN: 22-BD-039, Dkt. No. 202. Mr. Clark's challenged conduct, in fact, involved discussion of a classified draft report on foreign election interference from the Office of the Director of National Intelligence and a briefing from the Director where Mr. Clark posed questions to the Director, but none of that could be presented to the Hearing Committee because it is classified, depriving Mr. Clark of a fair trial. Dkt. 23-7, pp. 4-5. Recently declassified documents reveal that intelligence reporting on Chinese election interference was downplayed and deliberately kept from President Trump and other decisionmakers, with one official at the FBI bragging in an email that she was running a "shadow government" against President Trump to keep him in the dark about the penetration of the Communist Chinese into millions of American voter records.[8]

---

[8] *Setting The Record Straight: President Trump Declassifies Intel on Foreign Election Interference and Deep State Coverup*, THE WHITE HOUSE, July 17, 2026, https://www.whitehouse.gov/releases/2026/07/setting-the-record-straight-president-trump-declassifies-intel-on-foreign-election-interference-deep-state-coverup/ (last visited Aug. 23, 2026).

### III. The Case Against Mr. Clark Violates Federal Supremacy and Separation of Powers.

Even if Section 530B were to be read to give the DCCA authority to discipline lawyers at the United States Justice Department, the application of those authorities in the case against Mr. Clark is unconstitutional because it violates the supremacy of the national government over that of D.C. and because it violates the separation of powers.

#### 1. Supremacy

The Supremacy Clause has been enforced time and again by the Supreme Court:

> [N]o principle of [state power] … can be admissible, which would defeat the legitimate operations of a supreme government. It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.

*McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 427 (1819). "[T]here is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control." *Id.* at 431.

"The government of the United States, within the scope of its powers, is supreme, and cannot be interfered with or impeded in their exercise." *City of Detroit v. The Murray Corp.*, 335 U.S. 489, 497 (1958). A State cannot "limit the extent to which federal authority can be exercised." *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 395 (1971). "[T]he activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). "[T]he powers of the National government could not be exercised with energy and efficiency at all times, if its acts could be interfered with and controlled for any period by officers or tribunals of another sovereignty." *Tarble's Case*, 80 U.S. (13 Wall.) 397, 409 (1872). Of course, we are well aware that the District is not a "State" (which

is why it has not been extended statutory power to regulate DOJ lawyers in the first place), but the District must take the bitter with the sweet: If the District is a "State" for purposes of Section 530B, then it must be a "State" for purposes of Supremacy Clause/preemption analysis. And, in any event, no Defendant can dispute that the District is a municipality that is subordinate to the overarching federal government. The Seat of Government and the enclave it represents is a locale for the federal power split across the three branches in Articles I, II, and III; the District is not the master of any or all of those Branches.

*Tennessee v. Davis*, 100 U.S. 257 (1880), held the federal government "can act only through its officers and agents, and they must act within the states," and that if they are subject to state prosecution for conduct within their federal authority, "the operations of the general government may at any time be arrested at the will of one of its members." *Id*. at 262-63. *See also McClung v. Silliman*, 19 U.S. (6 Wheat.) 598, 605 (1821) (state court cannot issue a writ of mandamus to a federal officer because his "conduct can only be controlled by the power that created him"); *Ohio v. Thomas*, 173 U.S. 276, 284 (1899) (prohibiting state criminal prosecution of a federal officer for violating food regulations because "in the performance of that duty he was not subject to the direction or control of the legislature of Ohio"); *Johnson v. Maryland*, 254 U.S. 51, 57 (1920) ("immunity of the instruments of the United States from state control in the performance of their duties" prohibits prosecution of a post officer for violating a state license law).

Principles of federal supremacy necessarily apply with even greater force to enforcement actions by the District of Columbia that impinge on federal authority due to the inherently subordinate nature of the D.C. government under the Seat of Government Clause. There is no issue of federalism as with a State. D.C.'s existence and powers are entirely at the will of the national

government and it is thus structurally impermissible for D.C. to control or directly regulate or impede the operations of the national government. U.S. Const., art. I, § 8, cl. 17.

That Mr. Clark was acting within his federal authority such that no inferior sovereign can punish him for doing so is conclusively resolved in his favor by *Trump v. United States*, which held that ***the precise deliberations at issue in his case*** were squarely within the President's "conclusive and preclusive" authority under the Take Care Clause. 603 U.S. 593, 620-21 (2024).

The case against Mr. Clark by its nature intrudes into the President's constitutionally privileged Article II authorities. Mr. Clark was communicating directly with the President on a matter definitively within the President's "conclusive and preclusive" authority. The trial of the case involved detailed testimony from participants in an Oval Office meeting and in Justice Department leadership floor meetings concerning the President's exercise of those powers. The DCCA and its disciplinary adjuncts have no authority to intrude upon, supervise, or second-guess the confidential internal deliberations of the President over whether and how to carry out his core Article II authorities. "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id*. at 609. The relevant Presidential action in question is consulting with Mr. Clark. No state or local government can exercise the power claimed here by D.C. to regulate the advice given to the President within that zone of "conclusive and preclusive" authority.

### 2. Separation of Powers

The case against Mr. Clark also violates the separation of powers because the DCCA is an Article I court, and an Article I body cannot interfere in the President's exercise of his core "conclusive and preclusive" Article II authorities.

It was up to the President, not Hamilton P. Fox, III, Hearing Committee No. 12 (including one lay member), the BPR (including two lay members), or the DCCA, to decide on the propriety

of Mr. Clark's advice and recommendations—or that of the other legal advisors who opposed Mr. Clark's advice—on whether and to what extent the President should exercise his core Article II authorities. The President made the final decision and that constitutionally is the end of the matter.

The BPR's analysis of Mr. Clark's separation of powers arguments was superficial and erroneous, such a defect in the proceedings as to warrant granting the relief sought here by the United States. The Report limited its analysis to a shallow and flawed distinction of a Texas disciplinary case, *Webster v. Commission for Law. Discipline,* 704 S.W.3d 478 (Tex. 2024) that was decided in favor of Webster on Texas separation of powers grounds. In *Webster*, the Texas Bar attempted to discipline the Texas First Assistant Attorney General for allegedly false statements in the complaint in *Texas v. Pennsylvania,* 141 S. Ct. 1230 (2020), another election-related bar discipline case. The BPR distinguished *Webster* "because this case does not involve an alleged false statement in a court filing. Instead, it involves an attempt to make a false statement on behalf of the Justice Department." Dkt. No. 23-5, Report at 42. This distinction cuts in favor of the separation of powers argument, not against it. Here, the alleged false statements were not in a court filing but in confidential internal deliberations about a draft letter that was never sent and would have been true if it had been approved and sent. It is the ***logic*** of *Webster* that applies here: "[A] free-ranging power to second-guess the attorney general's and his first assistant's exercise of discretion in making initial filings that is wholly divorced from and collateral to the litigation in which those filings are made" would "create[] unauthorized friction between the judicial and executive departments" and "violate the separation-of-powers doctrine." *Webster*, 704 S.W.3d at 496.

The Texas Supreme Court cautioned that the charges were too vague and "constitute as direct an impingement on the presumptions each branch owes to the others as one can imagine."

*Id*. at 501. A narrow reading of disciplinary authority was therefore "necessary to avoid undue constitutional friction," *i.e.*, to avoid constitutional preemption. *Id*. "[T]he commission's unbounded construction of Rule 8.04(a)(3) forcefully pits the judicial department against the executive." *Id*.

Having an Article I institution in a politically monolithic entity like the District[9] purporting to discipline Article II federal attorneys who work under Republican Presidents immediately implicates significant separation of powers and Supremacy Clause concerns. A notable Fourth Circuit opinion from Judge J. Harvie Wilkinson recognized the mischief that would ensue if bar disciplinary processes were to be hijacked as a tool of political reprisal in terms that are instructive here:

> Regulation of the legal profession admittedly implicates significant state interests, but the federal interest in protecting federal officials in the performance of their federal duties is paramount. Many federal officials may be subject to potentially abusive state process. *See Mesa* [*v. California*], 489 U.S. [121] at ----, 109 S. Ct. at 970 (Brennan, J., concurring) (state and local resistance to acts of Congress and decisions of the Supreme Court in the areas of school desegregation and voting rights is "not so distant that we should be oblivious to the possibility of harassment" of federal officers by state and local officials). Although we intimate no view as to the underlying merits of the present action, ***state professional disciplinary proceedings could be used to interfere with the duties of federal officials***, including the President of the United States, the Secretary of State, and the Attorney General of the United States, all of whom may be lawyers. Federal prosecutors too may be targets of retaliatory state proceedings and the existence of the various forms of immunity available to federal officials raises at least a colorable issue as to whether they also are immune from state professional disciplinary actions.

*Kolibash v. Committee on Legal Ethics of W. Va. Bar*, 872 F.2d 571, 575 (1989) (Wilkinson, J.) (emphasis added and cleaned up) (approving federal officer removal of a bar discipline case).

---

[9] The average vote percentage of the District for Democratic Presidential candidates from 1964-2024 is 85.64%. In the last five Presidential elections the average rises to a remarkable 91.33%. *See* https://tinyurl.com/bd23rp38 (last visited Aug. 23, 2026).

As for the argument that this Court should abstain and let the disciplinary process play out, it should be borne in mind that the BPR rejected these core structural constitutional principles with no more than the truism that lawyers cannot lie. It is perversely illogical to call what Mr. Clark did "attempted dishonesty," as the letter would only ever have been sent, if it had been made true either because Mr. Clark had successfully persuaded other DOJ leaders to join it or if the President had decided it should be sent, which did not occur. The forbidden meddling and interference with the President's discharge of his duties and the chilling effect on other Executive Branch attorneys caused by the case against Mr. Clark cannot be evaded by rote incantation of inapplicable truisms. The Constitution requires a more serious analysis. The DCCA and its disciplinary organs do not have authority in this sphere, as *Trump v. United States* makes clear. S*ee* U.S. Const. art. II § 1, cl. 8 (Take Care Clause); art. II § 2, cl. 1 (Opinion Clause); art. II § 2, cl. 2 (Appointments Clause). Additionally, the United States' preemption suit is clearly ripe and clearly designed to achieve structural relief and precedent that will establish that the unconstitutional predations of the D.C. disciplinary process be refuted once and for all. There is no reason to delay the provision of such relief to the Executive Branch in the interests of ending the scourge of Barfare and its intrusions on the proper functioning of the federal government.

## CONCLUSION

The consolidated motion to dismiss should be denied.

Respectfully submitted this 23rd day of August, 2026.

*/s/ Charles Burnham*
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1634 I Street, NW
Suite 575
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
6 Concourse Parkway, Suite 2400
Atlanta, Georgia 30328
(404) 843-1956
hmacdougald@ccedlaw.com
*Pro Hac Vice applications forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of the foregoing document on all counsel of record by filing it in the Court's ECF system which causes a copy to be sent to all counsel of record.

This 23rd day of August, 2026.

*/s/ Charles Burnham*
Charles Burnham
DC Bar No. 1003464

Burnham and Gorokhov, PLLC
1634 I Street, NW
Suite 575
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com