**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br>*Plaintiff*,<br><br>v.<br><br>**HAMILTON P. FOX III, et al.**,<br>*Defendants*. | Case No. 1:26-cv-1658-RJL |

**PROPOSED BRIEF OF AMICUS CURIAE ARTICLE III PROJECT**

Christopher O. Murray
First & Fourteenth PLLC
88 Inverness Circle East, L-107
Englewood, CO 80112
(719) 428-4937
chris@first-fourteenth.com

Michael L. Francisco
James Compton
First & Fourteenth PLLC
800 Connecticut Ave. NW, Suite 300
Washington, DC 20006
(202) 998-1978
michael@first-fourteenth.com
james@first-fourteenth.com

*Counsel For Amicus Curiae Article III Project*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

IDENTITY AND INTEREST OF AMICUS ..... 1

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. The Supremacy Clause Has Protected Federal Officers From State and Local Interference Since the Founding. ..... 3

II. The Disciplinary Proceedings in This Case Run Afoul of the Supremacy Clause. ..... 7

A. Supremacy Clause Immunity's Central Purpose Is to Shield Federal Operations from State Obstruction. ..... 7

B. Weaponized Disciplinary Proceedings Run Afoul of the Supremacy Clause. ..... 8

III. The Threat of Disbarment for Internal Advocacy Will Chill the Deliberative Process Throughout the Federal Government. ..... 11

# TABLE OF AUTHORITIES

Page(s)

Cases

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 10

*Barr v. Matteo*,
360 U.S. 564 (1959) .......... 7

*Baucom v. Martin*,
677 F.2d 1346 (11th Cir. 1982) .......... 7

*Butz v. Economou*,
438 U.S. 478 (1978) .......... 7

*Clifton v. Cox*,
549 F.2d 722 (9th Cir. 1977) .......... 6, 7

*Cunningham v. Neagle*,
135 U.S. 1 (1890) .......... 3, 4, 5, 7, 8, 11

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) .......... 8

*Hancock v. Train*,
426 U.S. 167 (1976) .......... 4

*Johnson v. Maryland*,
254 U.S. 51 (1920) .......... 4, 10

*Kentucky v. Long*,
837 F.2d 727 (6th Cir. 1988) .......... 5, 7

*Martin v. Hunter's Lessee*,
14 U.S. (1 Wheat.) 304 (1816) .......... 3

*Maryland v. Soper*,
270 U.S. 9 (1926) ........ 14

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ........ 3, 8

*Mitchell v. Clark*,110 U.S. 633 (1884) ........ 14

*New York v. Tanella*,
374 F.3d 141 (2d Cir. 2004) ........ 7, 8

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ........ 9, 12, 13

*Ohio v. Thomas*,
173 U.S. 276 (1899) ........ 6, 11

*Tennessee v. Davis*,
100 U.S. 257 (1879) ........ 14

*Texas v. Kleinert*,
855 F.3d 305 (5th Cir. 2017) ........ 7

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
592 U.S. 261 (2021) ........ 13

*United States ex rel. Drury v. Lewis*,
200 U.S. 1 (1906) ........ 6

*United States v. Nixon*,
418 U.S. 683 (1974) ........ 9

*United States v. Washington*,
596 U.S. 832 (2022) ........ 4

*Willingham v. Morgan*,
395 U.S. 402 (1969) ........ 11, 14

*Wyoming v. Livingston*,
443 F.3d 1211 (10th Cir. 2006) ........ 7, 10

Statutes

28 U.S.C. § 1442(a)(1) ........ 11

U.S. Const. art. II, § 3 .......... 9

U.S. Const. art. VI, cl. 2 .......... 3

Other Authorities

The Federalist No. 28, at 179 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) .......... 3

The Federalist No. 51, at 351 (James Madison) .......... 3

*What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*,
112 Yale L.J. 2195 (2003) .......... 13

## CORPORATE DISCLOSURE

Amicus Article III Project is a nonprofit corporation with no parent company. No person or entity owns more than 10% of Article III Project.

## IDENTITY AND INTEREST OF AMICUS[1]

The Article III Project ("A3P") is a nonprofit organization focused on advocating for constitutionalist judicial reform and fighting against the politicization and weaponization of the justice system. Since it was founded in 2019, A3P has been a leader in defending the separation of powers and the Constitution while at the same time opposing lawfare and efforts to undermine the prerogatives of the Executive Branch.

Amicus curiae has an interest in this case because it concerns a clear weaponization of state bar ethics rules against the President of the United States and an affront to the rule of law. Amicus curiae files this brief to explain how existing Supreme Court Supremacy Clause precedent applies to this case.

## INTRODUCTION

There may come a day when this Court is called upon to carefully parse the Supremacy Clause and the McDade Amendment to identify the precise boundaries of permissible state ethics regulation of federal attorneys. This is not that day. Defendants have reached so far beyond the boundaries of good-faith ethics regulation and permissible state action as to make the Court's job easy. The Defendants are not seeking, or even claiming, to regulate litigation conduct, duties to the tribunal, or any

[1] No party's counsel authored this brief in whole or in part, and no person or entity other than amici curiae, their counsel, or their members made a monetary contribution intended to fund the brief's preparation or submission.

conduct external to the federal government. Rather, Defendants are trying to reach a matter totally internal to the government—pre-decisional drafting that never touched a state proceeding. Thus, the defendants are using ethics proceedings as a weapon to punish the bar's political opponents in the federal government.

The weaponized disciplinary proceedings in this case impose personal sanctions—potentially including revocation of the professional license necessary to perform one's federal duties—based on conduct undertaken in a federal officer's official capacity. They compel federal attorneys to defend their pre-decisional work product before a state or quasi-state tribunal. They are nakedly political attempts to gum up the works of the federal government because the DC bar doesn't like the President, his policies, or his decisional process.

This is not the first time state authorities have tried to interfere with federal operations. The Constitution provides safeguards against precisely what Defendants have attempted. The Supreme Court has consistently held that state entities may not interfere with the operation of the federal government via enforcement actions against federal officials. Those opinions have historically concerned criminal prosecutions, but the reasoning and principles underlying the decisions apply with equal force to these bar disciplinary proceedings. The Court should not permit Defendants to wage political war against federal officials by using state bar disciplinary proceedings to impair federal decisional processes in violation of the Supremacy Clause.

## ARGUMENT

### I. The Supremacy Clause Has Protected Federal Officers From State and Local Interference Since the Founding.

The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. From the Republic's earliest days, this Clause has been understood to protect the Federal Government—and the officers through whom it necessarily acts—from interference by state authorities. Historically, this doctrine meant that federal officers enjoyed immunity from state prosecution for acts within their duties. The same principles apply here. State bar disciplinary actions against federal attorneys for actions within their federal duties implicate the same constitutional interests as state prosecutions.

The protection is structural. The Founders recognized that a national government unable to protect its officers from state retaliation could not endure as a functioning sovereign. *See* The Federalist No. 28, at 179 (Alexander Hamilton) (Jacob E. Cooke ed., 1961); The Federalist No. 51, at 351 (James Madison). As the Supreme Court later explained, the Federal Government "must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers." *Cunningham v. Neagle*, 135 U.S. 1, 61 (1890) (quoting *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 363 (1816)). It follows that "the states have no power … to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). While the

police power is generally reserved to the States, it may not be directed against the Federal Government to "obstruct its authorized officers against its will, or withhold from it for a moment the cognizance of any subject which that instrument has committed to it." *Neagle*, 135 U.S. at 62.

These principles prohibit States—and, by analogy, the District of Columbia—"from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022). The Constitution bars state and local action that either directly regulates or discriminates against the Federal Government and its instrumentalities. *Id.* at 838–39. For example, in *Johnson v. Maryland*, 254 U.S. 51, 57 (1920), the Court held that a State could not require a federal mail carrier to obtain a state driver's license, recognizing the "immunity of the instruments of the United States from state control in the performance of their duties" and emphasizing that such a requirement "lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient." *See also Hancock v. Train*, 426 U.S. 167, 178–80 (1976).

As an immunity from state judicial proceedings for individual federal officers, the doctrine dates back to *Cunningham v. Neagle*, 135 U.S. 1 (1890). In that case, Deputy United States Marshal David Neagle was charged with murder in California after fatally shooting David S. Terry while protecting Supreme Court Justice Stephen J. Field. Field and Neagle were on a train from Fresno, California when a former litigant, David Terry, began assaulting Field. Neagle killed Terry and was

subsequently arrested and charged with murder by the State of California. Neagle sought habeas relief, arguing that California could not charge him for carrying out his duty under federal law.

The Supreme Court agreed with Neagle, even though "there exist[ed] no statute authorizing any such protection as that which Neagle was instructed to give Judge Field." *Id.* at 58. The Court construed federal law "to extend in a liberal manner … to persons imprisoned for the performance of their duty," regardless of whether Congress had expressly authorized the particular task undertaken by Neagle. *Id.* The Court concluded that Neagle was carrying out his duties "to protect the life of" Justice Field, who was "engaged in the discharge of his duties as circuit justice of the ninth circuit." *Id.* at 57–58. This was the case even though Justice Field was on a train some three thousand miles from Washington—Neagle's immunity attached because he was performing duties broadly within his federal function, not because he was within any express authorization or jurisdiction. *Id.* at 56–58.

The Court summarized the operative protection in language that has guided the doctrine ever since:

> [I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the state of California.

*Id.* at 75. Supremacy Clause immunity is thus immunity from the proceeding itself, not merely a defense to be litigated at trial. The officer need not "run the gauntlet of standing trial" where he is immune from conviction in the first place. *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988).

Though the Supreme Court has not had occasion to frequently address Supremacy Clause immunity since *Neagle*, it has reaffirmed the principle several times. The Supreme Court has repeatedly confirmed that federal officers enjoy broad immunity from state interference when acting within the scope of their official responsibilities. In *Ohio v. Thomas*, 173 U.S. 276, 283–84 (1899), for example, the Court held that Ohio could not prosecute a federal official for serving margarine in a veterans' home in violation of state labeling laws, because the official acted pursuant to a congressional appropriation and was therefore "not subject to" Ohio's law. The state court, the Court held, simply "had no jurisdiction to try the appellee for the offense charged." *Id.* at 284.

The Courts of Appeals have uniformly followed *Neagle* and adopted a broad understanding of Supremacy Clause immunity. Beginning with *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977), six circuits have recognized that federal officers enjoy immunity from prosecution when acting within their general role and authority, regardless of whether federal law expressly authorized any particular act. *See New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004); *Texas v. Kleinert*, 855 F.3d 305, 313 (5th Cir. 2017); *Long*, 837 F.2d at 734; *Clifton*, 549 F.2d at 728; *Wyoming v. Livingston*, 443 F.3d 1211, 1217 (10th Cir. 2006); *Baucom v. Martin*, 677 F.2d 1346, 1348 (11th Cir. 1982). They uniformly hold that "[t]he question is not whether federal law expressly authorizes violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties." *Livingston*, 443 F.3d at 1227–28.

Importantly, this principle extends beyond law enforcement to all federal officials acting within the scope of their duties. *See Butz v. Economou*, 438 U.S. 478, 489 (1978) (immunity of federal officials "began as a means of protecting [them] in the execution of their federal statutory duties from criminal or civil actions based on state law"); *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (plurality opinion) (protecting official acts within "the outer perimeter of [the official's] line of duty"); *see also Student Loan Servicing Alliance v. Taylor*, 1:18-cv-00640-PLF (D.D.C. Nov. 21, 2018) (holding D.C. law requiring local licensure of federal student loan servicers preempted because of "the threat of District of Columbia officials' second-guessing the federal government's" decisions regarding who services its debt.). The consistent history—from the Founding through the modern doctrine—establishes that federal officers are protected from state interference for actions taken in furtherance of their official responsibilities.

## II. The Disciplinary Proceedings in This Case Run Afoul of the Supremacy Clause.

### A. Supremacy Clause Immunity's Central Purpose Is to Shield Federal Operations from State Obstruction.

The immunity established in *Neagle* and carried forward by federal courts for more than 100 years exists to serve a single purpose: ensuring that the States cannot "retard, impede, burden, or in any manner control" the execution of federal law. *McCulloch*, 17 U.S. at 436. The Federal Government acts only through its officers. The immunity thus safeguards not merely the individual officer but the sovereign capacity of the United States to execute its constitutional responsibilities. It "protect[s] federal operations from the chilling effect of state prosecution," *Tanella*,

374 F.3d at 147, and prevents the States from "dictat[ing] the manner in which [a] federal function is carried out," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 n.3 (1988).

While many Supremacy Clause immunity cases concern criminal prosecutions, that procedural setting does not limit the doctrine. The constitutional question is a functional one: whether state or local authority is being wielded to burden or control the performance of a federal function. Here, a disciplinary investigation can compel disclosure of internal deliberations, require an attorney to defend official work before a local tribunal, and expose that attorney to a recommendation of suspension or disbarment. In this way, a disciplinary proceeding impairs federal functions just as seriously as a criminal prosecution. The threat of disbarment and national opprobrium are tools very much akin to criminal sanction in their practical effect on the smooth execution of government operations. For that reason, disciplinary proceedings like the one at issue here implicate the Supremacy Clause principles of *Neagle* and its progeny.

**B. Weaponized Disciplinary Proceedings Run Afoul of the Supremacy Clause.**

Supremacy Clause immunity exists to prevent state proceedings from chilling federal officers in the performance of their duties and that purpose is implicated with singular force when a bar authority seeks to disbar a Department of Justice attorney for internal executive deliberations—the very core of the attorney's federal function. The Federal Government cannot carry out the President's Article II duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, if the officers

charged with advising the President and the Attorney General must fear personal sanctions for proposing courses of action that state bar disciplinary authorities later decide they disagree with.

The Supreme Court has repeatedly recognized the importance of unimpeded executive deliberation. "[A] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974). Effective governmental decision-making depends on "frank discussion of legal or policy matters" within the Executive Branch. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975). Subjecting such internal deliberations to external disciplinary sanction threatens to truncate the decision-making process at every level of the Department of Justice.

The logic of *Neagle* and other Supremacy Clause cases is purposive: what matters is not the label affixed to the proceeding, but whether it threatens to impede, burden, or control the performance of federal duties. That's why *Neagle*'s threshold inquiry is "whether the federal official's conduct was reasonably necessary for the performance of his duties," *Livingston*, 443 F.3d at 1227–28. The fundamental question is whether the state action in question interferes with federal governance.

There can be no serious dispute that the conduct investigated by the bar authority at issue here—the preparation of a deliberative draft letter by an Assistant Attorney General, circulated internally for consideration by senior leadership—falls squarely within the scope of official duties. Preparing draft legal documents and

advocating for proposed courses of action is the core of what Department of Justice attorneys do. Unlike cases at the doctrine's outer limits, such as where an off-duty agent acts from personal motives, on a frolic or detour, this case focuses on conduct undertaken exclusively in the course of official federal responsibilities.

Defendants' exercise of disciplinary authority over that conduct is a direct attempt to regulate the manner in which federal attorneys discharge their internal responsibilities—to impose "qualifications in addition to those that the Government has pronounced sufficient" for a federal function. *Johnson*, 254 U.S. at 57. By threatening disbarment for the contents of an internal memorandum, Defendants assert the power to control which positions may be proposed, which alternatives explored, and which documents drafted within the Department. That is precisely what the Supremacy Clause forbids. The States cannot use bar regulation to sidestep an express prohibition to control "the [enforcement of laws] is entrusted to the discretion of the Federal Government." *Arizona v. United States*, 567 U.S. 387, 409 (2012).

States' ability to regulate the practice of law is not a relevant consideration here. Whatever authority states may possess to regulate conduct by federal attorneys, they certainly cannot reach the internal operations of a federal agency and implicate a pre-decisional document that did not result in any external action whatsoever. While Supremacy Clause immunity may not protect federal attorneys from every possible disciplinary proceeding, it certainly protects them from the one at issue here.

In important respects, what happened here may be more pernicious than a criminal prosecution. A prosecution at least triggers the protections of federal officer removal under 28 U.S.C. § 1442(a)(1), allowing the officer to invoke a federal forum for his federal defense. Disciplinary proceedings are typically not removable, leaving the federal officer without access to the neutral forum that Congress has provided. The Federal Officer Removal Statute exists precisely because Congress understood that federal officers cannot be forced to litigate immunity defenses in "hostile state courts." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). Bar proceedings circumvent that protective mechanism while imposing consequences equally devastating to federal operations. Bar proceedings carry comparable stigma and consequence; they can equally distort the candid exercise of official discretion. The Supreme Court has consistently treated Supremacy Clause immunity as immunity from the proceeding itself—not merely from liability. *See Neagle*, 135 U.S. at 75 ("There is no occasion for any further trial in the state court"); *Thomas*, 173 U.S. at 284 (the state court "had no jurisdiction to try the appellee"). The same logic requires that federal officers be spared quasi-judicial bar proceedings that impose devastating professional consequences while lacking even the procedural safeguards of a criminal prosecution.

## III. The Threat of Disbarment for Internal Advocacy Will Chill the Deliberative Process Throughout the Federal Government.

If bar authorities may discipline federal government attorneys for proposing courses of action that senior leadership reject, the consequence is clear: attorneys at every level will hesitate before offering candid advice—particularly on controversial subjects where political opponents might exploit the disciplinary process. That is

precisely the kind of state interference with federal government functions that Supremacy Clause immunity is intended to prevent. Even beyond the constitutional implications, this case presents a concerning practical reality: Permitting the disciplinary actions here will result in the chilling of decisional communications across the government and politically incentivize weaponization of bar discipline.

Government attorneys who know that their internal work product can draw disciplinary proceedings from the bar "may well temper candor … to the detriment of the decision-making process." *Sears*, 421 U.S. at 150–51. The chilling effect extends far beyond a single Assistant Attorney General. If discipline is permissible for internal advocacy, then every federal attorney who participates in a contentious deliberation must reckon with the chance opponents of federal policy will exploit bar licensure to impose personal costs on them for doing their jobs.

The protection of rejected proposals is essential to sound decision-making. A robust deliberative process necessarily means that "some ideas are discarded or simply languish." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). "[S]ometimes a proposal dies on the vine." *Id.* The consideration and rejection of alternative courses of action improves the quality of the ultimate decision. Disciplinary authorities who impose sanctions for proposals that were rejected—rather than adopted—truncate this vital process and make the resulting federal decisions "the poorer as a result." *Sears*, 421 U.S. at 150.

The Supremacy Clause exists to ensure that federal officers answer to the Federal Government and to federal standards—not to fifty different state disciplinary

regimes. The immunity is supposed to guarantee that officers do not have "to acquaint themselves with up to fifty potentially different normative regimes, depending on where in the country they are deployed." Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 Yale L.J. 2195, 2224 (2003). Federal attorneys practice across multiple jurisdictions. If bar authorities in each jurisdiction may discipline federal attorneys whenever those authorities disagree with internal federal deliberations, the government's capacity to function is fundamentally compromised.

Worse, Defendants' approach would transform bar discipline into a vehicle for political retribution. As much as Defendants try to prop up a veneer of neutrality, every observer knows why these proceedings were instituted: Defendants don't approve of Clark's politics or the President he serves. The disciplinary proceeding is an attempt to punish a federal attorney for doing his job. Allowing such a transparently political attack on a federal officer sets a dangerous precedent.

History confirms that danger. The Federal Officer Removal Statute was first enacted in 1833 during the Nullification Crisis, when federal customs officials faced state prosecution for enforcing unpopular tariff laws. *See Tennessee v. Davis*, 100 U.S. 257, 268 (1879). Congress has expanded the statute's scope repeatedly—to protect Union officers during Reconstruction, Prohibition enforcers during the Volstead era, and federal officials who enforce controversial national policies. *See Mitchell v. Clark*, 110 U.S. 633, 639–40 (1884); *Maryland v. Soper*, 270 U.S. 9, 31–32 (1926); *Willingham*, 395 U.S. at 405. When the political winds blow against federal policy,

state and local authorities have historically attempted to use their power to retaliate against federal officers.

Disciplinary proceedings present this risk in an especially acute form because they are not subject to federal officer removal. If Defendants' theory prevails, political opponents of any administration could file bar complaints against Department of Justice attorneys who take controversial positions. The result would be a federal government staffed by attorneys unwilling to take any position—even internally—that might later be characterized as aggressive or politically unpopular. That is precisely the outcome the Supremacy Clause was designed to prevent.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

Dated: August 24, 2026

/s/ *Christopher O. Murray*
Christopher O. Murray
First & Fourteenth PLLC
88 Inverness Circle East, L-107
Englewood, CO 80112
(719) 428-4937
chris@first-fourteenth.com

Michael L. Francisco
James Compton
First & Fourteenth PLLC
800 Connecticut Ave. NW, Suite 300
Washington, DC 20006
(202) 998-1978
michael@first-fourteenth.com
james@first-fourteenth.com

*Counsel for Amicus Curiae Article III Project*